# EXHIBIT 1

```
 1               UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3
        SUSANNE ATANUS,                    )
 4                                         )
                      Plaintiff,           )
 5                                         )
                 vs.                       )
 6                                         )   No.   06-1078(JDB)
        MICHAEL O. LEAVITT,                )
 7      Secretary, U.S.                    )
        DEPARTMENT OF HEALTH AND           )
 8      HUMAN SERVICES,                    )
                                           )
 9                    Defendant.           )

10           The deposition of SUSANNE ATANUS, called

11      by the Defendant, for examination, taken pursuant

12      to notice, taken before CARYL L. HARDY, RPR, a

13      notary public within and for the County of Cook and

14      State of Illinois, at 219 South Dearborn Street,

15      Suite 500, Chicago, Illinois, on the 24th day of

16      June, A.D., 2008, commencing at 9:42 a.m.

17

18

19

20

21

22

23

24
```

1828e225-cd91-449e-9825-ee8b50f8c6a6

1  A P P E A R A N C E S :
2
      BARRY A. GOMBERG & ASSOCIATES, LTD.,
3     53 West Jackson Boulevard
      Suite 1350
4     Chicago, Illinois  60604
      (312) 922-0550
5     BY: MR. BARRY A. GOMBERG,
6        Appeared on behalf of the Plaintiff;
7
8     UNITED STATES DEPARTMENT OF JUSTICE,
      555 4th Street N.W.
9     Washington, D.C.  20530
      (202) 514-7198
10    BY: MS. ROBIN M. MERIWEATHER,
11            and
12    UNITED STATES DEPARTMENT OF HEALTH
      AND HUMAN SERVICES
13    330 Independence Avenue S.W.
      Washington, D.C.  20201
14    (202) 401-7446
      BY: MS. ALEXANDRA MEIGHAN
15
      Appeared on behalf of the Defendant.
16
17
18
19
20
21
22
23
24

*Page 2*

      I N D E X
1
2
   EXAMINATION OF SUSANNE ATANUS       PAGE
3
   By Ms. Meriweather........................ 4
4
5
6
   EXHIBITS MARKED
7
   Atanus Deposition Exhibit No. 1.............87
8
9  Atanus Deposition Exhibit No. 2.............87
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

*Page 3*

1           (The witness was duly sworn.)
2           MS. MERIWEATHER:  Good morning,
3  Ms. Atanus.  Could you please cover up the notes
4  that you have exposed, because we're about to
5  commence testimony and you can't be referring to
6  documents during your testimony unless I introduce
7  them as exhibits?  And you don't have to completely
8  collapse them.
9           And also that notepad that you have
10  writing on, if you could either turn to a clean
11  page or put something on top of it, thank you.
12          (Brief pause.)
13          Ms. Atanus, you cannot consult with
14  counsel during your testimony.
15          MR. GOMBERG:  Yes.  Comply with what
16  Ms. Meriweather asked you to do.
17          MS. MERIWEATHER:  Thank you.
18          SUSANNE ATANUS,
19  called as a witness herein, having been first duly
20  sworn, was examined upon oral interrogatories, and
21  testified as follows:
22          DIRECT EXAMINATION
23  BY MS. MERIWEATHER:
24      Q.  My name is Robin Meriweather.  I'm an

*Page 4*

1  Assistant United States Attorney, and I represent
2  the Defendant in this case.  I will be taking your
3  testimony.  We have a court reporter here to your
4  right who will be recording everything on a
5  transcript.
6           Have you ever been deposed before?
7      A.  Yes.
8      Q.  Okay.  How many times?
9      A.  Twice.
10     Q.  Okay.  Well, as you may know from your
11  prior depositions, I will be asking you questions.
12  Because, as I noted, there's a court reporter who
13  will be recording this, it's important that we
14  follow some procedures that we might not follow in
15  regular conversation that wasn't being recorded.
16          For example, if the answer to something is
17  yes or no, you need to say yes or no as opposed to
18  nodding your head or saying uh-huh or something
19  like that because a nod or something other than a
20  yes or no wouldn't be properly recorded on the
21  transcript.
22          Also, it's important that we both speak up
23  and speak clearly so that the court reporter can
24  understand our answers.

*Page 5*

1    Are you able to do that today?
2    A.  Yes.
3    Q.  Also, we can't both talk at the same time.
4  Again, that's just something that goes along with
5  having the court reporter being able to capture
6  what it is that we're saying, so if you could wait
7  for me to finish my questions...
8    And likewise, I'll wait for you to finish
9  your answers.  And if I start and I inadvertently
10 start before you're done with your answer, just let
11 me know, and I'll let you continue.
12    If I ask you a question that you don't
13 understand, will you tell me that?
14    A.  Yes.
15    Q.  Okay.  And likewise, if I ask you a
16 question that you have trouble hearing, could you
17 tell me that as well?
18    A.  Yes.
19    Q.  Great.
20    And if you need a break to go to the
21 restroom, get a drink of water, something like
22 that, just please let me know.  If you're in the
23 middle of a question, I'll ask you to finish your
24 answer before we take the break, but we can
Page 6

1  certainly accommodate that type of request.
2    Are you taking any medication today that
3  would affect your ability to hear, understand, or
4  respond to my questions?
5    A.  No.
6    Q.  Do you have any alcohol or other
7  substances in your system that would affect your
8  ability to hear, understand, or respond to my
9  questions?
10    A.  No.
11    Q.  Is there any other issue, other than
12 medication or substances, that would make it
13 difficult for you to hear, understand, or answer my
14 questions today?
15    A.  No.
16    Q.  Okay.  Could you please state your full
17 name for the record?
18    A.  Susanne, S-u-s-a-n-n-e, Atanus,
19 A-t-a-n-u-s.
20    Q.  And what is your race and sex?
21    A.  White Caucasian, female.
22    Q.  And what is your national origin?
23    A.  Assyrian, A-s-s-y-r-i-a-n, second
24 generation.
Page 7

1    Q.  And Assyrian, that would be from what
2  country?
3    A.  Persia which is in Iran.  And I'm also a
4  little bit Armenian, a very small part.  I'm
5  primarily Assyrian.
6    Q.  And you said second generation?
7    A.  Second generation, yes.
8    Q.  So does that mean your parents are from
9  Iran or your grandparents?
10    A.  All four grandparents:  My grandmother and
11 grandfather on my mother's side and my grandmother
12 and my grandfather on my father's side.
13    Q.  Thank you.
14    A.  My two parents, mother and father, were
15 born in Chicago, Illinois.
16    Q.  And what is your religion?
17    A.  Christian Catholic.
18    Q.  And was Christian Catholic your religion
19 in 2004?
20    A.  I was Assyrian Orthodox only because I was
21 attending an Assyrian Orthodox church primarily all
22 my life, but I have attended -- I have attended
23 American churches as well.  And our Assyrian
24 Orthodox church merged.  Exactly when it merged
Page 8

1  with the Holy Apostolic Catholic Assyrian Church of
2  the East, it might have been before then, but then
3  I started attending that church after the merger.
4  So you're asking me 2004 was I -- I've always been
5  Christian Catholic, but can you tell me your
6  question again?
7    Q.  Yes.  The question was Christian
8  Catholic -- were you Christian Catholic in 2004?
9    A.  Well, I've always been Catholic.  I've
10 always been Christian.  When I turned Catholic is
11 when I started attending that church.  So I
12 identify myself as Catholic because I'm going to
13 that church.  When I started going to that church,
14 it probably was before 2004, so in 2004 I was
15 Catholic.
16    Q.  And what is your age or how old are you?
17    A.  I'm 49.
18    Q.  Are you married?
19    A.  No.
20    Q.  Do you have children?
21    A.  No.
22    Q.  Is there anyone who is dependent on your
23 income?
24    A.  No.
Page 9

3 (Pages 6 to 9)
1828e225-cd91-449e-9825-ee8b50f8c6a6

1    Q.   You have a bachelor's degree; is that
2  correct?
3    A.   Yes.
4    Q.   From which school did you obtain that
5  bachelor's degree?
6    A.   Northwestern University, Evanston,
7  Illinois.
8    Q.   And when did you graduate from
9  Northwestern?
10    A.   1981.
11    Q.   Did you have a major or a minor?
12    A.   Yes.  I majored in political science.  My
13  minor was philosophy.
14    Q.   And after you graduated from Northwestern,
15  did you attend graduate school?
16    A.   Yes.
17    Q.   Where did you attend graduate school?
18    A.   University of Illinois at Chicago.
19    Q.   And did you obtain a master's degree from
20  University of Illinois at Chicago?
21    A.   Yes.
22    Q.   What subject area was that degree?
23    A.   Master of public administration, public
24  administration.

Page 10

1    Q.   And did you attend another graduate school
2  after University of Illinois at Chicago?
3    A.   Yes.
4    Q.   Was that DeVry?
5    A.   Yes.
6    Q.   And what degree did you obtain from DeVry,
7  if any?
8    A.   Well, the name of the school is DeVry
9  University, Keller Graduate School of Management.
10  I obtained a master of business administration MBA
11  with distinction.
12    Q.   And apart from the education we've
13  discussed so far, Northwestern; University of
14  Illinois at Chicago; and DeVry University, Keller
15  School of Management, have you received any other
16  education since completing those three?
17    A.   Yes.
18    Q.   Could you tell me what that is, please?
19    A.   I have obtained a paralegal certificate,
20  grade point average 4.0, from Colorado State
21  University.  And I attended Oakton Community
22  College, and I was taking -- I took six courses --
23  completed six courses in information systems and
24  computer networking.

Page 11

1    Q.   And when did you obtain the paralegal
2  certificate?
3    A.   Let's see.  2007.  In August 2007, but --
4  I completed August 2007.  I obtained my certificate
5  in October of 2007.
6    Q.   And what about the six courses from Oakton
7  Community College; when did you take or complete
8  those?
9    A.   I took them in a year's time, and I
10  completed them in June of '07.
11    Q.   Okay.  I'd like to turn to some of your
12  employment history.
13       From May 2004 until August 2004, were you
14  a teller at Howard Savings Bank in Glencoe,
15  Illinois?
16    A.   Could you repeat the dates?
17    Q.   Yes.  May 2004 through August 2004.
18    A.   And you said what town was it?
19    Q.   Glencoe.
20    A.   The town is wrong.
21    Q.   Okay.
22    A.   The date is right.  It's Glenview,
23  Illinois.
24    Q.   Glenview?

Page 12

1    A.   Glenview, Illinois.
2    Q.   So you were a teller at Howard Savings
3  Bank?
4    A.   Yes.
5    Q.   And what were your job responsibilities as
6  the teller?
7    A.   Customer service; process customer's
8  business transactions, including deposits,
9  withdrawals, checking accounts, checking NOW; and
10  removing the money from their checks as the checks
11  came back to the bank and notifying my supervisor
12  if there were insufficient funds; and, of course,
13  balance at the end of the day and process CDs from
14  the bank counselor, opening them, renewing them,
15  closing them; and opening -- making sure there was
16  $5,000 in my drawer in closing; taking the excess
17  over $5,000 and put it in the vault; put my
18  paperwork where it would be picked up the next day
19  and checked by other employees in the bank.
20    Q.   And so as a bank teller at Howard Savings
21  Bank, none of your duties included reviewing or
22  editing documents that other people had written; is
23  that correct?
24    A.   Well, of course, you review and edit

Page 13

1  documents from the customers.  You see a lot of
2  paperwork.  You see the slips that they give you
3  for deposits, for withdrawals.  You're always
4  editing and reviewing them.  You review everything.
5       You review also your daily summary that
6  the computer generates, and you make sure that
7  that's right.  You're always reviewing and editing
8  everything.  You make sure everything is right.
9  Every transaction, you have to look at it --
10  everything very close.
11     Q.  So the documents that customers give you
12  that you're reviewing are deposit slips?
13     A.  They're all kinds of things.  Also, things
14  I'm reviewing are things from, yes, and also from
15  the counselors.  They'll give you the bankbook.
16  They'll give you the cards that has the customer's
17  identification, their signature, and sometimes I
18  would have to find that.  You always look to make
19  sure their signature is right; it matches their
20  documents that they're presenting to you for that
21  day.  You have to be on top of everything.
22     Q.  And what's a bankbook?
23     A.  A bankbook is the book that will show the
24  customer's balance and the previous transactions.

Page 14

1       And also, you're reviewing and editing
2  information in the computer.  You're reviewing
3  information from microfiche.  You're always making
4  sure everything is filed back correctly.  And if
5  things are not filed correctly, you have to --if
6  you see something that needs to be refiled, you
7  have to refile it.  You're always reviewing,
8  editing everything.
9       Q.  So apart from deposit slips that customers
10  give you, bankbooks, and microfiche, what would you
11  be -- what type of document would you review and/or
12  edit as a bank teller?
13     A.  Okay.  Withdrawal slips, if they're wrong.
14  And there are forms to open up a CD.  You're always
15  reviewing to make sure they have sufficient funds.
16  You're always reviewing to make sure that they can
17  withdraw their money if their -- if their CD has
18  expired.  If not, you have to assess a penalty; if
19  it's early withdrawal from a CD.  So you're always
20  reviewing everything, everything that has to do
21  with the transaction.
22     Q.  And you're reviewing these documents for
23  their -- whether the numbers are accurate and
24  whether the signature is accurate; is that correct?

Page 15

1       A.  Whether it's the proper transaction form,
2  whether it's -- what they're asking for is
3  something the bank does, reviewing to make sure
4  that it's acceptable, that it's the right person's.
5       Also, customers would come in to pay their
6  mortgage.  You have to make sure their loan number
7  on the form is correct.  You have to find their
8  account in the computer system.  You have to, you
9  know, watch to make sure that everything is okay;
10  you know, that their loan is still current; that
11  their mortgage payment is being processed correctly
12  and it's being processed as a transaction in the
13  computer.  You always have to watch and make sure
14  that the transactions are completed; that there
15  wasn't an error message that showed up for any
16  transaction, not just mortgages:  IRAs, Roth IRAs,
17  all kinds of things that the bank does.
18     Q.  So you're reviewing to make sure that the
19  financial information is accurate, that it's the
20  correct type of transaction, and that the
21  signatures are correct; is that a fair summary?
22     A.  Yes, and there are sufficient funds.
23     Q.  And you said that you're reviewing forms.
24  What type of -- what -- could you describe what a

Page 16

1  form would look like?
2       A.  Well -- well, you asked two questions.
3  You said what kind of forms and then describe the
4  forms, what they look like.  Do you want me to
5  answer both your questions?
6       Q.  I can break it up.
7            What types of forms?
8       A.  Mortgage forms, withdrawal forms, deposit
9  form slips.
10     Q.  A mortgage form, what type of information
11  would be requested on that form?
12     A.  Loan number, the amount that they're
13  depositing.  If they're paying additional funds
14  toward their payment of their mortgage, additional
15  funds into their escrow account.  If it's the last
16  payment on their mortgage, they'll let you know
17  it's the last payment.  And if there's a late -- if
18  they're paying a late fee, that would also be on
19  the form.
20          And, of course, where the bank is located
21  and the bank's name is always on the deposit form.
22  The bank's phone number, customer service number
23  might be also on that form if they have any
24  questions.

Page 17

5 (Pages 14 to 17)

1    Q.   And what percentage of your time in an
2  average day or week as a teller was spent reviewing
3  the forms or slips that customers submitted?
4    A.   Sixty percent.
5    Q.   And the other 40 percent of your time was
6  spent doing what?
7    A.   The actual processing in the computer,
8  opening, closing, lunch, breaks.
9    Q.   And how long did you work as a teller at
10 Howard Savings Bank?
11   A.   Three months.
12   Q.   And why did you leave after three months?
13   A.   I was told I -- they're letting me go.
14   Q.   Were you given a reason for why you were
15 being let go?
16   A.   No.
17   Q.   Did you ask anyone why you were let go?
18   A.   No.
19   Q.   Did you have any opinion or belief as to
20 why you thought you were being let go?
21   A.   Yes.
22   Q.   What was that opinion?
23   A.   I know that a counselor, her niece wanted
24 to work in the bank, and she wanted to give her

Page 18

1  niece a job. Also, the bank was merging.
2        Also, I think it had a lot to do with
3  discrimination, too. I was discriminated because
4  of my religion, my national origin. I also was
5  coming back from gallbladder surgery. I had
6  gallbladder surgery in February '04. And I -- I
7  had mentioned to my supervisor that I have to go
8  and get checked because I thought I had a kidney
9  infection. And I -- I really feel the primary
10 reason was because I was a Christian and the
11 counselor was not. And my supervisor and the bank
12 manager also were not Christian.
13       And also, because of my level of
14 education. I think that when they see my level of
15 education, they either are threatened by it because
16 the bank was going through a merger and I had a lot
17 more education than they did. They only had a high
18 school education, although the owner of the bank
19 was a lawyer.
20       But I think they were also threatened by
21 my ability because I always balanced and they
22 wanted to keep their jobs as first level supervisor
23 in the merger. So I think it's a combination of a
24 lot of -- like all the things I mentioned.

Page 19

1        And I was talking about that I didn't have
2  good surgery and I was, you know, talking a lot
3  about it because I was still in pain. I was in
4  pain in nine months after the surgery. I was
5  talking about suing the hospital and the doctors.
6  And I didn't talk a lot about it, but for a bank
7  that wants accounts from doctors, it's not good to
8  talk about you're going to sue them, you know,
9  and/or whatever. Maybe because I was working there
10 and I was going to sue the doctors and the hospital
11 and they want, of course, accounts.
12       And I -- it's a combination of a lot of
13 things, but -- you know, I wasn't making very good
14 money and I wanted to complete my book and play,
15 you know. I already had completed -- I already had
16 completed it, but I wanted to do more. And so I
17 wanted to, you know, work more of my movie, too, so
18 I wanted to publish them, and so I didn't really
19 care. I just would move on to something else.
20   Q.   And you said you were in pain for nine
21 months regarding -- from your gallbladder surgery?
22   A.   Uh-huh, off and on.
23   Q.   And when was that surgery?
24   A.   It was February 24th, '04.

Page 20

1        MS. MERIWEATHER:  One second.
2        (Brief pause.)
3  BY MS. MERIWEATHER:
4    Q.   And so you had the pain from the surgery
5  from -- I guess nine months, that would be through
6  November of 2004?
7    A.   Through November 2005, was it?  No, four,
8  2004.
9    Q.   And is the position, the teller position
10 at Howard Savings Bank, the last position that you
11 held immediately before applying to be a
12 writer/editor at HHS?
13   A.   Yes.
14   Q.   And what was the last job that you held
15 immediately prior to being a teller at the Howard
16 Savings Bank, do you recall?
17   A.   Well, I worked at -- I worked at Kohl's
18 for a short time the Christmas before that.
19   Q.   Was that a temporary position at Kohl's or
20 permanent?
21   A.   Well, it was during the holiday season,
22 and it could turn into a permanent job.
23   Q.   And you worked there for approximately how
24 long at Kohl's?

Page 21

1    A.  Two months.
2    Q.  And after that two months, why did you
3  leave Kohl's?
4    A.  I wasn't given enough hours, so I didn't
5  want to stay there.
6    Q.  And what were your job responsibilities at
7  Kohl's?
8    A.  I furnished customer service, selling
9  jewelry, watches, and processed requests for watch
10 repairs.  And I'd also have to count the jewelry to
11 make sure that the right number of merchandise was
12 still in the glass windows at the end of the day
13 and processed the transactions:  Cash, credit card,
14 checks for the jewelry and other sales.
15   Q.  So you voluntarily left Kohl's?
16   A.  Yes.
17   Q.  And how did you go about doing that?
18   A.  Well, I had another job lined up.  I was
19 starting to sell home security systems, so I just
20 told my supervisor that I, you know -- I'm leaving.
21 I was only getting, like, six hours a week, and so
22 I didn't like that.  I didn't like the supervisor
23 giving me only six hours a week.  And announcements
24 were still going on at Kohl's sign up for

Page 22

1  employment.  So they're hiring more and more people
2  supposedly and giving people who are working there
3  very few hours, so...
4    Q.  And what was the company with the home
5  security systems?
6    A.  I think it was called Home Alert.
7    Q.  And do you recall ever being a business
8  coordinator at IPA?
9    A.  Yes.
10   Q.  What was the nature of that job?  What
11 were your responsibilities?
12   A.  I guess I should have put that job because
13 I worked at 1-04 to 4-04, but the nature of that
14 job was calling businesses and making appointments
15 for the salespeople to visit with them and sign
16 them up for a survey.  And then the analysts would
17 go and tell them to make your business more
18 profitable, you need these services, and then they
19 would hopefully agree to them.
20   But I was primarily making appointments
21 for the salespeople and also, of course, telling
22 them, businessmen and women, all that we can do for
23 them and to be upbeat about it and to be sincere
24 and to let them know everything that we can do to

Page 23

1  help them have a more profitable business.
2    So I would explain all the different
3  services and I would say, of course, there's no
4  obligation; you don't have to pay for the
5  salesperson's visit; he just wants to stop by and
6  talk to you further about different services; that,
7  you know, you'll be hearing from him and to find
8  out more information.
9    And since -- I would say that the
10 salesperson will be in your area on Monday or
11 Tuesday, when is a good time for him to drop by or
12 her to drop by; he just wants to drop off a
13 business card.  If you want to talk to him for a
14 few minutes, he'll be available.  And you can call
15 him, if you able to, if you can't talk to him then;
16 just making the appointment and making them feel at
17 ease to work with our company that we're available
18 to help them.
19   Q.  And you said you were doing that job
20 through April of 2004?
21   A.  Yes.
22   Q.  Okay.  And why did you leave that position
23 to go to the savings bank?
24   A.  I wanted to get out of -- I wanted to get

Page 24

1  out of that area as a business coordinator and do
2  inside sales because I wasn't getting commissions.
3  And so they said, okay, come to the class.
4    I went to the class.  Then they said after
5  one day -- it was a two-day class.  They said it's
6  not our policy to change departments, so I also
7  knew I was just right out of gallbladder surgery
8  and I was walking around with my hand on my side,
9  and so they said, you know, we're going to part
10 company.
11   So I just left, you know.  I knew I
12 probably was there too early after gallbladder
13 surgery, but, you know, if they're not paying me
14 commissions, there's no point in me staying there.
15   Q.  So you, I guess -- so you left
16 voluntarily; you decided that you wanted to leave?
17   A.  No.  They wanted to part company with me.
18   Q.  And did they give you any reasons?
19   A.  They had wanted me to send them a fax from
20 my doctor's office, and I requested my doctor's
21 office to send them a fax.  And they said they
22 didn't receive it.
23   And before that, my supervisor said we
24 have to do something so you'll be making money, but

Page 25

1  they never really helped me. But they would use
2  the appointments that I made. Inside sales would
3  then work those appointments. Even when the
4  salespeople left, inside sales would really be
5  working those appointments and making sure someone
6  got in there and really set up an appointment for
7  the analyst to get in there.
8      When the analyst gets in there, she really
9  says we need to get your computers up and running
10  so you could see on a daily basis where you are,
11  what you need to change for the next day so you'll
12  be making more money. You need to watch your
13  numbers every day. And we can set up that program
14  for you. And if you want to merge with another
15  company, we can do that for you. We have lawyers
16  and, you know, we have everything you want.
17      And so they were making money on the
18  appointments that I made. And I, you know, just
19  left. They said we are going to part because you
20  can't go into inside sales. And I wasn't going to
21  go back to business coordinator and not make money.
22  So, you know, if anything, I would heal and maybe
23  do that on my own. I knew the operation. I could
24  do that on my own, look for another job. You know,

Page 26

1  I -- but my body took 15 months to heal, and so I
2  really had to watch what I was doing. I couldn't
3  carry anything heavy, not even carry anything more
4  than two pounds. Even two pounds I would feel it.
5  So I really had to be careful.
6      So I then went looking for another
7  position.
8      Q.  And prior to all of that, you spent
9  several work -- several years -- I'm sorry --
10  working for the General Services Administration; is
11  that correct?
12      A.  Yes.
13      Q.  And do you recall when you started working
14  for GSA?
15      A.  Yes.
16      Q.  When was that?
17      A.  September 1984.
18      Q.  And how long did you stay at GSA?
19      A.  Until May 19th, 2003. But my removal date
20  was effective July 7th, 2003.
21      Q.  Were you fired from your position at GSA?
22      A.  Wrongfully removed.
23      Q.  And what do you mean by wrongfully
24  removed?

Page 27

1      A.  I was terminated.
2      Q.  And that was effective July 7th, 2003?
3      A.  Yes.
4      Q.  Were you given a reason as to why you were
5  terminated?
6      A.  Yes.
7      Q.  What was the reason or what were the
8  reasons, if there was more than one?
9      A.  For the efficiency of the government, and
10  they mentioned something about creating a
11  disturbance.
12      Q.  What type of disturbance?
13      A.  Talking to my supervisor -- team leader.
14      Q.  What was the nature of the talking that
15  would make it be a disturbance?
16      A.  They were lying. There was nothing wrong
17  with my conversation with my team leader. They
18  wrote lies.
19      Q.  Who's the "they" you're referring to?
20      A.  Denise Henderson, my team leader; Kim
21  Brown, my supervisor; and Dick Smith, my director.
22      Q.  And did you form your own opinion about
23  why you were terminated from GSA?
24      A.  Yes.

Page 28

1      Q.  And what was your opinion of the reasons
2  for your termination?
3      A.  Discrimination and seven counts of
4  discrimination including retaliation;
5  discrimination because I was a Christian Catholic
6  and because of my righteousness and the Bible in
7  Luke 5 and Matthew 5 and the beatitudes on the
8  Sermon on the Mount talk about men will revile and
9  say all manner of evil falsely against you for my
10  namesake and they will exclude you. And when you
11  look up revile in a dictionary, it says abuse.
12  They will abuse you.
13      And in John 15 it talks about that the
14  world will hate you because you are not of this
15  world. And they hated me. And they treated the
16  forefathers the same way before you, including
17  Jesus Christ. But in the beatitudes it says
18  rejoice and be exceedingly glad for great is your
19  reward in heaven.
20      And I was discriminated because of my
21  color and my race, white Caucasian; and my national
22  origin, Assyrian; and my age because I was in a
23  protected class over 40 years old; and my sex, a
24  female; and my retaliation because I filed an

Page 29

1  informal and formal complaint of discrimination
2  against the government, and they then took action
3  to remove me. And they were very mean to me
4  because I was a Christian.
5      And I got my MBA with distinction in June,
6  and they knew I was getting As. I got all As, one
7  A minus and one B plus. And they were
8  discriminatory toward me because they knew I wanted
9  a promotion to GS 12 because I hadn't received a
10 promotion for 13 years and I was going to get it.
11 I was on my way to get it. And they never
12 encouraged me and said: That's great, you're doing
13 great work; if you don't get a promotion here, keep
14 on applying and you'll get your promotion.
15     And so I was going to get my MBA in June,
16 and on May 19th, they removed me. They put me on
17 six weeks of administrative leave, and they said
18 we'll let you know if you're coming back. And then
19 they had changed my position description
20 April 1st and they knew I didn't like my grade
21 level. It was still 11. So I'm getting two
22 master's degrees now and I says: I have two
23 master's degrees; my job is still 11.
24     Can you tell me your question one more

Page 30

1  time?
2      Q. Yes. Actually, I forgot.
3      MS. MERIWEATHER: Could you repeat the
4  last question that I asked, please?
5      THE COURT REPORTER: "Question: And what
6  was your opinion of the reasons for your
7  termination?"
8      (Record read.)
9  BY THE WITNESS:
10     A. Do you have ten pages? I'll keep on
11 going.
12     So I had told my supervisor: I'm on this
13 desk that they put me on. Tom Propopinski dies.
14 He's a GS 12. Atanus, we want you to work his
15 desk, the GS 12 desk for three months. Well, I'm a
16 smart lady and I should have gone to the EEO office
17 at GSA and said they want me to work this GS 12
18 desk but they haven't raised my grade to GS 12. So
19 it was discrimination on seven counts of
20 discrimination just doing that.
21     They were very mean to me, very
22 discriminatory. I was not treated in the same or
23 similar way as the other employees in the contract
24 administration branch who were younger than me and

Page 31

1  who were black, Jewish, Hispanic, and Polish and
2  one lady who was German, but she claimed she was
3  economically disadvantaged. She would say that
4  occasionally. And she got a promotion to a 12, and
5  I never did.
6      So the names of the people to help my
7  case, there was Denise Henderson who got a 13. I
8  got her contract, so I thought I would get a 12.
9  She says she used to give the contractor a lot of
10 free ones, free extensions, and she gets a 13. I
11 got monetary consideration, price consideration
12 from this contractor for every extension that he
13 got for every purchase order.
14     I had no control over when he would send
15 his letter, but he would send the letter soon. I
16 would process the modification. And they were
17 nit-picking me, trying to find fault with my work.
18 And it goes back to the Bible. They will revile
19 and say lies about you falsely for my namesake.
20 And then they don't even let me perform on the new
21 position description, procurement analyst, which
22 was directing all the issuance of report cards,
23 correcting them that are issued four times a year.
24     So I'm now the director of report cards,

Page 32

1  plus like purchase agreements, but then they take
2  my contracts away. And then I leave, the position
3  is still open, contract administrator, but they
4  closed it just to get my contracts out of the way
5  and to change my position description to
6  procurement analyst so they wouldn't promote me.
7  They were discriminatory towards me for seven
8  counts of discrimination.
9      And then they have an announcement which
10 was December '03 -- December '02, 2002. They don't
11 tell me about it. And the web site is not easy to
12 find. You have to know the precise URL address.
13 And it's Christmastime and a lot of people from the
14 office are out of the office, but they want me to
15 stay there and do the work. So I'm doing the work,
16 still going to school. I have a full load, and so
17 I don't have a lot of time to look for jobs because
18 I knew I'm going to get my MBA and I'll get a 12,
19 13 anyway. So they tell her about the job and
20 don't tell me. And usually we had meetings every
21 Monday where they would tell important news like
22 job openings or vacancies, how to apply. They
23 didn't mention it.
24     So she's black, and she's an intern. So

Page 33

1 I'm doing the job for 13 years and she's black and
2 she's an intern, and they're holding her hand a
3 lot. And she gets the 11/12. It was announced as
4 11/12, but they didn't tell me about it.
5     So I was discriminated, not treated in the
6 same or similar way as she who's in a protected
7 class. She was over 40 and a female and black.
8 But so am I. I'm in four protected classes:
9 Assyrian, over 40, female, and a Christian
10 Catholic.
11     So then I told them this is a slap in the
12 face. You're giving me this job. She has 11.
13 They didn't like that. They knew I was unhappy,
14 and so they said, well, we're just going to get her
15 out of here. They didn't care I had the highest
16 efficiency as a contractor specialist. They had no
17 respect for me because I was a Christian.
18 BY MS. MERIWEATHER:
19     Q.  So you feel that you were -- GSA
20 discriminated against you and that was why they --
21 discrimination was the reason for your termination
22 from GSA?
23     A.  Yes. And they wrote 19 specifications
24 which were all lies, misconstruing the facts. And

Page 34

1 a brain and lawyers have brains and judges have
2 brains and they go to school, but they don't know
3 righteousness, many of them. Some do. Some don't.
4 The courts gave me a bad decision. There are
5 judges, there are many of them, who gave me a bad
6 decision because they don't know righteousness.
7 The devil has made them think a certain way, and
8 they don't have enough sense to say: Oh, my
9 goodness, why are we, in our court decisions,
10 misconstruing the facts some more and continually
11 discriminating against her? Why don't we help her?
12     Q.  And so you said the courts gave you bad
13 decisions. Had you filed lawsuits regarding your
14 termination from GSA?
15     A.  Yes. And so the names of the people were
16 Pete Smolinski, Polish. He became a GS 1. And
17 there's Portia Hurt. She became Portia Nash when
18 she got married, black. She became a GS 12. And
19 there's Marjette Austin, black. She became a GS 12
20 while I'm being there, while I was there. And
21 Dorothy Price who's Jewish. And then prior to me
22 being suspended, there were Aretha Hunter who is
23 younger than me, black, she got a GS 12. And
24 there's Grace Alvarez who's Hispanic. She became a

Page 36

1 15 of them were for creating a disturbance which I
2 never did. And six were not following written
3 authorized instructions, and I always did. They
4 didn't say when I was leaving: Atanus, you did
5 this wrong, you have to resign. I never did
6 anything wrong. And they put me on a five- and
7 ten-day suspension wrongfully. And I'm on a
8 ten-day suspension, I get a 1300 performance award.
9 How can I be doing something wrong if I'm getting a
10 $1300 performance award which everyone received? I
11 didn't receive my paycheck, but I received that.
12     And it's important to tell you the names
13 of the people who got promotions and their race and
14 I didn't. And so when I'm telling HHS I was
15 wrongfully removed, HHS never had a heart to say:
16 Oh, my goodness, let's give her a chance; the
17 government needs to listen.
18     So the names of the people besides Denise
19 Henderson who said I created a disturbance and then
20 she's going 195 miles an hour on her keyboard --
21 and I knew she was writing me up to my supervisor.
22 And the Bible says people will be like wolves.
23 You'll be a sheep, but you'll be in the midst of
24 wolves. And that's exactly what it is. They have

Page 35

1 GS 12 with Dorothy Price, who's Jewish, no college
2 education. She became a 12 because they feel she's
3 Jewish and, you know, we'll give her this 12.
4     And here I am with a BA from Northwestern
5 and two master's degrees about to get my MBA with
6 distinction and we're just going to write her up
7 wrongfully because they're full of the devil. They
8 don't know what's right and what's wrong. They're
9 following the devil. The devil has blindfolded
10 then. They walk in darkness. It doesn't matter
11 how many degrees you have. And if you don't have
12 degrees, if you're walking in darkness, you're
13 walking in darkness, you're not following the
14 light. The light of the world is Jesus Christ.
15 And when you're Christian, you're a different
16 creature and you don't do those things because
17 you're God-fearing and you live to please God and
18 do what is right.
19     Q.  So the district courts -- I'm sorry. You
20 said that the judges gave you bad decisions. Did
21 they hold that GSA did not discriminate against
22 you?
23     A.  Yes.
24     Q.  And you said that your position, I believe

Page 37

1  it was, in April of 2003 became the title of
2  procurement analyst; is that correct?
3      A.  Yes, that's correct.
4      Q.  And what were the job responsibilities of
5  a procurement analyst?
6      A.  The procurement analyst, my supervisor
7  didn't have time to read the regulations, so she
8  wanted me to read the regulations, all of them,
9  which I did.  And she knew I was a speed reader and
10  not everybody could read all the regulations, but
11  they wanted me to do everything for them, and I did
12  everything for them.  They didn't have respect for
13  me and just treated me like, you know, you're not
14  someone that we're going to promote ever.  So I
15  just always did what they wanted me to do, but no
16  correct compensation that's adequate for what I was
17  doing.
18          So she wants me to write a summary of the
19  regulations for her, which I did.  She wanted me to
20  do it every week, and then she would say, well, you
21  don't do it every week; turn it into me next week;
22  it's okay because I still had all these blanket
23  purchase agreements to do, and I still had
24  contracts that I had to close.  And she never got

                                    Page 38

1  to the point where I had to review report cards
2  because they never let me perform.  They just --
3  May 19th they told me pack up and leave.
4          Debbie Walkup, who was my supervisor
5  before Kim Brown, became my supervisor January '03.
6  She gives me these specifications in her office and
7  I'm reviewing them, and she's sitting at the other
8  side of the table, also not a Christian, doesn't
9  know what's right from wrong.  She's the chief,
10  GS 14 level?  We're paying these people these kind
11  of salaries who treated me this way, discriminatory
12  against me, and they're still there and I'm left
13  because they kicked me out?  We've got these people
14  in the government?  We're paying them these kind of
15  salaries who do these kind of things to people?
16          It took a lot of government time to write
17  up those 19 specifications.  They're not written up
18  for wasting the government time writing lies about
19  a person?  They're still there?
20          And so my duties also were to administer
21  all the blanket purchase agreements and small
22  purchases in the office, but they were going to
23  take my contracts away so they wouldn't have to
24  promote me.  They're doing it their way, and so

                                    Page 39

1  then now they're shuffling the contracts.  And so I
2  would then, you know, close the contracts and move
3  them over and then like two, three days later, the
4  contracts are back on my desk, you know, so that
5  they're playing games on me.  Why do you bring them
6  back to my desk for?
7          You know, and then Kim Brown comes to my
8  desk: I want these closed out by 1:30 today.  She
9  never came to my desk before.  She doesn't go to
10  anyone else's desk, gives me a command.  Well, I
11  had a phone call I had to take care of something.
12  I told her I wasn't going to get them done by 1:30,
13  so then she includes that in the specification.
14  You didn't have this done by 1:30.  How does that
15  create a disturbance?
16      Q.  So they asked you to write a summary of
17  regulations?  Someone asked you to write a summary
18  of regulations?
19      A.  Uh-huh, which I did.  I did very well.  So
20  that's a point to make note for this writer/editor
21  job.
22      Q.  And then you didn't -- I'm sorry.  Go
23  ahead.
24      A.  And I'm a gifted writer and I'm a speed

                                    Page 40

1  reader, so I could absorb a lot of information,
2  which I have to do for this writer/editor job.  And
3  I could put it in succinct form, precise form,
4  which I have to do for this writer/editor job.  She
5  never had to correct anything.  She just wanted to
6  be on top of everything.
7      Q.  And when were you asked to write the
8  writing summary of regs?  Just so I'm clear, that
9  was as a procurement analyst?
10      A.  Uh-huh, yes.
11      Q.  So timing wise, that would have been from
12  April of 2003 until you went on administrative
13  leave?
14      A.  On May 19th, yes, correct.  And --
15      Q.  And then -- I'm sorry.  You were also
16  supposed to review report cards, but you said you
17  didn't get an opportunity to do that?
18      A.  Not as -- I was always doing that as a
19  contract administrator, but not in my official
20  capacity as procurement analyst where all the
21  report cards would come to me, not -- I guess not
22  to each contract administrator.
23          And a contract administrator would have a
24  better idea of how these contractors are performing

                                    Page 41

1  because they work with these contracts every day.
2  And so they just wanted to change my position
3  description to something to get the contracts away
4  from me so they wouldn't have to promote me to a
5  GS 12 because I had asked for a GS 12. And my
6  position description was unassembled duties,
7  contract specialist, but I wanted to be promoted to
8  a contract administrator or a contract specialist
9  GS 12.
10      So I'm on the job for about six, seven
11  months and I say to myself: I'm getting GS 11 pay
12  and I'm doing GS 12 work. Then they would say:
13  No, you're not doing GS 12 work. I have a million
14  dollar warrant doing everything that the other
15  GS 12 people on my team are doing, and I'm not
16  doing GS 12 work. They would then start
17  nit-picking to find fault with my work like you're
18  backdating modifications, which I wasn't. And so
19  then they're not saying you did this wrong; we're
20  going to take your warrant away; you have to
21  resign. I didn't do anything wrong. They were
22  finding fault with my work so they wouldn't have to
23  promote me.
24      So probably if I stayed there and never

Page 42

1  said anything about my grade, I'd still be there.
2  But I wasn't going to do that. I wasn't going to
3  do that because I was on that desk 11 years before.
4  Then I was doing procurement work awarding
5  contracts, issuing purchase orders for GSA stores
6  for five years.
7      And then Tom Propopinski died. A year
8  after he died and he has closed contracts --
9  contracts need to be closed, so I get on his desk.
10  I have all these contracts on his desk. I have to
11  close them. I have to get all the contracts where
12  they should be as far as up to date, make sure all
13  his printouts are up to date. And there was the
14  end of the month cutoff, which I did for 18 and
15  three quarter years. There would be four
16  printouts. Some days I would have to make 60
17  calls. It's not just 60 calls with the status of
18  these purchase orders. You have to ask for
19  extensions. You have to get price considerations
20  before you do them. You have to call the item
21  manager and the procurement contract officer to see
22  if they will agree to the extensions. You have to
23  sometimes fax orders to contractors, extend the
24  dates if they never received the orders.

Page 43

1      So I'd be working hard all the -- through
2  the month, but I knew at the end of the month, the
3  last week of the month, I'd have to really
4  accelerate.
5      And I had a zero percent delivery
6  delinquency rate for 18 and three-quarters years,
7  and they reason why they put me on six weeks
8  administrative leave, they didn't know if they
9  could do without me, but they probably did okay
10  that month, so they let me go. But they weren't
11  sure if they could make it without me.
12      Q. And before you were a procurement analyst
13  at GAS, what was your -- what was the job title
14  that you had before it changed to procurement
15  analyst?
16      A. Well, it was sometimes contract
17  specialist, sometimes contract administrator. When
18  I would go for my six-month annual reviews,
19  sometimes they would say contract specialist,
20  sometimes contract administrator. The position
21  descriptions are the same. It's just that when
22  they promote, they would promote you to a contract
23  administrator 12. So they would get
24  discriminatory, so on some reviews, it would say

Page 44

1  contract specialist.
2      And all my reviews were satisfactory. I
3  shouldn't have been removed because all my reviews
4  were satisfactory, performance reviews. Most of
5  the time, I got highly successful and got an
6  outstanding once. But they wanted to say lies
7  about me because. The devil has blindfolded them
8  to -- from seeing the light of Jesus Christ, so
9  they're walking in darkness and they follow the
10  spirit of darkness.
11      And they don't know why they do these
12  things. They just do them. They really don't know
13  why. I guess the devil makes them do it, but what
14  they're doing is discriminating against me on seven
15  counts of discrimination.
16      Q. And what were your -- you may have touched
17  on this --
18      A. But I want to also change my answer.
19  They -- when I say they don't know why they're
20  doing it, it's because Jesus says father, forgive
21  them for they know not what they're doing. In
22  essence, they really don't know why they're doing
23  it because if they knew that you're treating this
24  woman of God this way and that their final destiny

Page 45

1    is in hell, they wouldn't be doing that, but
2    because -- even Jesus says they -- father, forgive
3    them for they know not what they're doing. If they
4    stopped and thought that you're treating her this
5    way who loves Jesus, who paid the price so they may
6    see the kingdom of heaven and not spending their
7    eternity in hell, you wouldn't be treating her this
8    way.
9        But they have not seen the light. They
10   don't -- so they don't really know why they're
11   doing it. They just know that I'm different from
12   them; that I'm not of this world. And because they
13   see the light in me that makes them look how they
14   look, they see the sin in their own life, and so
15   then they try to say lies to make me look bad to
16   make me like them, and I'm not that way.
17       So I was not treated in the same or
18   similar ways as the other people in the contract
19   administration branch who were not discriminated
20   against me and who received promotions to GS 12 and
21   higher, who are in protected classes, including
22   Jewish, Polish, black, Hispanic, economically
23   disadvantaged. But I am in four protected classes.
24   I'm an Assyrian, second generation; female;

Page 46

1    responsibilities as a contract specialist or
2    contract administrator?
3        A.   My job duties with both titles, contract
4    specialist and contract administrator, were to
5    insure delivery to our customers by the due date
6    and have zero delivery delinquencies that would
7    count against our region. And to insure that, I
8    had to make sure that purchase orders would be
9    delivered by their due date so we would not go into
10   back order;
11       Also, when we were in back order, to
12   insure that orders would be delivered on time; it
13   would not be delinquent. And our team was so good
14   in March 2003, I received congratulatory e-mails
15   from the rest of our team because the director in
16   Washington of our program and our office director
17   of the contract management division and my team
18   leader, Denise Henderson, and my supervisor, Kim
19   Brown, sent us congratulatory e-mails. This is the
20   first time that the GSA federal supply service has
21   had zero delivery delinquencies for purchase orders
22   with back orders.
23       So we're doing -- I'm -- I'm doing
24   phenomenal, and then in May they send me this

Page 48

1    Christian Catholic; over 40 years old. And they
2    shouldn't have treated me that way.
3        And they were trying to do harm to me,
4    economic harm. They knew I was building a
5    townhome. They knew I was going to get an MBA in
6    June and I would be getting promotions, and they
7    wanted to do harm to me, economic harm to me. But
8    the Bible says that weapons will be formed against
9    you, but they will not have their intended effect.
10   And weapons were formed against me with five- and
11   ten-day suspension and wrongful removal, but they
12   did not have their economic harm or other harm to
13   me because God will protect you and they will not
14   have their economic harm. They will not have their
15   intended effect because God has overcome the world.
16   And who is against you if God is for you?
17       So I'm sorry. I interrupted your
18   question. I just want to clarify that.
19           (Telephone interruption.)
20           (Brief pause.)
21       THE WITNESS: You may repeat your
22   question.
23   BY MS. MERIWEATHER:
24       Q.   Yes. The question was what were your job

Page 47

1    garbage letter with 19 specifications and they tell
2    me to pack up and leave.
3        And they never said I'm sorry to me.
4    Well, they better repent because judgment day is
5    coming and most people will not see the kingdom of
6    heaven. The Bible says few.
7        So I had to do a lot of writing. This is
8    the writer/editor job that I want. But I'm beyond
9    the writer/editor job because in 2004 I should have
10   gotten it as a GS 11, and then the next year I
11   would get a 12, the next year a 13, 14. So by now
12   I would be a GSA 15 and I want to be reinstated as
13   deputy regional director of HHS in the Chicago
14   regional office to make up for their
15   discrimination.
16       But I did a lot of writing on my job. I
17   had to write contracts, which I did. I had to
18   write technical information. And I awarded
19   contracts and I had to respond to contractor's
20   e-mails with some questions. I wrote my synopsis
21   so good that they didn't have a lot of questions,
22   but I always responded very soon the next day.
23       So I had to use the computer. I'm very
24   computer literate. And I had to issue purchase

Page 49

1   orders, and I had to put them in Pegasus with
2   financial information. And I had to put the
3   contract information in the national contract
4   database. And I had to say who the contractors
5   were, if they were small business, large business,
6   women-owned, disadvantaged-owned. And I was very
7   good at awarding contracts.
8       I liked my work at GSA very much. I was
9   very good at what I did. I was the best in the
10  business. I had the lowest delivery delinquency
11  rate in 18 and three-quarter years, and I worked
12  really hard. And it was a lot of work, a very
13  demanding job, but I was very good at what I did.
14      And I had to write award letters. When we
15  received a new contract, we had to either call up
16  the contractor and tell them the main clauses in
17  their contract, including the delivery clause, of
18  course, the term of their contract and if there was
19  a first article inspection. And then if there was,
20  I'd have to enter the entry on my printout, give it
21  to our program assistants, and they would enter the
22  information in the computer. And then they would
23  have to deliver a first article to the quality
24  assurance specialist.

Page 50

1   contract that change the terms of the contract.
2       Q.   And so if you issue a modification, could
3   you just explain to me what that means?
4       A.   Issue a modification is a change to a
5   contract which can also be a purchase order
6   changing the delivery due date or changing the
7   specifications if it's acceptable to the
8   government. Let's say something is not the
9   required length, it's a little bit shorter or a
10  little longer, but will work, won't do any harm,
11  the intended effect will be okay with the change.
12      Sometimes state-of-the art we have to make
13  changes because the spec might be outdated. So
14  it's just making changes to the contract.
15      Q.   And you stated earlier that you were
16  writing technical information?
17      A.   Yes.
18      Q.   Could you define what that means as well?
19      A.   Technical information is, for instance, a
20  blanket purchase agreement that I awarded would be
21  for the repair and maintenance of conveyor belts.
22  So describing the duties that they would have to
23  perform that's required for the maintenance and
24  repair of conveyor belts is technical information.

Page 52

1       And their title then changed, and he would
2   inspect the first article. If it was okay, then
3   they would start production. And I would receive
4   waivers and deviation requests, and I'd have to
5   process it; review it; ask for monetary
6   consideration, if applicable; ask for
7   administrative clause, if applicable; send it out
8   to the spec manager; extend the delivery due dates
9   of purchase orders, if necessary, because we always
10  had to maintain a zero percent delivery delinquency
11  rate.
12      And, of course, I had to issue
13  modifications to grant those deviations or waivers
14  and extend delivery due dates. I issued a lot of
15  modifications, thousands of them, but then in 2003
16  they accused me of backdating mods. Excuse me?
17  I've been doing this for 18 and three-quarter
18  years. All of a sudden in May 2003, with emphasis
19  added, all of a sudden, I'm backdating
20  modifications. But they never took my million
21  dollar warrant away, so I guess I'm doing something
22  right.
23      Q.   What are modifications?
24      A.   Modifications are modifications to a

Page 51

1       Also, my awards for consultants to our
2   database, the jobs that they would have -- duties
3   they would have to perform to our database, keep
4   our database up to date of all our national stock
5   numbers and the descriptions. We have millions of
6   national stock numbers, so they're always busy
7   keeping the information up to date, making
8   awards -- contract awards for photographers for our
9   catalogs, describing the training to the
10  contractors who have to submit bids, always
11  describing the terms of the contracts and for
12  moving services and other contracts.
13      And also, the writing would be issuing
14  cure notices to contractors. When a quality
15  deficiency notice was issued, the contractor was
16  given in my letter the cure notice 30 days --
17  calendar days to cure the deficiencies or their
18  contract may be terminated or the national stock
19  number or numbers may be terminated or purchase
20  orders.
21      Q.   And you said that you wrote contracts. I
22  take it there were other contract specialists
23  working for GSA when you had that position? You
24  had other people doing similar jobs?

Page 53

1    A.   There were two of us.
2    Q.   Okay.
3    A.   After I was contract specialist or
4  contract administrator for 11 years, we had an
5  opportunity to move somewhere else in the federal
6  supply system to another job.  And we have three
7  choices.  We can put down three jobs that are also
8  the same grade level that we would like to have.
9        So I said I'm not getting a promotion here
10  on the stock team, which is primarily getting
11  printouts every week and making sure purchase
12  orders were delivered on time, but it was more than
13  that as I'm telling you.  Sometimes I would also
14  issue show cause letters.  If the purchase orders
15  passed a delivery date, I would then issue a show
16  cause letter this purchase order is delinquent;
17  show cause why it should not be terminated;
18  otherwise, the purchase order will be terminated.
19        And then issued termination letters also.
20  When you issue a termination letter, you need a
21  modification terminating the purchase orders or
22  national stock number or numbers or the entire
23  contract.
24        Sometimes there would be Freedom of

Page 54

1  business-minded, very profit-oriented.  I have an
2  eye for details.  And I read over the reports, the
3  two reports that HHS sent me.  They're reports I
4  could write very easily, do an excellent job.
5  Writing comes very easy to me.
6        In order to maintain a zero percent
7  delivery delinquency rate for 18 and three-quarter
8  years, you had to be fast and efficient, of course,
9  and accurate.  And that I was.  I was a very fast
10  writer, very fast thinker, reader, speed reader.
11  My supervisor knew I was a speed reader.
12        And they gave us these federal regulations
13  to read.  I used to read them on the train, initial
14  them that I read them.  Not all the contract
15  specialists who had to do that in our office read
16  them.  Some that were supposed to read them did not
17  read them at all and here I am reading all the
18  regulations, going to school, getting an A average,
19  doing all my homework, doing all the work on the
20  job, you know, say:  Atanus, you're wonderful; keep
21  it up; if you don't get a promotion here, you'll be
22  able to get a promotion somewhere else.  Nothing to
23  help.  They said they're writing me up.  So before
24  I go on a five- and ten-day suspension, you know

Page 56

1  Information requests -- Freedom of Information Act
2  requests, Congressional inquiries.  Sometimes I
3  would have to complete reports.  My chief would ask
4  me to complete this report activity of our branch
5  for last quarter.
6        And also, you had to be very good with
7  writing your record of contacts.  After every phone
8  call, you had to write a record of contact:  What
9  happened, what was said, what action is going to
10  take place, follow through with it.
11        You had to keep a tickler file, keep track
12  of actions that are coming up that you have to take
13  by the due dates.
14        And the fact that I was writing contracts
15  and using acceptable government publication office
16  language makes me very qualified for this job, my
17  MBA, knowledge of business principles, sample
18  sizes, how to do an audit.  I have an A in
19  auditing.  I have an A in statistics.  I understand
20  how it is to do the jobs that the auditors do.  And
21  if I can get an A in statistics, I could do
22  anything.
23        And I found the MBA program to be
24  something that came easy to me, very

Page 55

1  they're writing me up.
2        So they're following the devil.  They
3  don't know any better.  They have a brain in their
4  head, but their brain does not act the way it
5  should to control their behavior the way it should
6  because they live in darkness.
7        So I wrote technical information,
8  synopsized all this technical information on the
9  computer.  I used to do it in an hour, put all this
10  information in an hour, get it on the computer, and
11  then go on and working on something else.
12        And then besides that, I was a loan
13  executive at the United Way.  And the year before
14  they didn't meet their goal, so they say:  Atanus,
15  we want you to head communications.  So we exceed
16  our goal by over $435,000.  Geez, Chicagoland went
17  from seventh place to fifth place.  The following
18  we're still in fourth place.  And I worked really
19  hard doing that.  And it was fun when I worked
20  hard.  I worked over three hours every night for
21  six months calling up agencies:  We're having our
22  combined federal campaign and we would like you to
23  have a program speaker at this agency on this date
24  and time.  Can you be there?  We appreciate it very

Page 57

1 much if you could send out a speaker.  Sure.  So I
2 sent a fax confirmation.  Then I had to have a fax
3 filing system, all the agencies.
4        And I would have to be there at least by
5 8:35 in case there would be a cancellation.  There
6 weren't a lot of them, but there were a couple.
7 Then I would have enough time to get another
8 speaker out that morning for their kickoff program.
9        And then I arranged for all the agency
10 fairs in the federal government lobby.  And it was
11 wonderful.  And I enjoyed it a lot, and my
12 enthusiasm spread all over.  And I wanted to do a
13 real good job because I really want to help people.
14 That's my nature.
15        And then I sometimes have to set up agency
16 fairs.  Sometimes agencies wanted to see other
17 agencies in the combined federal campaign.
18        So it's never happened before where GSA --
19 or Chicagoland went from seventh place to fifth
20 place.  Never happened before in all the history of
21 the combined federal campaign.  That alone should
22 have been:  Atanus, you worked really hard; we're
23 going to give you a promotion, plus all the other
24 work that you've been doing for all the other
Page 58

1 years.  You've been great.  You worked really hard.
2 Never caused a disturbance, never misfollowed
3 authorized instructions, never.  They just wrote
4 lies.
5        And so I was wrongfully removed, and I
6 explained this to Eileen Gomsey in a phone
7 conversation:  I was wrongfully removed; I want to
8 get back in; I've been applying for federal jobs.
9 And no one had the heart or the mind to ever stop
10 and think and say, you know, maybe we should help
11 her.  The country is in a recession.  She said
12 she's building a townhome.  Maybe we should give
13 her a chance.
14        And I was discriminated by HHS, and Judge
15 John D. Bates knows that.  That's why this case is
16 here today.  Judge John D. Bates said that she was
17 discriminated because of her color for this
18 writer/editor position and she has been
19 discriminated, period.  And that was from Judge
20 John D. Bates.
21        So now I'm on cruise control.  And ever
22 since discovery, I have more to say, which I will
23 say, that the job application said that your resume
24 and your questions in Quick Hire would be
Page 59

1 evaluated.  And then the HR people, Melinda Bean
2 and Donna Thomas, said they gave zero points from
3 the essay questions.  Then how are the scores
4 created?  They were subjectively made.  If you give
5 zero points, how do those scores get generated?
6 They were subjectively made.  There was a prima
7 facie case of discrimination against me because the
8 four:  Alinder Mestry, Liverhott, Grizzell, and
9 Moscul have Jewish names.  And that was their
10 intention to hire Jewish people to fulfill their
11 affirmative action plans.
12        And they didn't care that I was a female
13 over 40.  They knew I was Assyrian.  They knew I
14 was wrongfully removed on seven counts of
15 discrimination, so they discriminated against me
16 because I was Assyrian and I was not black, Jewish,
17 Polish, or Hispanic or economically disadvantaged.
18 And I was in four protected classes:  Assyrian,
19 second generation; Christian Catholic; female; over
20 40 years old.  And they knew I was a female over
21 40 years old.  They knew my name, Atanus.  They
22 know I was wrongfully removed.  They know I'm
23 Assyrian.  They know Atanus is not a Jewish name.
24 But they should have hired me because I was a GS 11
Page 60

1 which had noncompetitive status.  And I had the
2 highest score merit for promotion, 92.2.
3        And if they have three vacancies, they
4 will submit five names.  That means if they have
5 six vacancies, they submit ten names.  Well, there
6 were seven vacancies, so they should have submitted
7 at least 12 or 13 or 14 names, and my name was not
8 on any of them.
9        And I was an outstanding scholar.  And
10 even if you say that outstanding scholar is only
11 for grades five and seven, if you see someone that
12 comes in with a BA from Northwestern University
13 who's worked for the government 18 and
14 three-quarters years with two master's degrees,
15 you're not going to toss it out unless you are
16 severely disturbed on dope medication and your
17 brain is not working right; someone who applies
18 with three degrees and you just toss out my
19 application and you say her resume did not
20 substantiate what she said.  And did I have
21 to -- if you're asking for several essays in Quick
22 Hire, why do I have to then copy everything over
23 into my resume?  I'll never finish the application,
24 which is electronic, and you know it's going to
Page 61

1  kick out after so many hours.
2      So I was discriminated -- prima facie case
3  of discrimination. And no one told me that I would
4  get zero points. The application said everything
5  would be reviewed. And I wanted to be considered
6  noncompetitive status as an outstanding scholar and
7  because I was a GS 11. It didn't matter. The HR
8  person said if you got your 11 competitively.
9  That's not what it said in the application online.
10  It says if you ever were or if you are a GS 11.
11      So I got this now on accelerated cruise
12  control because the scores were subjective. I was
13  not told by Eileen Gomsey. She said you can come
14  if you have a disability for noncompetitive
15  selection authority. I says: Well, my side hurts
16  from my operation. She says: Well, you're going
17  to have to get a doctor to write that you have a
18  disability. Well, I didn't know if it would be
19  permanent or not, so I didn't go that route.
20      But I knew I was being discriminated
21  against because someone who's been writing at GSA
22  for 18 and three-quarter years, contract
23  modifications with technical information, plus at
24  Northwestern University I had to write reports for

Page 62

1  every social science class I took and I had to do a
2  lot of research, formulate hypotheses, do further
3  research to have a conclusion in my paper, I've
4  been looking at documents, extracting information
5  from documents like I would have to do from audit
6  reports and write a final paper, a summary that is
7  understood by the public.
8      So I guess I was not forwarded to seven
9  selecting officials. And there were only five or
10  six names, but if you have seven openings, you
11  should have at least 13, 14 names. And no one from
12  merit promotion was -- name was forwarded? And out
13  of 586 applicants, you mean only Alinder Mestry's
14  name was noncompetitive and that's because she's
15  competed?
16      So even HR people, when they gave their
17  depositions, they said it incorrectly. If you were
18  a federal employee or are a federal employee with
19  GS 11, you had noncompetitive status. So they
20  discriminated against me because of seven counts of
21  discrimination, including retaliation, because I
22  filed a lawsuit against GSA. And they should have
23  said: Oh, my goodness, this -- they have wronged
24  her so much that she had to file a lawsuit to make

Page 63

1  things right.
2      And then they said my SF 50 wasn't
3  received, so they -- so they're in darkness.
4  They're discriminating against me because of my
5  religion and other six counts. They're not
6  treating me in the same or similar way as they in
7  protected classes: Moscul, Liverhott, and Grizzell
8  who were Jewish. They treated them different than
9  me.
10      Then they had two other names on the list,
11  and they already are in positions. So then there's
12  seven openings. They only have four people. The
13  other two are already in positions.
14      And they said my score was not good
15  enough. 92.2 was not good enough? It was the
16  highest score under merit promotion. And it was
17  fabricated, and so were the other scores that were
18  higher than me were fabricated because if you give
19  zero points to their essay answers, then the scores
20  were subjective and fabricated and the HR people
21  used discretion.
22      And they have Jewish names. And even
23  Grizzell was asked a question: So are you
24  Catholic? No. He's Jewish. So are the other

Page 64

1  three. They're Jewish. And I was discriminated
2  against because of my religion and my color and my
3  race. And Judge John D. Bates said: Atanus said
4  she was discriminated against because of her color
5  and she is discriminated against.
6      Q. So you believe that Brian Moscul, Sarah
7  Alinder Mestry, Charles Liverhott, and Michael
8  Grizzell are Jewish?
9      A. Yes.
10      Q. And on what do you base that belief that
11  they're Jewish?
12      A. Grizzell said: No, I'm not Catholic.
13  Grizzell is a Jewish name. Liverhott is a Jewish
14  name. Moscul is a Jewish name. Alinder is a
15  Jewish name.
16      I was -- and even if I was not
17  discriminated against because of religion -- but I
18  was because Atanus is a Christian Catholic name --
19  I was discriminated because of my race because if I
20  was black, they would have not tossed my
21  application aside.
22      And I saw the 30-page affirmative action
23  plan. And I know with that detail for every office
24  where they are and are they progressing to a higher

Page 65

1  number with minorities and 13, 14, and 15 grades,
2  13 grade, 14 grade, 15 grade, those especially
3  count toward affirmative action goals. And when
4  they discriminate because I'm an 11 and want to be
5  a 12, they only usually hire people in those
6  protected classes: Black, Jewish, Hispanic,
7  Polish, and economically disadvantaged, and other
8  minorities, they give them the 12, nobody else
9  usually unless you're a vet because then for the 13
10 they won't have any competition. For the 14 and
11 15, they will have no competition or very little
12 competition like it was the 13. And that is
13 discriminatory.
14     Q.  So you think that Jewish people are given
15 preferential treatment?
16     A.  Yes.
17     Q.  And what makes you -- what are the facts
18 or evidence that you rely on to make that
19 conclusion?
20     A.  Because Alinder, Moscul, Liverhott, and
21 Alinder Mestry were the only four out of 586
22 applicants and you mean to tell me that Alinder
23 Mestry and me and I were the only federal employees
24 and I was not put on the noncompetitive list just

Page 66

1  because I -- and I should have been just for being
2  a GS 11. So they discriminated against me not
3  putting me on the noncompetitive list as a GS 11.
4      So Alinder Mestry, out of 586 people, she
5  and I were the only federal employees and my name
6  was not put on the list? You have seven openings
7  which means you should have 12, 13, 14 names
8  afforded to the selecting officials. They gave
9  those four people the jobs because of their name
10 because -- not only their name; because of who they
11 are, because they're Jewish.
12     Q.  You stated that Atanus is a Christian
13 Catholic name. Is that your belief or is that what
14 you said?
15     A.  Yes.
16     Q.  Apart from your name, was there anything
17 on your resume that would convey to HHS that you
18 were Christian Catholic?
19     A.  Yes.
20     Q.  What was that?
21     A.  Because I was discriminated at GSA not
22 getting a promotion for 13 years, being a GS 11 for
23 13 years, that showed that they were discriminating
24 against me. And I was not Jewish because if I was

Page 67

1  Jewish like Dorothy Price, they would have promoted
2  me. And she had no college education. So they
3  said Atanus is not Jewish because GSA did not
4  promote her. She's not a protected class. If she
5  was a protected class, she would have been
6  promoted.
7      Q.  Was there anything on your resume that
8  expressly stated that you were Christian?
9      A.  My name is Atanus. My name says that I am
10 not Jewish. The name is Atanus.
11     Q.  Apart from your name, is there anything on
12 your resume that expressly states that you were
13 Christian?
14     A.  I've already repeated -- you're repeating
15 yourself.
16     Q.  You haven't answered my question.
17     A.  I answered your question the first time.
18 I've answered -- you're now asking the same
19 question that I answered, GSA did not promote me.
20 If I had -- if I was Jewish, GSA would have
21 promoted me, but they did not. But they promoted
22 Dorothy Price who has no college education, was
23 only there for four years. And I was there for
24 18 and three-quarter years and they said Atanus

Page 68

1  doesn't like being an 11; she says it's a slap in
2  the face; we're just going to get her out of here.
3      Q.  I don't think you're --
4      A.  And also -- I am listening to your
5  question. Is there anything else? Yes.
6      Q.  No. You haven't -- my question is, is
7  there anything that expressly states that you are
8  Christian apart from your name?
9      A.  Yeah. It expressly states. It says I was
10 a GS 11. It's expressly stated. That's expressly
11 stated to me. They discriminated against me. They
12 didn't promote her for 13 years, and HHS gets my
13 application, let's help her. Someone who is
14 decent, who is not discriminating against Atanus,
15 we'll say let's help her. She's got an MBA with
16 distinction. This is her second master's degree.
17 She's written a book and a movie and a play. And
18 the book and play were on the resume.
19     Besides awarding contracts, maintaining
20 zero percent delivery delinquency rate, being a
21 loan executive at the United Way and it was on her
22 resume exceeded her goal level by over 435,000,
23 let's give her an opportunity.
24     Q.  Did you --

Page 69

1    A.   Yeah.  And that's expressly stated.
2  That's expressly stated that I exceeded the goal by
3  over $435,000 and GSA wrongfully removed me.
4  That's on the resume.  She's got an A average.
5  Highest efficiency as a contract specialist, that's
6  expressly stated that I was discriminated against
7  because of my religion and what my religion is.
8    Q.   Does the word Catholic appear on your
9  resume?
10    A.   The name Atanus is not Jewish.
11    Q.   The question is, did the word Catholic
12  appear on your resume?
13    A.   The name Atanus is Catholic.
14    Q.   But the word Catholic did not appear on
15  your resume; is that correct?
16    A.   You could keep on asking me.  I've
17  answered you.
18    Q.   You haven't answered.
19    A.   Take a look at the resume.  Answer it
20  yourself.  I'm not going to fall into lawyer's
21  traps.  Judge --
22    Q.   Are you refusing to answer my question?
23    A.   Catholic, I don't think was -- the word
24  Catholic itself, C-a-t-h-o-l-i-c, was not on my

Page 70

1  resume, but my name Atanus was.  And Atanus is not
2  Liverhott, Grizzell, Moscul, or Alinder Mestry
3  which means I'm not Jewish.  And they used the
4  names primarily and put them on the list for being
5  selected and did not put me on not one of seven
6  lists.  And I was with noncompetitive status, and
7  Gomsey didn't tell me that you have noncompetitive
8  status just for being an 11.
9    Q.   Turning back to your employment at GSA,
10  you stated that you wrote a record of contacts
11  while you were working at GSA.  Did anyone review
12  the records of contact after you wrote it?
13    A.   I know I reviewed them.
14    Q.   Did anyone other than you review them?
15    A.   Well, if someone picks up the file, they
16  could read them.  Whether they're reviewing them,
17  we didn't use the word read them.  You used the
18  word review them.  They would read them.  If
19  someone picks up the file, I'm sure they will read
20  this record of contact.  Whether they will review
21  them, you have to give me your definition of
22  review.
23    Q.   Were you turning the record of contact
24  into someone else, a supervisor?

Page 71

1    A.   It would be in my file if -- the file
2  could be reviewed by him or her, but it wasn't
3  practice to write a record of contact and let a
4  supervisor review it to edit it or to change it or
5  to critique it, no.  It's just keeping you as the
6  contractor administrator and other people picking
7  up the file updated of the status of the contract
8  or purchase orders and any other issues that are
9  being worked on.
10    Q.   And did you read or review record of
11  contacts written by other GSA employees?
12    A.   Yes.  I read them.
13    Q.   And what did you do with them, if
14  anything, after you read them?
15    A.   I'm not a supervisor.  It wasn't my duty
16  to -- to change them.
17    Q.   And you said that you wrote contracts.
18  Did you read or review contracts that other GSA
19  employees wrote?
20    A.   Yes.
21    Q.   And what did you do with them, if any- --
22  the contracts, if anything, after you read or
23  reviewed them?
24    A.   Well, I was a supervisor of purchase

Page 72

1  orders, and I had to make sure they were correct.
2  I had to make sure that requisitions were being
3  processed and purchase orders were being issued in
4  a timely manner.  I would have to go to them and
5  make sure that they're completing their
6  requisitions.  Or if there was a problem, I would
7  have to resolve -- help them resolve the problems
8  so that the purchase orders would be issued for
9  those requisitions.
10      So I -- we're back to your same question
11  about writing and editing.  Yes, I've done a lot of
12  writing and editing.  All -- I've done -- I'm
13  49 years old.  I've been writing and editing since
14  I've been six.  I am very well-qualified for the
15  writer/editor job.  I've written a play.  I've
16  written a book that's been copyrighted.  I've
17  written movies, designed movies.  I've written
18  contracts.  I never had a protest.  I never had a
19  claim.  I was outstanding in what I did.  It's
20  phenomenal:  Awarding a contract never having a
21  protest, never having to resolve a claim.
22      And I'm an excellent writer.  And in this
23  lawsuit I've written so many documents, motions,
24  complaints, briefs, responses to interrogatories,

Page 73

1    production of documents. I've done more with a
2    paralegal certificate, legal writing than a
3    writer/editor would need to do. And I've written
4    speeches, and I've written scripts, and I've
5    written letters, and I've written memos, and I've
6    designed brochures and pamphlets.
7        And I was a supervisor of fund-raising for
8    GSA staff advisory council scholarship program, so
9    I was always sending out e-mails, colored
10   attachments, brochures telling them about our book
11   fairs, our jewelry fairs, our candle fairs, our art
12   fairs, bake sales. And we gave to close to
13   80 students $500 for them to pursue a scholarship
14   for vocational interest. This is besides my
15   regular work. I was sending out e-mails all the
16   time with colored attachments, brochures. I am
17   more than qualified for this job.
18       And as a loan executive, I had to train
19   19 agency campaign coordinators. I had to speak in
20   front of these agencies. I had to prepare what I
21   was going to say. I had to keep track of their
22   collections, pick up their money collections, pick
23   up their pledge cards, take over prizes --
24   incentive prizes, keep things going, keep things

Page 74

1    upbeat, take their eagles and their other prizes as
2    thank you gifts for their donations. I worked hard
3    for six months walking all over downtown Chicago to
4    all these agencies, keeping them upbeat, training
5    them.
6        I've done more for this writer/editor job
7    than was necessary. I'm an excellent, gifted
8    writer. I've written many papers. I've written
9    PowerPoint presentations, done PowerPoint
10   presentations with slides. I'm prepared to go in
11   front of this Congress committee. And I read over
12   the reports. That's something -- something that I
13   could do. I could write them very easily.
14       Q.   And did you revise any other contract
15   specialists' or contract administrators' contracts
16   when you worked at GSA?
17       A.   Well, I revised letters. Purchase orders
18   are contracts. Yes, I've revised purchase orders.
19       Q.   Whose purchase orders did you revise?
20       A.   Well, if a contractor couldn't do it, we'd
21   have to change the contractor, change the purchase
22   order. I supervised other program assistants
23   issuing purchase orders for requisitions, so I've
24   had to change some.

Page 75

1        Q.   You changed your subordinates' purchase
2    orders?
3        A.   Well, I've had to -- well, I've also had
4    to issue modifications for other people's
5    contracts, too.
6        Q.   And if you issued a modification for
7    someone else's contract, that was making a change
8    to the contract terms? Is that what a modification
9    does?
10       A.   Well, I was asked to prepare
11   modifications, you know. They may not necessarily
12   have been my contracts, so I was asked to prepare
13   modifications. So yes, I've revised other people's
14   contracts. All the work that I did at GSA,
15   occasionally I would be told to prepare a
16   modification for this or do this or, you know,
17   whatever.
18       Q.   And if you were asked to do a modification
19   of another person's contract, what aspect of the
20   contract were you modifying or changing?
21       A.   Well, I know this. I was given
22   requisitions to do that weren't my requisitions
23   originally, but they were given to me to do.
24       So I had to issue purchase orders, okay.

Page 76

1    I supervised the contract administration branch on
2    occasions. Work would come to me. If you were a
3    supervisor, work would come to you. You'd have to
4    read it over, make changes. Okay.
5        Q.   What types of changes were you making?
6    What aspect of the contract were you changing; or
7    the order?
8        A.   Well, let -- can I say usually if I were
9    making changes to purchase orders or contracts,
10   they would be my own modifications.
11       Q.   Okay. So most of the time if you were
12   changing them, you were changing your contracts
13   that you yourself -- I'm sorry. Let me rephrase
14   that.
15       For most of the time if you were making a
16   modification, it was to a contract or a purchase
17   order that you yourself had prepared; is that what
18   you're saying?
19       A.   Yes.
20       Q.   And what percentage of the time would you
21   be making a modification or a change to a contract
22   or a purchase order that someone else at GSA had
23   written?
24       A.   Not very often.

Page 77

1    Q.   In an average week, how many times would
2  you review -- I'm sorry.
3       How many times would you make a
4  modification to someone else's contract or purchase
5  order?
6    A.   Not very often.
7    Q.   I'm just trying to get a sense of what you
8  mean by not very often.
9    A.   Well, each contract administrator has been
10  delegated their own contracts, okay, but besides
11  administering these contracts, I said that I
12  supervised the issuance of purchase orders for
13  requisitions.  Okay.
14       Occasionally, you know, there was a
15  mistake on the purchase order, so I would get a
16  call from the customer supply center saying there
17  was a mistake.  You know, I was getting
18  sometimes -- not a lot, but I was getting once in a
19  while a call that there was a mistake.  So it would
20  be brought to the attention of the person to fix
21  the mistake, you know, or you can't use this
22  supplier.  We need another supplier.
23       So I was involved with correcting and
24  editing that way.  And a purchase order is a

1  using the correct terminology to resolve claims
2  even though I never had to resolve a claim.  But I
3  knew the correct terminology to put in a letter:
4  Please forward us any pertinent documents within
5  20 calendars days from this letter and failure to
6  respond, we will close your claim, you know.  And
7  so I knew the proper terminology to help them
8  resolve their claims.
9       And so I was -- I told them how to prepare
10  their letters, and I didn't have to repeat myself.
11  But I was in their office to get their files ready
12  for a program review, which means that things had
13  to be edited, you know, things had -- the files had
14  to be organized.
15       And I was also put there to work on a
16  voluminous Freedom of Information Act request and
17  to complete it.  So I had to review it, make sure
18  it was correct, so that had to do with editing
19  contracts and writing letters to contracts -- other
20  people's contracts to make sure that they're moving
21  the claims along that I was on detail for.
22    Q.   You said you were on detail.  Is that with
23  a detail to GSA information technology solutions
24  that you're discussing or some other detail?

1  contract.
2    Q.   Other than purchase orders, are there any
3  other types of documents that other GSA employees
4  wrote that you would have modified or edited?
5    A.   Well, when I became a procurement analyst,
6  they wanted me to review and edit report cards, so
7  I would have been doing that.  So that job would
8  have required -- I reviewed and edited my own
9  contractors' report cards sometimes on my own.  Or
10  if they called me and said I think this is a
11  mistake, I would look into it.
12       Sometimes I would get -- I would get
13  contracts from another contract administrators and
14  their record of contacts might have a wrong
15  contract number or a wrong purchase order, and I
16  would spot it, and so I would correct it.
17       You know, you get a file from someone
18  else.  There could be just different editing that
19  you have to do or organize the file in a better
20  way, you know.  But if there was a -- or, you know,
21  wrong contract number, I would correct -- maybe
22  correct it.
23       When I was on detail to the GSA technology
24  service, they selected me because I was gifted in

1    A.   It's called GSA Federal Technology
2  Service.  I was on detail there.
3    Q.   And when was that detail?
4    A.   Let's see.  It was probab- -- January to
5  March 1990 or, I want to say, '91.  January to
6  March '91, 1991.
7    Q.   When you applied for the position at HHS,
8  did you respond to a questionnaire, an online
9  questionnaire?
10    A.   Yes.
11    Q.   And in that response, did you indicate
12  that your writing skills were considered to be of a
13  superior quality?
14    A.   I said I was a gifted writer.  And I
15  answered their questions which were multiple
16  choice, but I know I said I was a gifted writer.
17  And I wrote a play and a book and I awarded
18  contracts.  And just being a contract
19  administrator, working with technical information
20  for government contracts for 18 and three-quarters
21  years, it should have been enough that someone
22  would not toss out my application.
23       And I also furnished a sample -- a writing
24  sample that they asked for.  It was received

1    timely.  And the sample would have shown that she's
2    an excellent writer for someone who's written a
3    play and a book.
4           And then I told Eileen Gomsey that I wrote
5    a movie and I have three degrees.  And it was just
6    discrimination that they didn't help me to put me
7    on one list for one location.  I applied for seven
8    and noncompetitive status and someone comes in with
9    three degrees from Northwestern University and
10   she's written all these papers at Northwestern
11   University, just getting accepted into Northwestern
12   University, and she's a female over 40 and she's
13   Assyrian second generation, Christian Catholic,
14   four protected classes.  But I checked I was white,
15   so I was tossed out because of my race and color.
16          And Judge John D. Bates said she says she
17   was discriminated against because of her race and
18   she was discriminated against.  And it was prima
19   facie case of discrimination against me because I
20   was asked the question.  And the government has to
21   wake up.  You don't ask people those questions.
22   That's discrimination.  You don't base your
23   selection on those questions.  That's
24   discrimination.  Affirmative action is the most

Page 82

1    discriminatory plan there is.  That's
2    discrimination.
3           And I was a GS 11, and I had
4    noncompetitive status just being a GS 11, and
5    Eileen Gomsey didn't tell me.  And I answered those
6    questions.  There were several essay questions.  I
7    was -- HR people, Melinda Bean and Donna Thomas,
8    said:  Like fools you got zero points.  I'm not a
9    fool.  You got zero points, how are the scores then
10   fabricated with discretion?  And the four people
11   that were selected have Jewish names.  That's prima
12   facie case against me.  They are Jewish.  No matter
13   what they say, Alinder, Moscul, Liverhott, and
14   Grizzell are Jewish names.  They selected them to
15   be GS 12, only them, so when it comes to time to
16   promote to GS 13, they won't have any competition.
17   Yes, other people may apply if they announce the
18   vacancies, but they will have no competition for
19   the most part because they will be the ones
20   selected.  When it comes to a 14 and 15, they will
21   have no competition.  That's discrimination.
22          And Judge John D. Bates knows what
23   happened to me in this HHS case.
24      Q.   Has anyone ever told you that you are a

Page 83

1    gifted writer?
2       A.   Yes.
3       Q.   Who told you that?
4       A.   When I was put on detail at the federal
5    technology service, it's because I was a gifted
6    writer.  I knew how to say in letters what needed
7    to be said.  That's why I was put on detail there.
8    I knew how to write letters to resolve claims.
9           Also, I awarded contracts and wrote them
10   with very short deadlines.  And there were only two
11   people in the entire office who was awarding
12   contracts because there was only two of us doing
13   contracts, awarding contracts.  It means that I was
14   an outstanding writer.  I never had a protest.
15   That means I was an outstanding writer.  I had
16   highest efficiency as a contract specialist.  I
17   received an outstanding award which means I'm an
18   outstanding writer.
19      Q.   And did anyone expressly say:  Susanne or
20   Ms. Atanus, or however they addressed you, you're
21   an outstanding writer?
22      A.   My mother.
23      Q.   Is there anybody else who's directly
24   complimented your writing in that way?

Page 84

1       A.   My teachers.
2       Q.   Teachers at what level?
3       A.   In -- in grammar school I received
4    outstanding report cards.  In high school, I
5    graduated third in my class.  I received
6    outstanding report cards for writing.
7           In my MBA program, two professors said
8    she's an outstanding writer.  They -- my essay
9    exams were so excellent, so outstanding they said
10   that this is an outstanding writer; please read
11   your answer; two professors at DeVry University
12   Keller Graduate school of Management.
13      Q.   Have you ever --
14      A.   Also, I received -- I received outstanding
15   remarks on my papers that I've submitted in school.
16   And my contracts were outstanding because they
17   never had to be revised as far as the terminology
18   goes.  When I put them in the synopsis online, they
19   were outstanding, crystal clear, short, concise.  I
20   did them succinctly with proper terminology, to the
21   point.  They were outstanding.  And I had a million
22   dollar warrant and I was continually awarding
23   contracts because I was so outstanding.
24      Q.   Have you ever written for a magazine?

Page 85

1    A.  Yes.
2    Q.  What magazine?
3    A.  It was in grammar school.
4        Also, I edited my father's paper for a
5    chemical journal.  I edited my father's paper, who
6    was a chemist, who wrote a paper on thin layer
7    chromatography, TLC.
8    Q.  Were you listed in that article as a
9    co-writer or editor?
10   A.  No.
11   Q.  Are you a member of the Screen Actors
12   Guild?
13   A.  No.
14   Q.  Are you a member of any professional
15   writers' associations currently?
16   A.  No, but I want to also mention that I have
17   helped my friends write their resumes.  I've also
18   worked on them in my computer while they're sitting
19   next to them helping them so that they read very
20   outstanding and have the correct punctuation and
21   format and style and descriptions for the work that
22   they've performed.
23       And so my friends have, you know, thanked
24   me for helping them write outstanding resumes.

Page 86

1        MS. MERIWEATHER:  Could we go off the
2    record for just one second, please?
3        (Discussion had off the record.)
4        (A recess was taken.)
5        MS. MERIWEATHER:  Back on the record.
6        Could you mark this as Exhibit Number 1,
7    please?
8        (Atanus Deposition Exhibit No. 1
9        marked for identification, 6-24-08.)
10   BY MS. MERIWEATHER:
11   Q.  Showing you what's been marked as Exhibit
12   Number 1, if you could take a moment to review it
13   and let me know when you finished...
14       (Brief pause.)
15   BY THE WITNESS:
16   A.  When you say reviewed it, do you want me
17   to read the whole thing?
18   BY MS. MERIWEATHER:
19   Q.  Just look at it enough to be able to
20   identify it.
21       (Brief pause.)
22   BY THE WITNESS:
23   A.  Well, when you say -- first you said
24   review and the second one was just enough to

Page 87

1    identify it.  So yes, I identify what this is.
2    BY MS. MERIWEATHER:
3    Q.  Have you seen this document before?
4    A.  Yes.
5    Q.  Is this, what's been marked as Exhibit 1,
6    your core questions and resume for your application
7    to HHS?
8    A.  It's not complete, no.  This has been
9    fabricated, too.  And I'm glad you asked that
10   question.  You walked right into it.
11       This has been so fabricated.  There were a
12   lot more questions.  There were a lot more essays
13   that I wrote.  And I saw the blank core question,
14   Quick Hire.  They had a lot more pages, a lot more
15   questions.  It asked if I wanted to be considered
16   under noncompetitive status as a GS 11 which I did.
17   Those questions aren't on here.
18       You have these questions that aren't
19   numbered.  And then there's all grades four, all
20   grades five, all grades six, all grades seven, all
21   grades eight, all grades nine, all grades ten like
22   we're supposed to understand what that means.
23   Nobody understands what that means.
24       Under all grades four, I got 12 points.

Page 88

1    On all grades five, whatever that means -- the
2    question isn't even on here -- I got eight points;
3    all grades six, 12 points; all grades seven, four
4    points; all grades eight, ten points; all grades
5    nine, five points; all grades ten, zero points.
6        And then we were told by the HR people
7    we'd get zero points.  How do we get these
8    12 points, eight points, 12 points, four points,
9    ten points, five points, zero points?  How could I
10   get zero points if I answered the question correct?
11   It was fabricated with discretion and
12   discriminatory against me on seven counts on
13   discrimination because I was not black or Jewish or
14   Polish or Jewish, Hispanic, or economically
15   disadvantaged.
16   Q.  I'm going --
17   A.  All the questions are not on here.  It
18   doesn't explain how the points would be given.  In
19   core questions on the Quick Hire, it didn't say
20   you'd be given these points if you answered it this
21   way, these points if you answered this way, these
22   number of points if you answered it this way.  This
23   is garbage.  This is the most excellent piece of
24   discrimination I've ever seen.  All the questions

Page 89

23 (Pages 86 to 89)
1828e225-cd91-449e-9825-ee8b50f8c6a6

**Page 90**

1    are not on here.  All the essays are not on here.
2        Then they give me one page with those
3    points that I told you about not even the questions
4    or my essays.  Pieces are missing.  We asked under
5    discovery that this information would be furnished
6    to us.  It's incomplete.  It shows discretion.  It
7    shows discrimination.  I was discriminated against
8    because of my color, because of my race, as Judge
9    John D. Bates said, and because of my religion.
10       If I had checked I was black or if I was
11   Hispanic, my application hopefully wouldn't have
12   been tossed out.  But they didn't even realize on
13   my resume it said I was a GS 11.  For all those
14   13 years I was a GS 11, I should have been
15   considered a noncompetitive status that way for
16   seven locations.  I was not put on one list to be
17   considered by a selecting official.
18       And Judge John D. Bates is correct.  I was
19   discriminated on a prima facie case of
20   discrimination.  And then you tell me to look at
21   this document and pieces of information are
22   missing.  It's incomplete.  It doesn't have all the
23   information that the blank without answers to the
24   Quick Hire questions ask for.  And then you give me

**Page 91**

1    points, and then HR Melinda Bean and Donna Thomas
2    says you get zero points.  Then how did you put
3    down 12 points, ten points?  And how -- you don't
4    even tell us how they were scored.  Fabrication,
5    discrimination.  I won this case.
6        Q.  Do you --
7        A.  And I was not --
8        Q.  Ms. Atanus --
9        A.  I was not treated in the same or similar
10   way as Moscul, Alinder Mestry, Liverhott, and
11   Grizzell who have Jewish names and who were treated
12   differently than me.  And I was applying for the
13   same position as them and they were selected and I
14   was not -- not put on not one list.  That is prime
15   facie case against me.  I was not treated the same
16   or similar way as them who are protected classes
17   and I'm in four protected classes as Judge John D.
18   Bates knows and you know that I'm Assyrian, female,
19   over 40, Christian Catholic.
20       Q.  I direct your attention to pages F5C 5 of
21   9 through pages F5C 9 of 9 of what has been marked
22   as Exhibit Number 1.  The page numbers are on the
23   bottom.  Those pages are your resume; are they not?
24       A.  Page 5 is not.

**Page 92**

1        Q.  The bottom of page 5 says resume for
2    Susanne Atanus resume.  Are you saying that is not
3    a part of your resume?
4        A.  I'm sorry.  It started there.  Okay.  I
5    was looking at the most -- 90 percent of page 5
6    which was not my resume, but that part is.
7        Q.  And continuing through page 9, are those
8    four and a half pages the resume that you submitted
9    to HHS?
10       A.  Yes.
11       Q.  So there's nothing fabricated in this
12   resume, is there?
13       A.  No.
14       Q.  I direct your attention to page 4 of
15   Exhibit Number 1.  At the top of page 4, it states:
16   Please describe below your ability to communicate
17   clearly in writing a variety of legal and/or
18   analytical and technical documents or articles that
19   require a research and analytical approach.
20       Is the paragraph below that your response
21   to that question?
22       A.  Yes.
23       Q.  And that's an essay response, correct?
24       A.  I may not have put it all in one

**Page 93**

1    paragraph.  I can't say that I did that.  It
2    appears all in one page in one paragraph.  I know I
3    write in paragraph form.
4        So it appears that it has the content of
5    what I said, but it was all put in one paragraph
6    even though I know I intended that there would be
7    paragraph breaks.
8        Q.  But this is your response to an essay
9    question, correct, albeit formatted differently?
10       A.  This is a response to one of the essay
11   questions.  There were several essay questions, and
12   what you have put in front of me is only my answer
13   to one of them which is not an accurate reflection
14   of how hard I worked to answer the essay questions
15   in Quick Hire.  This is one and only one, but there
16   were several.
17       And when we asked for them in discovery,
18   we wanted them to come back to us complete, and
19   this is not complete of what I did for all your --
20   answering all your questions -- HHS questions in
21   Quick Hire for this writer/editor job with an
22   announcement number HHS-OIG-2004-0160.
23       Q.  And what essay question do you claim is
24   missing?

1    A.   There were other essay questions because
2  after the question or questions, they would say:
3  Please explain your answer.  There was not just one
4  essay requested in Quick Hire.
5    Q.   And what question do you recall being
6  asked to explain that you did not see in Exhibit 1?
7    A.   Can I refer to the Quick Hire questions I
8  was given to me in discovery that I have here?  I
9  have to find it.
10   Q.   No.
11   A.   That might help me answer your question.
12   Q.   You can only refer to documents that I
13  give you as an exhibit.
14   A.   Okay.  All right.  You've asked me the
15  question twice.  I don't know -- it probably was
16  explained your writing of speeches, scripts
17  brochures, technical articles, reports, explain.
18  And also in this essay, I did not say that I wrote
19  a book and a play, but I know I said it in my
20  answer to the Quick Hire question.  That was one of
21  the answers that I elaborated on the other writing
22  that I did.
23       Also, the Quick Hire questions ask, who is
24  your audience that you write to?  Do you supervise

Page 94

1  your writing?  Do you supervise writing?  Do you
2  write technical articles?  Those questions were --
3  were asked.  Do you edit other people's work?  Do
4  you supervise other people's writing work?  Those
5  questions were all asked in Quick Hire, as well as
6  what types of writing you do where I said I
7  write -- I've written a book and I've written a
8  play and I've done a lot of research papers at
9  Northwestern University and in my master's program
10  for my MBA.  In my MBA I had to submit papers,
11  research papers.  I had to review many documents,
12  many articles, and I had to analyze them, think
13  about them --
14   Q.   I'll direct --
15   A.   -- and formulate a hypotheses for my
16  research papers at Northwestern University.  And
17  for every social science course I took -- and I
18  took many -- I had to write a paper.  And I would
19  be in the halls of periodicals --
20   Q.   Ms. Atanus --
21   A.   -- volumes, and I had to summarize them
22  and I had to review them and I had to write an
23  outstanding paper to graduate from Northwestern
24  University.  Just being admitted there, just

Page 95

1  staying there and graduating from there, you had to
2  do outstanding work.
3    Q.   Ms. Atanus, you at this point have gone
4  several miles beyond the question that I asked
5  which was, are there specific questions that you
6  contend that you answered that are not in
7  Exhibit 1?
8    A.   Yes.
9    Q.   And let me direct you to page 5 of
10  Exhibit 1.  Near the top where it says:  All grades
11  five, it says:  I have written and edited.  And
12  then listed there are technical articles,
13  brochures, speeches, and scripts.
14   A.   That is not true.
15   Q.   What is not true?
16   A.   That is not true.  These answers -- what
17  you see on page 5 were fabricated because there
18  were at least -- a list of seven, eight different
19  things, which ones have you done.  And there's only
20  four here.  And technical articles, brochures,
21  speeches, scripts, they didn't appear that way.
22  They appeared that way with four or five others,
23  and there would be a box if you checked it or not
24  checked it.  The way it's presented here --

Page 96

1    Q.   Are those the four things that you
2  checked?
3    A.   I might have checked more.  These are
4  fabricated.  I told you there were more than just
5  three-quarters page of -- on one page of questions.
6  Quick Hire questions had 20 pages to it, not four
7  pages.  It had 20 pages to it.  These are
8  fabricated.
9    Q.   Is the answer to number 5 the answer that
10  you provided?  I'm not asking you about the
11  question above that, if that's identical to the
12  full question that was on the system.  Is the
13  answer the answer that you provided?
14   A.   I don't think so.  I could have put more
15  information.  It had -- it's not -- it's not,
16  because I remember there are lot more categories
17  to check.  There were eight or nine categories to
18  check, so this is definitely not the question that
19  I had to answer.
20   Q.   That's not my question.  My question is,
21  is the answer in Exhibit 1 under number 5 on page 5
22  the answer that you provided?  In other words, are
23  these the four boxes that you checked?
24   A.   No.  I checked more.  I checked more

Page 97

1  boxes. Besides these, I checked more boxes.
2      Q.  And you received a copy of what has been
3  marked as Exhibit 1 during your administrative
4  complaint against HHS; is that correct?
5      A.  Can you repeat your question?
6      Q.  You received a copy of what we've had
7  marked as Exhibit 1 today during the process of
8  filing an administrative complaint against HHS,
9  didn't you?
10     A.  I -- I don't know your definition of
11  administrative complaint.  I filed a complaint of
12  discrimination.  Is it called administrative
13  complaint?  No.  Did I receive this at the time I
14  filed with the EEOC?  Definitely not.  They don't
15  go to the EEOC and get questions -- answers to your
16  Quick Hire questions that are fabricated.  EEOC is
17  not HHS.  EEOC does not have the computer software
18  or the information to fabricate such a document.
19     Q.  Did you receive a report of the EEO
20  investigation?
21     A.  Yes.
22     Q.  And are you saying that this document was
23  not in that report?
24     A.  You asked me at the time that I filed an

Page 98

1  now.
2      MS. MERIWEATHER:  Yes.  Well, I was
3  expecting to break at 12:30, but I didn't expect to
4  be told that this exhibit was fabricated, so this
5  line of questioning has taken more than the three
6  or four minutes that I expected.
7      MR. GOMBERG:  I understand.
8      MS. MERIWEATHER:  But this was -- I just
9  was planning to get through this exhibit -- get
10  through this exhibit and then break for lunch.  So
11  I think I will be ready within the next five
12  minutes.
13     MR. GOMBERG:  What's so critical?  Why
14  can't we wait until after lunch for that?
15     MS. MERIWEATHER:  Barry, I've been
16  unbelievably indulgent of your client in this
17  deposition.  I would like to conduct the deposition
18  in the sequence that I prefer, and I want this done
19  so I can go on to other things.
20     MR. GOMBERG:  Well, I don't mind that, but
21  I have someone from my staff who's been waiting
22  downstairs based on your --
23     MS. MERIWEATHER:  And I waited for you for
24  15 minutes when we got started, so --

Page 100

1  administrative complaint did I receive -- did I
2  receive this document at the time I filed an
3  administrative complaint?
4      Q.  I'm asking you a different question now.
5      A.  No.
6      Q.  My question now is, is Exhibit 1 a portion
7  of the report of investigation that you received,
8  yes or no?
9      A.  I would have to look at the report of
10  investigation to tell you if every page here is in
11  there.  I know my resume is there.  The answers on
12  page 5 I don't think are there.  We got this during
13  discovery.  It was not report of investigation.
14     Page 4 of 9, yes, but page -- I would have
15  to see the report of investigation to know if I'm
16  exactly correct.  The resume, yes, is there.  I
17  don't think I've seen page 5 at the bottom of my
18  resume yet and not the top part of page 5 where I
19  said 12 points, 12 points, four points, five
20  points, zero points.  That I don't think was in the
21  report of investigation.
22     MR. GOMBERG:  When you told me you were
23  breaking at 12:30, I told someone from my office to
24  meet me in the lobby, so they're probably there

Page 99

1      MR. GOMBERG:  I was here at 9:30.
2      MS. MERIWEATHER:  Well, we were in here at
3  9:30.
4      MR. GOMBERG:  Well, I'll give you five
5  more minutes.  If you're done in five minutes,
6  fine.  If not, I'm leaving.
7      MS. MERIWEATHER:  Barry, you can't control
8  the deposition.  I'm going to take the time that I
9  need.
10     MR. GOMBERG:  You're going to have --
11     MS. MERIWEATHER:  If you want to leave and
12  leave your client in here for me to continue, go
13  right ahead.
14     MR. GOMBERG:  I'm not arguing with you,
15  Robin.  I'm just telling you that I have someone
16  from my office waiting downstairs based on your
17  word that we were breaking at 12:30.
18     MS. MERIWEATHER:  And I'm telling you --
19     MR. GOMBERG:  So I'm going to give you
20  five more minutes, and after that, I'm taking a
21  lunch break.  You can do whatever you want.  Go
22  ahead.
23     MS. MERIWEATHER:  Okay.  You can take a
24  lunch break, and I will continue the questioning if

Page 101

**Page 102**

1  I need to.
2      MR. GOMBERG: You'll do the questioning
3  without Ms. Atanus because she's leaving with me.
4  So you've got five minutes.
5      MS. MERIWEATHER: You're not controlling
6  my deposition.
7      MR. GOMBERG: I'm telling you what I'm
8  doing. You can do whatever you want.
9      MS. MERIWEATHER: I'm telling you you
10  can't tell me what you're doing in my deposition.
11      MR. GOMBERG: I have just told you what
12  I'm going to do. You've got five minutes. Decide
13  what you want to do with the five minutes. Go
14  ahead.
15      MS. MERIWEATHER: Barry, if you're going
16  to leave while I'm questioning, you're going to
17  have to call the Court and request --
18      MR. GOMBERG: I'm not calling anybody.
19  I'm breaking in five minutes. Go ahead. You're
20  wasting your time.
21      MS. MERIWEATHER: You're wasting my time.
22  BY MS. MERIWEATHER:
23      Q. Ms. Atanus, so you have confirmed that
24  pages F5C 5 of 9 through F5C 9 of 9 are your

**Page 103**

1  resume; is that correct?
2      A. Right, but four-fifths of page 5 has
3  fabricated questions. The questions aren't
4  complete. The answers aren't complete. The points
5  are fabricated. If Melinda Bean and Donna Thomas
6  said they give zero points, then where in the heck
7  did these 12 points come from for all grades four?
8  Like we are supposed to know what all grades four
9  mean? What does all grades mean for heaven sake?
10  All grades wasn't even -- you know, probably 11,
11  12. It's a writer/editor position, so maybe all
12  grades means 11, 12. I saw all grades four. I
13  says: What does four mean? It doesn't say
14  question four. I mean, this sheet came out of
15  nowhere --
16      Q. Ms. Atanus --
17      A. -- without anything else, without any
18  other questions. It just came out of nowhere and
19  the -- the answers are --
20      Q. Ms. Atanus, let's get back to the
21  question.
22      A. -- you know, not complete because I wrote
23  more essays.
24      And don't be so surprised,

**Page 104**

1  Ms. Meriweather, that this is a fabricated
2  document.
3      Q. Ms. Atanus?
4      A. It sure as heck is fabricated. Don't be
5  so surprised.
6      Q. Ms. Atanus --
7      A. It's fabricated, discretionary, and
8  discriminatory on seven counts of discrimination.
9  And please don't act so surprised. You're not
10  stupid and we're not stupid. Don't act stupid and
11  don't waste our time.
12      Q. Ms. Atanus, my question is, is your
13  resume -- is the resume portion of page F5 5 and
14  all of page F5 6 through F5 9 of 9 your resume that
15  you submitted to HHS, yes or no?
16      MR. GOMBERG: Asked and answered.
17  BY THE WITNESS:
18      A. I asked and answered, Ms. Meriweather.
19  BY MS. MERIWEATHER:
20      Q. Yes or no?
21      MR. GOMBERG: Asked and answered.
22  BY THE WITNESS:
23      A. Asked and answered. Have the court
24  reporter read it back to you. You have a poor

**Page 105**

1  memory.
2  BY MS. MERIWEATHER:
3      Q. Ms. Atanus, your counsel's objections do
4  not give you the right to not answer my question.
5      A. I've answered it yes.
6      Q. Yes, this is your resume? The resume is
7  not fabricated, correct?
8      MR. GOMBERG: Asked and answered. You can
9  still answer again.
10  BY THE WITNESS:
11      A. The resume is not fabricated.
12  BY MS. MERIWEATHER:
13      Q. And this is the resume you submitted when
14  you applied for the writer/editor position,
15  correct?
16      A. Correct.
17      MS. MERIWEATHER: Let's take a break.
18      (A lunch recess was taken.)

1        AFTERNOON SESSION:  2:00 P.M.
2   BY MS. MERIWEATHER:
3       Q.   One of your claims against HHS is that you
4   were discriminated against because you're not
5   Jewish; is that right?
6            Is that one of your claims?
7       A.   I was discriminated against because of
8   religion, including not being Jewish.
9       Q.   And are there specific -- do you believe
10  that Melinda Bean at HHS had reason to know that
11  you were not Jewish?
12      A.   Yes.
13      Q.   And -- and what is that specific reason
14  that you believe that Melinda Bean had to know that
15  you were not Jewish?
16      A.   Atanus is not a Jewish name.
17      Q.   So your belief that Melinda Bean knew you
18  were not Jewish is based on her knowing your name?
19      A.   Also -- yes.
20           Also, she could look up my records from
21  GSA.  She could look up the lawsuit that I had
22  against GSA that explains my count of
23  discrimination -- one of my counts of
24  discrimination in the GSA case, which was because I

Page 106

1   was Christian Catholic and I was discriminated
2   because of my religion, and other -- six counts of
3   discrimination.
4            So she could call up a GSA office and say,
5   What do you know about Atanus?  What do you know
6   about her discrimination suit against GSA?  But she
7   knew Atanus was not a Jewish name.
8       Q.   And what -- how do you define what -- what
9   is a Jewish name?
10      A.   Liverhott (phonetic); Moscul (phonetic);
11  Grizzell (phonetic); Alinder.
12      Q.   And what makes those names Jewish?
13      A.   They're -- you could tell by the names
14  that their bloodline is Jewish.
15           They only picked four out of 586.  And two
16  of the other names were not Jewish, but they
17  already had jobs at HHS.
18           So they only sent four names with some
19  other names, but only four were selected.  The
20  other two that were selected already were in the
21  position of writer/editor.  So they only select
22  four out of 586 other people.
23           And you even put in writing,
24  Mrs. Meriweather, that I wasn't considered under

Page 107

1   either delegated examining unit or merit promotion
2   plan.  I wasn't considered under any plan.  That is
3   very discriminatory.  So I wasn't even considered,
4   period, because my name was not a Jewish name.  I
5   was not black.  Judge John D. Bates already said I
6   was discriminated because of my race.  She was
7   discriminated because of her race, period, prima
8   facie case of discrimination that I was applying
9   for the same job as Alinder Mestry (phonetic),
10  Liverhott, Moscul and Grizzell.  I was more
11  qualified than them.
12      Q.   And --
13      A.   I was more qualified.  I had three
14  degrees.  I worked for The Government 18,
15  three-quarters years writing government technical
16  contracts.
17           I have an MBA with distinction.  I'm
18  familiar with auditing.  I'm familiar with
19  statistic sampling.  I worked with quality
20  assurance specialists, who their name was changed
21  to industrial analysts.  And they were in
22  contractor's facilities all the time.  And they had
23  to take samples like the auditors do and they had
24  to count the number of deficiencies like the

Page 108

1   auditors do.  And the contractors had to offer
2   price considerations like the contractors that work
3   at HHS do that have contracts with HHS.
4            I'm very familiar.  I was an intern at
5   Health and Human Services when I was in college --
6   junior year of college.  I'm familiar with Medicare
7   and Medicaid.  I have a life insurance license.  I
8   have a health and accident insurance license.  I've
9   read over the different types of insurance
10  policies, Medicare supplements.
11      Q.   Is it your opinion that Jewish people were
12  given preferential treatment?
13      A.   Yes.
14      Q.   And do you feel that that was unique to
15  your application to HHS or do you have -- or do you
16  believe that this is a common occurrence?
17      A.   It's a common occurrence in the Federal
18  Government.
19      Q.   And on what do you base that belief?
20      A.   At GSA, many of the people in Grades 12,
21  13, 14, 15, and senior executive service were
22  Jewish, many of them.
23           Dorothy Price had no college education.
24  They promoted her to a GS-12.  Not even told her

Page 109

28 (Pages 106 to 109)
1828e225-cd91-449e-9825-ee8b50f8c6a6

1 you have to go to school, take some courses. They
2 promoted her. Dick Smith, my director, came on
3 board as a 14.
4        The rules were you don't get promoted
5 beyond Grade 12 without a college degree. So they
6 broke the rules. No problem. They don't even say,
7 Dick Smith, you can accept this job, but you're
8 going to have to finish your college degree. No.
9 Special privileges. What is this? What it is is
10 discrimination. Capital D, real big, capital I,
11 bigger, s-c-r-e-t-i-o-n (sic). Discrimination.
12        Debbie Walkup, she's a 12. They give her
13 the chief slot. But before she took this chief
14 slot, she was told to get some college. So she
15 takes two, three courses. She's now in the chief's
16 spot. She doesn't go to any more school. What is
17 this? Discrimination --
18        Q. And was she Jewish?
19        A. -- capital D. She was polish. Capital
20 D-i-s-c-r-e-t-i-o-n (sic), real big letters. Her
21 name was Lizek (phonetic) before.
22        The rules were you don't get promoted past
23 Grade 12 if you don't have a college degree. I had
24 three degrees. They don't say, Atanus, we're going

1 to promote you to 12, 13, 14, 15 and 16 to make up
2 for the 13 years that we did not promote you. All
3 right. Who else was promoted?
4        Kenneth Kalsher (phonetic), he came on
5 board for a summer job when he was in college.
6        Q. Was he Jewish?
7        A. Yes.
8        And there was J. David Hood. He became
9 the assistant regional administer of Federal
10 Supply, then he became the regional administrator
11 of Public Building Service. He's Jewish.
12        Then there was two attorneys who were
13 Jewish, possibly three who were Jewish. There was
14 Michael, and he became the director of Federal
15 Supply. And there was Frank Hoft who was very
16 discriminatory to me. He was -- when I started
17 work at GSA 1984, he was the chief of quality
18 assurance, and he wasn't going to promote me. And
19 I didn't see any promotions to women who were not
20 minorities past GS-11. Only one, and that was the
21 German girl, Crystal Mony (phonetic) who claims she
22 was economically disadvantaged.
23        Q. Do you --
24        A. But she married a Chicago -- a City of

1 Chicago attorney. So she wasn't disadvantaged
2 anymore.
3        Q. Do you consider yourself to be a minority
4 on the basis of your national origin?
5        A. Yes. I'm Assyrian. I'm smallest number
6 of people there are and we're continually being
7 discriminated.
8        Q. Were you born in the United States?
9        A. Yes.
10        Q. Have you ever lived outside of the
11 United States?
12        A. No, but I've been on vacation outside the
13 United States.
14        Q. And just to clarify, when you said
15 Assyria, you meant that that's traces back to an
16 Irani descent; is that correct?
17        A. Assyria is in the Mesopotamia valley
18 between the Tigris and Euphrates River, but it
19 doesn't exist anymore. Alexander the Great
20 conquered Assyria.
21        There's no Assyria, but we are all over
22 the world; but my ancestry is from the Middle East.
23 And even the Genesis, Chapter 7, talks about
24 between the two rivers. So we've been around from

1 the beginning of time.
2        And between the two rivers, you know darn
3 well, Genesis 7 is talking about Tigris and
4 Euphrates River. And that's -- that's where we're
5 from.
6        And the Assyrian people, when they are
7 congregated, they don't bother anybody. They just
8 live in their own villages, a very simple life.
9 But they're mean and wicked people who live in the
10 dark side of the darkness and they run out Assyrian
11 people for no reason but because they're Assyrian.
12 And they speak the language of Jesus Christ, which
13 is Aramaic.
14        Q. And who are the people who live in
15 darkness who chase Asyrians?
16        A. The people who run them out of their
17 villages.
18        Q. And who are those people?
19        A. People who are not Christian Catholics.
20 They are animals who live in the world of darkness.
21 They follow the evil one. They are mean, wicked
22 people.
23        Q. And is there a country from which these
24 people originate?

1    The "people" being the people who live in
2    darkness.
3    A.   They're all over the world.
4    Q.   Do they have a religion?
5    A.   They might give their religion a name.
6    Q.   What would that name be?
7    A.   They might -- they might call themselves
8    -- you ask them what they are, they might call
9    themselves anything.  They might say they're Islam.
10   They may not answer you.  They might say they're
11   even Christians.  But Christians don't run out
12   other people who are Christians.  So you know
13   they're lying.
14       But they could be -- they could call
15   themselves anything.  They could call themselves
16   Jewish.  They could call themselves Protestant.
17   But if you ask them what they are, most likely,
18   they won't say, I'm a Christian.  They'll say -- if
19   you ask them what they are, they might say, I'm
20   Catholic, but they'll never say they're Christian
21   and run out other people.  So you know if they are
22   running out other people, they're lying.
23       And I was discriminated against by HHS and
24   GSA.  They don't care about my ability.  They don't

Page 114

1    care what I could do for the agency.  They don't
2    care that I made a lot of suggestions at GSA.  They
3    don't care I was smart.  They had no respect for
4    me, both GSA and HHS.  And neither do you
5    Ms. Meriweather, and neither do you, Ms. Meighan.
6        You can look at me straight in the eye,
7    but I know you don't have any respect for me.
8    Because if you did, you wouldn't write up your
9    legal documents the way you did.
10       So you're not lying with (sic) me and
11   you're not lying to anybody here.  You're not lying
12   to Judge John Bates, because he's got this down.
13   He knows discrimination took place, okay?
14       So my name Atanus is not Jewish.  If it
15   was, I would have been hired.
16   Q.   And that's because you believe that Jewish
17   people receive preferential treatment for
18   government jobs?
19   A.   Yes.  And I could tell you more names at
20   GSA, more people.
21   Q.   I don't think I need those other names.
22       Are you familiar with the name Eileen
23   Gomsey (phonetic)?
24   A.   Yes.

Page 115

1    Q.   You have you ever met Eileen Gomsey?
2    A.   No.
3    Q.   Have you communicated with Eileen Gomsey?
4    A.   Yes.
5    Q.   Who is Eileen Gomsey?
6    A.   She's a -- is a team leader at HHS that
7    time I talked with her in 2004.  August --
8    Q.   And would --
9    A.   -- August or September or both 2004.
10   Q.   So you spoke to or communicated with
11   Ms. Gomsey after you applied for the writer/editor
12   position?
13   A.   Yes.
14   Q.   And what did you discuss with Ms. Gomsey?
15   A.   I told her that I was an outstanding
16   scholar and I had noncompetitive selection
17   authority.  And she said, Well, you're the only one
18   that's ever contested that.  And she said, We're
19   looking at having that removed.
20       So it's in every application, you ask if
21   someone is an outstanding scholar, because you know
22   they make great federal employees and they do great
23   work and they're great writers, outstanding
24   writers.

Page 116

1        If you have a high grade point average,
2    that means when you take essay exams, you know how
3    to express yourself in an outstanding way.  They
4    know what they were looking for.
5    Q.   What was your GPA from Northwestern?
6    A.   I'm not done answering your question.
7        At the beginning of the deposition, you
8    said, Wait until I'm finished.  You have to wait
9    until I'm finished.
10   Q.   And my question was, what did you discuss
11   with Eileen Gomsey?
12   A.   Okay.  Well, let me finish, please.
13   There's a lot that we discussed.
14       And she said that, We're looking at
15   getting that removed.  We're going to have to hire
16   somebody.  And I said to her I was wrongfully
17   removed at GSA and I would like this position.  And
18   I applied to seven locations and I would like a
19   position, preferably in Chicago because that's
20   where I live.
21       And she said that you can come on board
22   with noncompetitive selection authority if you have
23   a disability.  And I said I do.  I can't lift
24   anything heavy.  And she says, Well, you're going

Page 117

1  to have to have a doctor say that you have a
2  disability. And I didn't know if my condition
3  after my cholecystectomy, removal of the
4  gallbladder, would be permanent or not.
5       I did talk to my doctor about it. And he
6  says it could be permanent, but it wasn't because I
7  had talked to Gomsey. It was because I was talking
8  to lawyers and they all wanted to know do I have a
9  permanent injury or not. And I told the surgeon,
10  you know, it's hard to sue. They want to know if I
11  have a permanent injury. He says you could.
12       So what was printed and given to
13  Mr. Gomberg, my attorney, were four ways that I
14  could be con- -- they asked, How do you want to be
15  considered? Now, whether that was in actuality in
16  the application that I saw on-line or not, I don't
17  know.
18       What was sent to Mr. Gomberg was
19  approximately 20 pages of questions that required
20  essays. Was that the actual thing that was on the
21  QuickHire? I don't know. If my supposedly answer
22  has been fabricated with points that are
23  subjective, because both Melinda Bean and Donna
24  Thomas says you get zero points. So how in the

Page 118

1  heck can they come up with these points? It
2  appears very subjective.
3       What they downloaded or supposedly
4  downloaded, was that the actual thing I saw? I
5  don't know. But it did say, from what Mr. Gomberg
6  saw and he showed me, the 20 pages, they asked, How
7  do you wish to be considered?
8       So I knew with three master's -- with
9  three degrees, including two master's degrees, I
10  knew that my chances were very good at being
11  outstanding scholar. With GPA of 3.84 out of 4 in
12  an MBA program, I had a lot going for me to be
13  selected or to at least be put on a list.
14       But to be put on no list and then
15  Ms. Meriweather has the audacity to say she wasn't
16  considered anyway. Oh, no? That's like saying she
17  wasn't considered at all. Oh, no? That's because
18  I was discriminated because of my color and my
19  religion.
20       Judge John D. Bates said she was
21  discriminated because of her race, but I'll say
22  also color and my religion, because I'm Christian
23  Catholic and the four that were collected all have
24  Jewish names and they're Jewish. Their bloodline

Page 119

1  is Jewish. Their bloodline is Jewish.
2       And then I never heard of such fabricated
3  answers. When you ask, What's your national
4  origin, it's like saying, What's your nationality?
5  Some people who are cute will say American, but
6  that's not what the question is asking for.
7  They're asking -- they want to get to know you.
8  They want to get to know the real you. They want
9  to, you know, know you so they really know you.
10  And they ask you what is your national origin.
11  That means, What is your bloodline? Some people
12  will say seven things. You know, I'm Irish-German,
13  a little Scottish, a little Polish. That what
14  we're asking for.
15       So Mr., you know, Grizzell says he met
16  with you a few times. That is very obviously. You
17  don't come up with the answer, I'm American. We
18  know his bloodline is Jewish.
19       And for Linda Mestry, she said her
20  mother's side, it's Russian-Ukrainian. And on her
21  father's side, she says it's American. All the way
22  down, it's American. No, it's not. No one is
23  completely American. We all have bloodlines from
24  different countries.

Page 120

1       And Alinder is German. Her bloodline is
2  German. She said she's Christian. Well, she could
3  be a Messianic Jew. But we know Grizzell is
4  Jewish. So even if one person -- only one was
5  Jewish, I was discriminated because I was not
6  selected and he was.
7       And he said -- well, you asked him, Are
8  you Catholic? No. And -- and Linda Mestry said
9  she's Christian when her bloodline is not, her
10  ancestry. Her bloodline is Jewish. Liverhott and
11  Moscul, their bloodline is Jewish.
12       How would four out of 586 only be
13  selected? Only four out of 400 -- 586. And you
14  have a 30-page affirmative action plan and they
15  were in the protected class that you were looking
16  for. You weren't looking for Assyrian Christian
17  Catholic, but you should have been. That's a
18  protected -- both of those are a protected class.
19       You didn't care what was on my resume that
20  showed that. You didn't care I was a contracting
21  officer; I wrote contracts. That wasn't good
22  enough. You didn't care I had three degrees. That
23  wasn't good enough.
24       I'd be flipping cartwheels and doing

Page 121

31 (Pages 118 to 121)
1828e225-cd91-449e-9825-ee8b50f8c6a6

**Page 122**

1  backflips and handstands if I just saw two degrees,
2  a graduate degree. Plus, from Northwestern
3  University? They take the cream of the crop to
4  graduate. You're the cream of the crop. You think
5  analytically.
6      So I'm not impressed with your questions.
7  The more you continue this deposition, the more
8  discrimination is further on my side, the way you
9  look so surprised at my answers.
10     Q. Speaking of your --
11     A. The whole system is very discriminatory
12  and very disgusting and very awful --
13     Q. Speaking of your answer --
14     A. -- and I'm entitled to damages.
15     Q. Speaking of your answers, Ms. Atanus, when
16  you're referring to what Ms. Mestry -- Ms. Alinder
17  Mestry and Mr. Grizzell said, are you referring to
18  their depositions in this district court
19  litigation?
20     A. Yes.
21     Q. And that occurred in -- the testimony
22  occurred in 2008, correct?
23     A. Yes.
24     Q. So you couldn't have discussed that

**Page 123**

1  testimony with Eileen Gomsey; that's correct?
2      A. No, I didn't discuss the testimony with
3  her, but I was talking to her, telling her I was
4  wrongfully removed. I wanted a government job. I
5  wanted to get back in The Government. And it --
6  you would think she's a team leader; she's an
7  adult; she would understand. But no one seemed to
8  really understand.
9      It seems like I became like an object of a
10  joke. And you would think after the counselor
11  would hear my testimony, even after an investigator
12  would hear my testimony, they would say, Enough of
13  this. You know, we're human beings. We should
14  treat her as a human being.
15     Why could someone threw the mud and why
16  continue this through the mud and I'm asking for a
17  settlement. And Mr. Gomberg talked to you a couple
18  days and said, it's obvious after Grizzell's
19  deposition. He said and Alinder Mestry said, I
20  don't need training from a school. We get the
21  training that we need on the job. She went to four
22  short sessions. He's been to maybe seven or eight
23  short session a day, half a day. He sees a report.
24  I saw two reports. I know I could write these

**Page 124**

1  reports, I told you.
2      I told Mr. Gomberg to tell you,
3  Ms. Meriweather, that I had noncompetitive status
4  just being an 11. I told him the scores are
5  subjective and fabricated.
6      How can Ms. Melinda Bean and Donna Thomas
7  possibly say to anybody who has an ounce of brain
8  cells in their head to say that we gave zero points
9  and then come up with scores? How did you get
10  these scores if you gave zero points? The whole
11  thing is so fabricated.
12     And you guys, wake up. The Government
13  made discriminatory errors. They did damage to me.
14  I'm entitled to all the damages that I asked for.
15  I want a three-million-dollar pension. I'm willing
16  to work for it. Bring me on board. Hire me. If
17  not, give me what I am going to lose, $3 million
18  pension. Give me what I'm entitled to. The
19  Government needs a slap on their butt.
20     Q. I would just note --
21     A. That includes punitive damages, okay?
22     They deserve -- they deserve the big dad
23  to give them a slap to wake them up just like the
24  doctor gives the baby a slap on the behind to wake

**Page 125**

1  the baby up, get everything, you know, moving and
2  thinking and working. The Government needs a slap
3  to get them moving and working and thinking. You
4  don't do this to people.
5      I'm entitled to damages. It's about time
6  The Government gets slapped. Then they'll stop
7  doing this. There's 100,000 jobs on USA Jobs. I
8  can't seem to get one.
9      Q. Have you applied for other government
10  jobs?
11     A. I applied for over 40 jobs.
12     Q. Have you been interviewed for any of those
13  jobs?
14     A. No.
15     Q. When did you apply?
16     A. I've been applying ever since I left GSA
17  in 2003. I would have been applying before I got
18  my MBA; but between going to school and working and
19  studying and writing my business plan and keeping
20  up with everything.
21     And then -- and then I pulled my thigh
22  muscle, my right thigh muscle. I was under so much
23  stress at GSA, after you get a five- or ten-day
24  suspension, you're under stress. You don't just

1  pull muscles putting on your pantyhose out of the
2  blue. People who pull muscles like that are under
3  stress.
4      And so the doctor told me I needed to be
5  off for six weeks. So after two weeks, Kim Brown
6  calls me. She's black in a world of darkness and
7  I'm white. She says, You have to come back. I
8  need your doctor report. I said, The doctor report
9  is private. Fax it to me. She says, You need to
10 be back.
11     You know why I needed to be back? So by
12 May 19th, they would give it to me in person, my
13 removal letter. That's the only reason why she
14 wanted me back. She wanted me back to get my
15 contracts off my desk. She wanted me back so she
16 could persecute me after I remove the contracts.
17     She brings them back into (sic) my desk.
18 She's at my desk in front of my face at 1:30: I
19 told you by 1:30 I wanted these contracts off. I
20 said, I called you and I said I had a call. I'd
21 take care of it. She laughs at me, verbally
22 harasses me, yells at me at least four times for no
23 reason, screaming at me at the top of her lungs.
24 And all this was written up and the judge just

Page 126

1  totally ignored it.
2      They're in a world of darkness, too,
3  following the evil one who's blinded their eyes.
4  They don't see right from wrong. They're very
5  discriminatory against me because I live in the
6  world of light and they know that and they see
7  their sin and their ugliness and their wickedness
8  and that bothers them.
9      So then they write evil things that are
10 lies against me. And they really weren't too evil,
11 but they were stupid things.
12     MR. GOMBERG: I'm going to go to the
13 bathroom. I'm sorry.
14     THE WITNESS: But enough --
15     MR. GOMBERG: I'm sorry. I got to go to
16 the bathroom.
17     MS. MERIWEATHER: Okay. Let's take a
18 short break.
19         (Recess taken.)
20 BY MS. MERIWEATHER:
21     Q.  Ms. Atanus, you stated that you told
22 Eileen Gomsey that you had been wrongfully removed
23 from GSA.
24     Is there -- did you tell any other HHS

Page 127

1  employees about your GSA employment?
2      A.  Oh, David Shorts, S-h-o-r-t-s. And there
3  were three other people in his office, and they
4  knew because they see the records and my file.
5      Q.  Did you speak directly to any of the three
6  other people in Mr. Shorts' office?
7      A.  Well, I've called their office. I talked
8  to them.
9      Yes, I gave them some messages and I talk
10 to them, too. We exchanged e-mails. So he knew I
11 was wrongfully removed.
12     Q.  And did you talk to David -- when did you
13 talk to David Shorts? When did you first speak to
14 him or e-mail him?
15     A.  Well, I was talking to Eileen Gomsey
16 August and September '04 and he came in the picture
17 probably very soon thereafter. So you could say
18 September or October I was talking to David Shorts.
19     Q.  And the other --
20     A.  You know, from time to time after that, he
21 was going to set up a counselor and he was going to
22 set up an investigator. And I told him there was
23 going to be a lawsuit. You know, I told him there
24 was going to be a lawsuit until the end.

Page 128

1      And I'm sure he forwarded the messages.
2  But, HHS, whatever I said just has fallen on deaf
3  ears. You don't seem to have any respect for me as
4  a person. You don't seem to want to care about me,
5  bringing me on board. You don't seem to care that
6  there's 100,000 jobs on USA Jobs I haven't been
7  able to obtain. There's jobs at HHS. You don't
8  want to help me in any location, finding me any
9  job.
10     That is very discriminatory and it shows
11 how people are following the evil one and living in
12 darkness because no one treats people like this and
13 that's where they're going to end up, in a world of
14 darkness.
15     And the Bible says very harsh things.
16 Just open up your Bible and start reading. He
17 says, Sodom and Gomorrah will be better than what's
18 going to happen to them. Meaning they're dead, but
19 they're going to be alive in the dark place for
20 eternity in pain and torment and gnashing of teeth
21 on fire and pain. They'll be alive and
22 experiencing it forever.
23     So they need to change. They need to want
24 to settle with me. They need to want to help

Page 129

1 people like me -- not continue lawsuits that are
2 expensive, but to say, you know, my God, she's been
3 writing for four years in this lawsuit. She can
4 write. She writes like a lawyer. She talks like a
5 lawyer. She can do this writer/editor job. She's
6 edited her own documents that we see. She's done
7 modifications. She's written contracts. She's a
8 graduate of Northwestern University.
9        But they just came after excuse after
10 excuse. She didn't send her SS50. Well, I hear
11 that when I'm in the investigative stage. All
12 right. Here's my fax that shows it was received.
13 I have the receipt. That's not good enough. Oh,
14 it was -- it wasn't filed. That wasn't good
15 enough.
16        Well, can I have a job, please? No. Your
17 resume doesn't substantiate what you're saying. I
18 mean, I told you I wrote a book and a play. I have
19 three degrees. That's not enough? I have wrote
20 contracts. That's not enough. A high sufficiency
21 as a contract specialist is not enough? I was loan
22 executive. Chicago went from seventh place down to
23 fifth place, down to fourth place. It's not
24 enough? What more do you want from me?

1        In March, we get these congratulatory
2 e-mails. We did a great job. They never said,
3 Atanus, you have to resign; you did this wrong. I
4 never did anything wrong.
5        And so Mr. Gomberg calls you up,
6 Ms. Meriweather, and says we want to settle with
7 you. No. She's been talking about settlement ever
8 since. We don't want to settle with her. That's
9 very discriminatory and it's not how attorneys
10 should act.
11        It shows that your legal education did
12 something, but maybe changed you in an awful way.
13 That's what it shows. Is this what legal education
14 does to attorneys when they act this way? It makes
15 you into a despicable, ugly person that's very
16 discriminatory and loses heart?
17        MR. GOMBERG: Susanne, don't make comments
18 towards the other attorney. That's not proper.
19        THE WITNESS: Well, I don't want to lose
20 my case. I want --
21        MR. GOMBERG: I know, but don't make --
22        THE WITNESS: -- Judge John Bates to read
23 this and get upset.
24        MR. GOMBERG: Don't make comments about --

1        THE WITNESS: But, you know, is this what
2 lawsuit teaches judges how to act, lawyers how to
3 act? Is this the effect that it has on society, a
4 poor effect? You would think let's make the
5 society -- a world a better place, not an ugly,
6 despicable, discriminatory place.
7 BY MS. MERIWEATHER:
8    Q.   What was your GPA at Northwestern?
9    A.   It was 2.90 (sic) out of four.
10   Q.   And you mentioned that there were three
11 other people who worked in David Shorts' office.
12 Did you talk to those three other people about your
13 GSA employment?
14   A.   It was mostly different things about what
15 they might have asked me or information or asking
16 them information, things like that.
17        It was nothing about GSA employment, but
18 they knew. But the whole point is your questions
19 show that, you know, you need to maybe have a
20 better handle on the system. There -- they're
21 there to move along and process discriminatory
22 complaints, okay?
23        Yes, they might talk to, you know, the
24 other HHS employees and say, Atanus is in

1 communication with us. We're moving along her
2 complaint. She wants to settle. But they don't
3 take on the role to really push a settlement.
4 They're just (sic) is to pass along paper. They're
5 just along to make sure that we're told at the end
6 of the investigation when you can file a complaint
7 with the EEOC, Equal Employment Opportunity
8 Commission.
9        They're just there to make sure that they
10 follow the law and the procedures and the
11 regulations, and they're disseminating information
12 to me that they're required to furnish to me.
13 That's all they're really there for.
14   Q.   So David Shorts and Eileen Gomsey are the
15 only two HHS employees that you personally told
16 that you had been wrongfully removed from GSA; is
17 that correct?
18   A.   Well, I -- David Shorts knew it.
19        You know, you don't tell -- say you can
20 look at your record of contact. You say you can't
21 have any papers in front of you. Did I memorize
22 exactly the word-for-word conversations?
23        The other -- the other people, I know that
24 they knew I was trying to get back into the HHS.

1  I'm sure they looked at my file.  My file had the
2  counselor's report.  My file had the investigation
3  report.  I explained all that in the counselor
4  report.  I explained all that in the investigation
5  report.  Did I have to verbally tell them?
6  Probably not.  It's all in the report.
7      Q.  And I think maybe -- maybe my question --
8  maybe you didn't get my question.  Let me rephrase
9  that.
10      Did you tell any HHS employee other than
11  David Shorts and Eileen Gomsey that you had had a
12  discrimination complaint against GSA?
13      A.  Well, I didn't -- I guess you still will
14  call it a complaint, even though it's not a
15  lawsuit.
16      But, first, your -- first,
17  Ms. Meriweather, you said, Did you tell them I was
18  wrongfully removed?  Yes, I told Ms. Gomsey that.
19  Yes, I told Mr. Shorts that.  Now, you're changing
20  your question, Did you tell them you had a
21  discriminatory complaint.
22      Q.  I'm actually asking if you told anyone
23  other than Eileen Gomsey and David Shorts.  Any HHS
24  employee.

Page 134

1      And I'm sorry I called the question stupid, but
2  why --
3  BY MS. MERIWEATHER:
4      Q.  But my question --
5      A.  Why do you -- you know, so you know the
6  answer.  No, I wouldn't -- no one puts on their
7  resume they filed a formal complaint of
8  discrimination.
9      So now I've answered your question.
10      Q.  On your resume, does it state that you
11  were wrongfully removed from GSA?
12      A.  Yes, it does.
13      Q.  Where?
14      And I --
15      A.  Because it shows that I have a GPA with
16  distinction and I have another master's degree from
17  UIC, University of Illinois at Chicago, in public
18  administration.  I had the highest efficiency.  I
19  maintained a zero percent delivery delinquency rate
20  for 18 and three-quarters years.
21      MS. MERIWEATHER:  Could you please show
22  Ms. Atanus Exhibit 1?  I gave it to this morning's
23  reporter.
24      MR. GOMBERG:  She can look at mine.

Page 136

1      A.  Well, on my resume, it shows that I have
2  three degrees.  It shows I have the highest
3  efficiency.  So my resume was seen by a lot of HR
4  people and they were told by what was on my resume.
5  She's tossed out with three degrees, highest
6  efficiency; didn't get a promotion for 13 years.
7  Everything is pretty well stated on the resume.
8      Q.  But your resume doesn't say that you filed
9  an EEO complaint against GSA, does it?
10      A.  Well, your first question was, Who did you
11  tell that you were wrongfully removed?  My resume
12  that was seen by a lot of people says that.
13      Q.  My question is, does your resume state
14  that you filed an EEO complaint against GSA, yes or
15  no?
16      MR. GOMBERG:  I object to the question.
17  The document speaks for itself.
18      But you can answer.
19      THE WITNESS:  I don't know why,
20  Ms. Meriweather, you would ask such a stupid
21  question.
22      You know, on my resume, it doesn't say I
23  filed a formal complaint of discrimination.  I
24  don't know why you would ask a stupid question.

Page 135

1      THE WITNESS:  You're talking like an
2  attorney.  You're acting like an attorney.
3      MR. GOMBERG:  I've handed her my copy.
4      MS. MERIWEATHER:  Right, but we need a
5  copy for the transcript.
6      (Discussion off the record.)
7  BY MS. MERIWEATHER:
8      Q.  Could you tell me where in Exhibit 1 it
9  states that you were wrongfully removed from GSA?
10      A.  Well, I already told you twice.  I've
11  already told you twice that when someone reads my
12  resume, they see for (sic) it.  Oh, let me say, My
13  God.  This was a sheep in the midst of wolves.
14      Q.  And I'm asking --
15      A.  She was wrongfully removed, because I've
16  told you it's now for the third time and please
17  don't ask me again.
18      Q.  You actually have never answered my
19  question, which is why I'm asking you the question.
20      A.  I've now -- I'm now answering it this way
21  for the third time.  I've already answered it this
22  way two times before.
23      When someone has a resume that reads like
24  mine; in between the lines, it says she was

Page 137

1 wrongfully removed and a person who has any
2 righteousness and decency will say, Let's help her.
3 But HHS appears not to have any righteousness or
4 decency because no one has yet helped me, but
5 continues to discriminate and persecute me with
6 these kind of questions that I've already answered
7 twice.
8       So this is how I'm answering it. It's
9 answered in between the lines. So anyone who knows
10 how to read and does well on reading comprehension
11 tests knows that when you see this, then the next
12 question is, what is the conclusion? The
13 conclusion is she's out of a job and she was
14 wrongfully removed even though she did outstanding
15 work.
16    Q. And so --
17    A. I was not treated the same or similar way
18 as other GSA employees who are not written up
19 wrongfully. So that they could set her up to get a
20 five- or ten-day, or both, suspension. So then,
21 then, they could have the weapons to remove her.
22 No one else was treated that way. Everyone else
23 got promotions to GS-12 and higher who were in the
24 contract administration branch except me who were

1 working as contract specialists.
2       They all got promotions to GS-12, 13, 14
3 and 15 and higher except Susanne Atanus because I
4 was discriminated on seven counts of
5 discrimination.
6    Q. So your resume is the only basis that an
7 HHS employee other than David Shorts and Eileen
8 Gomsey would have on which to base a belief that
9 you had been wrongfully removed from GSA; is that
10 accurate?
11    A. No. I already told you. Everyone who
12 sees the resume. You don't answer -- you don't
13 listen when I'm answering your question --
14    Q. You actually didn't -- my question is, is
15 the resume the only document or source of
16 information for people -- HHS employees other than
17 David Shorts and Eileen Gomsey to know or believe
18 that you have been wrongfully removed from GSA?
19    A. No.
20    Q. What is there other than your resume that
21 would give someone other than Eileen Gomsey or
22 David Shorts, who's an HHS employee, that
23 information?
24    A. My complete application that I submitted

1 in QuickHire. All the questions, all my essays,
2 they'll -- they say that I'm an outstanding writer
3 to someone who's reading my questions. She's
4 gifted in her writing ability and editing ability.
5 Her grammar, her cadence, her style, her
6 punctuation, her delivery, her confidence in
7 herself all shows she's an outstanding scholar, an
8 outstanding government employee, an outstanding
9 writer, and they were stupid, discriminatory,
10 abusive. They excluded me. They removed me.
11       Just like the Bible says, because you are
12 a Christian and you are not of this world, and they
13 see you as someone where you were full of light and
14 they know they see their darkness and their sin,
15 and it bothers them that you're different than
16 them.
17       It didn't matter how smart I was and how
18 outstanding my work was. They just acted like
19 wolves to a sheep, and that's how they treated
20 Christ. He was their sheep and they treated him
21 like wolves. And it didn't matter all the
22 outstanding things that he did. They just were
23 full of the darkness from the evil one, from the
24 dark evil place.

1       And it blinds them and it doesn't make
2 them think the way they should think and act the
3 way they should act. So they discriminated against
4 me and they tried to hurt me the way they tried to
5 hurt Christ. But the Bible says, Weapons will be
6 formed against you, but they will not have their
7 intended effect. Christ was resurrected and I'm
8 still alive and doing well.
9       I could use more income. I'd appreciate
10 if HHS would give me a job and work with me. I'm
11 sure there's jobs in Chicago that I could do. By
12 now, I should be a GS 15 at HHS. But if you don't
13 give me a job, you have damages to pay. And I hope
14 that Judge John D. Bates will understand that I'm
15 willing to work to earn my pension. But if you
16 don't bring me on board, you have to give that to
17 me and my four years' backpay, at least, or until
18 this court case is ended, resolved, settled.
19       You have to understand that those scores
20 were fabricated, were subjectively put down on
21 paper. If you give zero points, how were those
22 scores, you know, made?
23       And, Ms. Meriweather, I don't appreciate
24 it that you continue to ask the questions that you

1  ask, instead of saying, Oh, my God, let's end this
2  case and I'll go and see if we could settle with
3  her and do the right thing for her.  But the more
4  you ask the questions, the more you discriminate
5  against me.
6       And I see the flaws in the legal system;
7  that this is what three years of -- four years of
8  law school will do.  Makes the world a less decent,
9  less willing to negotiate and settle.  Heaven help
10 us.
11      Q.   Did you file a written complaint with the
12 EEO regarding GSA?
13      A.   Yes.
14      Q.   And did you send any HHS employee a copy
15 of that written complaint against GSA?
16      A.   I didn't have to send them.  It's public
17 information.
18      Q.   So you didn't send it?
19      A.   They -- I didn't send it, but they have
20 access to it.
21      Q.   And did any HHS employee tell you that
22 they had access to your complaints against GSA?
23      A.   No, they didn't have to say that.  I'm not
24 stupid.  I know they have access to it.  You could
Page 142

1  against.
2       And he further states that HHS has not
3  stated nondiscriminatory reasons for her
4  nonselection.
5       Praise be to God that the system is not a
6  total sewer system.
7       Q.   Did you discuss your GSA complaint with
8  Melinda Bean?
9       A.   No.
10      Q.   Did you discuss your GSA complaint with
11 Donna Thomas?
12      A.   Not verbally; but through correspondence
13 with the counselor and with the investigator -- I
14 discussed it with both of them through the
15 correspondence and the questions that were asked
16 them and asked me with the counselor and
17 investigator.
18      The counselor asked important questions
19 that showed how they discriminated against me by
20 saying, Yeah, I didn't send them the SS50.  And
21 they could have -- and they could have called me
22 immediately.  Your resume says you were a GS
23 employee.  Can you fax it to us?
24      But to play games like fools.  I'm not a
Page 144

1  go to any court, look it up electronically; go to
2  the court, ask for it in paper; ask where the files
3  are, ask that they make you a copy.  They don't
4  have to talk about that.
5       They had enough to talk about as far as
6  answering the counselor's and investigator's
7  questions.  They didn't have to ask me for a copy
8  of the GSA complaint.  They had enough on their
9  desk just taking care of what the counselor wanted,
10 what the investigator wanted.
11      Maybe if they were not discriminatory,
12 they would have said, Atanus, please send us what
13 your complaint states so that we could better
14 understand what you went through and maybe we can
15 help you get on board and give you some income.
16 Maybe a decent person would have asked and
17 discussed it with me.
18      But, so far, HHS has not acted or
19 Department of Justice has acted (sic) decent in
20 this case and the GSA case.  But Judge John Bates
21 has acted decent toward me because he has stated
22 that the plaintiff, Atanus, states that she was
23 discriminated against and did not receive a job
24 because of her race.  She was discriminated
Page 143

1  fool.  They appear to be very foolish.  A decent,
2  nondiscriminatory person with righteousness who's
3  in the light and not lives in the dark world and
4  discriminatory and mean vicious world like wolves
5  and animals act, they would have called me and
6  said, Susanne, how are you doing today?  We
7  received your application, but can you please fax
8  us your SS50.  You might have misplaced it.
9       That's all a decent person would have had
10 to do.  But four years goes on and all I see is
11 people act acting like animals, like wolves.  Very
12 mean, callous, like pit bulls.  Just tear up people
13 and the more you tear them up, the better.  Is
14 this -- is this the way people should live?  Like
15 animals?  Like in a hellhole?
16      Or do you see these churches around and
17 say, you know, there must be something.  If I go in
18 this church, maybe I'll learn something how to live
19 a better life so that I'm pleasing in God's sight
20 and the people who know me are glad that they know
21 me.  That maybe I can make this world a better
22 place.
23      Maybe I should open up this Bible and
24 learn what Jesus is saying, who's coming back.
Page 145

1  Maybe I should get right before Judgment Day
2  instead of living like a creepy fool. Maybe I
3  should do something to make something easier for
4  somebody today. Maybe I should do the right thing.
5  Lord help me to know what the right things are all
6  the time. Help me to be like you. That's what
7  being a Christian is.
8       But not the way HHS and GSA treated me.
9  And you asked me who were the other people I talked
10 to. Well, I don't have their names memorized, but
11 there were two other people in David Shorts' office
12 who were ladies. There was a person above
13 David Shorts. There's probably at least another
14 person above him. There's the Office of Civil
15 Rights.
16      And the Office of Civil Rights, you would
17 think -- went to law school. And is it because
18 you've read too many cases that you see how to act
19 wrong? Is that what most of the cases show you,
20 how you act wrong and get in a good -- get a good
21 summary judgment decision by acting wrong and
22 vicious and like wolves, like animals?
23      Is this what, you know, the system is
24 about or is the system about, Well, I read more

Page 146

1  that had bad decisions, but there were some that
2  had good decisions. And I have a brain and I know
3  right from wrong because I have the wisdom God has
4  given to those who he has chosen. And so I want to
5  do the right thing.
6       Q.  And so you spoke to people in
7  David Shorts' office after you started the EEO
8  process with HHS; is that the time frame?
9       A.  Yes.
10      Q.  And do you believe that David Shorts
11 discriminated against you?
12      A.  He's job (sic) was to move the paperwork
13 along. He verbally harassed me, yelling at me --
14 not proper tone of voice so that the whole office
15 could hear. And he kind of set the tone how his
16 office should act for people who are and have filed
17 formal complaints of discrimination. He kind of
18 set the tone. You don't talk nice to them. You
19 talk very mean and uncivil to them and very
20 discriminatory to them.
21      So, yes, he discriminated against me. Not
22 -- I'm sure he didn't say, you know, I've been
23 talking to Atanus and she's a very nice lady and
24 maybe we should really give her a chance. I'm sure

Page 147

1  he didn't say anything like that. I'm sure he
2  doesn't say that about anybody who files complaints
3  in his office. Just, you know, treat them like a
4  number; make sure that their number gets processed
5  in accordance with the regulations.
6       But everyone in HR discriminated against
7  me by not forwarding my name, not putting my name
8  on the list to be considered. Everyone in HR did.
9  And even you, Ms. Meriweather, said I wasn't
10 considered under delegate examining unit or merit
11 promotions. So then that leaves noncompetitive
12 status. I had to be considered under something,
13 but you said I wasn't considered under those two.
14 So that leaves noncompetitive status.
15      So then that's where we are. I should be
16 considered under noncompetitive status. I was a
17 GS-11. That means I should be able to come on
18 board as a writer/editor GS-11. My name should
19 have been on seven lists. I had noncompetitive
20 status just by being a GS-11.
21      And so you need to correct your mistake.
22 HHS needs to correct their mistake. I was
23 discriminated against and I was not treated the
24 same or similar way as the other people who were

Page 148

1  selected who are in protected classes who are
2  Jewish and that was the only thing -- and one who
3  was in protected class and she was a female. They
4  were also protected classes because they were --
5  most of them or at least half of them were over 40.
6       Okay. Well, so am I. I was a GS-11. I'm
7  over 40. I'm a female. I'm in three protected
8  classes right there, but I'm also an Assyrian, and
9  that makes me in another protected class. I'm a
10 Christian Catholic. That makes me another
11 protected class.
12      So I'm willing to work with you to settle
13 to give me a job, please. I don't think I'm asking
14 for the world. You're in a lawsuit. And it looks
15 like you're going to lose this one. When HR people
16 said they give zero points and all of a sudden, I
17 see numbers. And what you faxed us was four-fifths
18 of a page of questions when there was 20 pages of
19 questions that you also sent, but the ones with
20 answers are only one page, four-fifths of it, one
21 page; but the others what you downloaded,
22 supposedly, was 20 pages.
23      So show me 20 pages with my answers. But
24 then I asked in discovery show us how the scores

Page 149

1   were made. No answers. These your scores, 92.2,
2   and these are their scores.
3       Okay. But there weren't enough names
4   submitted. They said for three jobs, there would
5   be at least five names submitted. So for six that
6   means ten. And this was seven, so there should be
7   at least ten names.
8       And out of 586 people, only four were
9   selected. Only four? And then two other guys'
10  names were already in their writer/editor position.
11  So that means there was one location that didn't
12  have somebody.
13      Also, Mr. Moscul had vet status and XP
14  status. Well, I was an outstanding scholar and I
15  was an 11 with noncompetitive status. So I should
16  have got a slot before him because I have
17  noncompetitive status. That's what it says. You
18  don't compete with anybody. You're in.
19      So it doesn't matter if he had vet or XP
20  status, I had the slot over him. And if I was
21  wrongfully removed, then it shows The Government
22  discriminated against me by wrongfully removing me,
23  by marring my record, but we should make it right.
24  Because why should she have difficulty finding

Page 150

1   another job? Why should she work somewhere else
2   where those number of years won't go on her record?
3   Let's help her. Let's do the right thing. She
4   lives in Chicago. She's an outstanding scholar.
5   She's a gifted writer. She's everything we're
6   looking for. She's been to three schools. Let's
7   give her a chance.
8       Q.  I believe you said earlier in your
9   testimony today that you feel you were dis- -- that
10  your race, Caucasian, was one of the reasons that
11  you were discriminated against; is that correct?
12      A.  Yes.
13      Q.  What makes you believe that HHS employees
14  would be likely to discriminate against Caucasian
15  people?
16      A.  Well, because The Government asks your
17  race. There's going to come a time very soon where
18  The Government will not be able to do that anymore
19  because that is discriminatory, just asking the
20  question and basing your selection on the race,
21  which they do. Otherwise, they wouldn't ask the
22  question.
23      Q.  To your knowledge, were any of the people
24  hired as writer/editors also --

Page 151

1       A.  Also, you don't --
2       Q.  -- Caucasian?
3       A.  Ms. Meriweather, this time, you're not
4   going to get away with jumping in before I've
5   completed the answer.
6       Q.  I thought you were done because you
7   paused. But please continue.
8       A.  No, that's only the eighth time that you
9   did it; but this time, it's on the record that you
10  have done it eight times and I'm asking you to let
11  me finish.
12      Q.  And I will --
13      A.  So then I -- so then I checked that I was
14  white and I didn't get hired because white is not
15  considered a protected class.
16      They have a 30-page affirmative action
17  plan for every office, for every office of four or
18  five people, and they have to show are they hiring
19  certain types of people or are they not? And the
20  affirmative action plan also includes Jewish
21  people.
22      And so like Judge John D. Bates said, I
23  was discriminated against because of my race,
24  because I said and HHS has said that you checked

Page 152

1   the "white" box. So I was discriminated against.
2   I was applying for this job with 586 people and
3   only four were selected who weren't in the
4   writer/editor position. They all had Jewish names.
5   That was not a coincidence.
6       It was not a coincidence that they would
7   have higher scores when Melinda Bean and Donna
8   Thomas says you get zero points for your essay. No
9   one told me I would get zero points. They said
10  we'll look at your complete application. And so I
11  said a lot in my essays. Like I've already said --
12  I said I wrote a play and a book. I told
13  Ms. Gomsey I also wrote a movie. I wrote
14  contracts. That means using Government-acceptable
15  language. Style, punctuation.
16      For -- I did it for 18 and three-quarters
17  years. She's in a government office talking to
18  thousands of people. Her correspondence being seen
19  by millions of people on the Internet. That's not
20  enough for a writer/editor job, and now she's in a
21  lawsuit and she's writing like a lawyer and she's
22  talking like a lawyer and correcting lawyers and
23  seeing how the system sometimes works in a very
24  ugly discriminatory way.

Page 153

1    But I'm not going to say the complete core
2  system is a sewer system because Judge
3  John D. Bates has been with this case and he's seen
4  it all in this case, and he knows and I know and
5  everyone in this room knows that I've been
6  discriminated against when there's 586 applicants;
7  only four are selected. They all have Jewish
8  names.
9    And I was more qualified than them because
10 I have an MBA and none (sic) of them don't. And
11 Medicare and Medicaid is a business system and you
12 have to do audits in a businesslike way. And I was
13 familiar with it because I've seen it done for 18
14 and three-quarters years at GSA. And I've written
15 reports and I've written correction letters, just
16 like the auditors do. You have to correct this.
17    They're given time to correct it. And
18 when they don't, they have to pay for their
19 negligence for their damages. Just like
20 contractors have to pay back when they steal from
21 The Government with fraudulent billing and
22 fraudulent purchase orders and fraudulent invoices.
23    And money is sent from The Government to
24 them, just like in Medicare and Medicaid, and they

Page 154

1  have to pay that money back. And I was doing that
2  for 18 and three-quarter years, and I was thinking
3  like a lawyer and talking like a lawyer and
4  thinking and writing in professional manner,
5  acceptable for a writer/editor job.
6    And so I'm more qualified than them. I
7  have a master's in public administration. No one
8  has a master's in public administration.
9  Ms. Alinder Mestry has a degree in public policy.
10 Well, in my public administration degree, I studied
11 a lot of public policy, implementation, evaluation,
12 and how do you start the process formation of
13 public policy. It's a very political process. And
14 the political process defines the system, but it
15 doesn't make you a writer/editor.
16    And she even said -- and Grizzell even
17 said, You don't need formal training. Mr. Grizzell
18 said you can be a gifted writer. You can know how
19 to write, and I know how to write. And I was
20 writing for The Government for 18 and
21 three-quarters years. And when I come in with
22 three degrees, they should have said, Oh, my
23 goodness. We have to do cartwheels and handstands
24 and backflips. Let's bring her on as soon as

Page 155

1  possible. She wants Chicago. Let's give her
2  Chicago. We'll put Moscul, you know, at another
3  location. She has noncompetitive status over him.
4    And vet status, think people are crazy?
5  They're going to go in the armed forces, end up in
6  Iraq and get killed. That status isn't what it's
7  cut out to be. What, you're going to go in the
8  Army and they don't pay you enough to take care of
9  your family? I'll be working on that. But status
10 isn't everything.
11    And, also, we spend too much on foreign
12 defense and defense of our own country. When we
13 pay our taxes is that our priority, defense of
14 other countries? That's like, Okay. This money's
15 going to go fix our roads and our highways and our
16 schools and police and fire, hospitals, libraries.
17 You know, I can live with that. Bridges. Okay. I
18 can live with that. Building a senior citizen
19 home. But is it like three-quarters of our money
20 should go for defense?
21  Q.  Given that you're talking about --
22  A.  And so you -- and so his vet status, you
23 know, does that mean everyone should be soldiers?
24 You know, is that what our money should be going

Page 156

1  for, to be soldiers? To be in Saudi Arabia? You
2  know, armies in Saudi Arabia today, you wonder why
3  Al-Qaeda hates us. They see tanks every day. They
4  see soldiers with guns every day. We didn't touch
5  their oil.
6  Q.  Ms. Atanus, is there a link between this
7  discussion of foreign policy and my question?
8  A.  Yes, there's too much emphasis on vet
9  status. Okay. XP status, all it means is if your
10 wife or your child was in the armed forces dies.
11    Okay. Probably because they have -- going
12 to have preferential treatment because they were a
13 vet and get benefits. Maybe have their foot in the
14 door for state jobs. You know, that there's a loss
15 indirectly to them because their child can then
16 help support them. But vet status, to me, emphasis
17 on military and war instead of peace, there's too
18 much emphasis on vet status and it's unfair and
19 discriminatory.
20    Maybe there's never been a case where it's
21 been discriminatory, but it worked against me.
22 Discriminatory. I'll think twice before I become a
23 vet and go to Iraq and get killed and run in mud
24 and not be paid enough and want to go home and then

Page 157

40 (Pages 154 to 157)

1828e225-cd91-449e-9825-ee8b50f8c6a6

1  continue your deployment. What's so great about
2  being a vet?
3       Maybe because our country is in a
4  recession, these people need jobs. But to have
5  that over me, when I -- when I'm an outstanding
6  scholar and I am a scholar and gifted writer and
7  I've edited articles, and I work with people to
8  write their resumes. And I wrote a book, a play,
9  and I've written, not only one movie, but now I've
10 written three movies. I'm a designer of movies.
11 Very creative.
12      And that was enough for me to get a
13 writer/editor job. So I was -- I was discriminated
14 on noncounts of discrimination, vet and XP.
15    Q.  And the four people who were selected for
16 the writer/editor position were all Caucasian,
17 weren't they?
18    A.  Yes. But because I didn't check I was
19 black or Hispanic, I was discriminated against
20 because my application was tossed out; but because
21 they were Jewish, their application was stayed --
22 stayed in. But Judge John D. Bates says she was
23 discriminated because of her race, and I was,
24 because I checked the "white" box.

Page 158

1       So The Government asks your race, which is
2  discriminatory. Then they expect people to answer
3  it, which is discriminatory. You do answer it,
4  which is discriminatory. You mail it in, which is
5  discriminatory. And they act on it, which is the
6  most discriminatory thing.
7       So I got The Government on six counts of
8  discrimination just for asking your race. In the
9  future, they won't be able to do that anymore. You
10 want to see their race, bring them in for an
11 interview. And good luck finding their race that
12 way.
13      But you don't be stupid enough to ask it
14 on paper and then act on it when it's in writing.
15 That's really stupid and it's very discriminatory.
16 And The Government really should stop doing that
17 because, this time, it slapped them in their face.
18 And it should have slapped them in their face a
19 long time ago. And they're going to have to pay me
20 damages for discriminatory actions because of their
21 question.
22      They don't act on their outstanding
23 scholar question. Oh, we won't mind that at all.
24 She's an outstanding scholar, but we won't care

Page 159

1  about that. We won't care that she's Assyrian. We
2  won't care her name's, you know, Atanus. You know,
3  isn't it right to have other people in the 13, 14,
4  15, 16 slots other than the ones that usually
5  choose? Don't other people also have bills? Don't
6  these other people also have good ideas; that are
7  gifted; that she makes a lot of suggestions,
8  including not asking people that discriminatory
9  question that's going to get The Government in
10 trouble, and it has this time for sure.
11      Judge John D. Bates agrees with me, I was
12 discriminated because of my race. Prima facie case
13 of discrimination.
14    Q.  I'm going to read you a list of categories
15 and I'd like you to tell me if I'm missing one of
16 the bases of your discrimination claim.
17      It's my understanding that you're alleging
18 discrimination based on your race, your national
19 origin, your religion, your age, your sex, not
20 being a veteran and retaliation. Are those the
21 seven?
22    A.  And color and -- and XP status and vet
23 status. There's nine of them. Okay?
24      And I think you said them all, but to make

Page 160

1  sure, there's race, there's religion, retaliation,
2  and religion. I always do the four Rs. And then
3  there's, of course, age, sex and national origin.
4  And there's XP status and vet status.
5       And I have respect for the vets. I have
6  respect for freedom. I have respect for what they
7  do. But I also have knowledge to know that you
8  don't go into the armed forces and go to Iraq, and
9  chances are very high that you'll be killed. You
10 don't -- you don't -- normal people really think
11 twice, but some people have qualities where they
12 really want to help our country and really have
13 respect for freedom and want to help the people in
14 Iraq.
15      And they're my blood people, and I have
16 respect for people that want to help other people,
17 but I want to help those people in other ways. I
18 want that country, every day, people to pray for
19 peace. Okay? I want to help that country in other
20 ways. I want that country to have a cease fire. I
21 want the troops completely out of the Middle East.
22      If there's a problem, our planes will be
23 there. But you wonder where El Quada comes from.
24 Because all they see is weapons and all they see is

Page 161

1 people in uniform. All they see is these guys
2 carrying guns and looking at them in their face.
3 And they get their checks every month. They don't
4 need to touch their oil to damage it, because they
5 live like kings in Saudi Arabia.
6      So I want to help the world in a different
7 way. I treasure peace. I treasure freedom. If
8 woman want rights, they are welcome to have rights.
9 And that's why we have this freedom in that
10 country, pushing democracy in that country. So
11 people can make their own personal decisions and
12 live the way they want to live and move forward if
13 they want to work. I'm all for women's rights.
14 But not sending planes and bombs and a hundred
15 billion a year just for Iraq. Take care of
16 America. We have to get out of recession. We have
17 a lot of work to do in America. And lower people's
18 taxes and property taxes so they don't increase
19 every six months. We don't pay taxes for the money
20 to go to other countries.
21      So I'm going to help this country in other
22 ways. But I believe in praying for peace so we can
23 set an example for our children and they don't have
24 to grow up seeing all this fighting.

Page 162

1   Q.   Are you currently employed?
2   A.   No.
3   Q.   When is the last -- what is the last job
4 that you held?
5   A.   I was at Pennsylvania Life, and I left on
6 March 31st. That was the last job I held. And I
7 want to go back to selling insurance. Obviously,
8 today and tomorrow, there's depositions. I can't
9 do it today. Can't do it tomorrow. But I want to
10 go back.
11      Do I want to sell insurance? I'm not
12 crazy about it. I want to - this writer/editor
13 job, but I want a higher job at HHS because four
14 years have gone by and I could have been a GS-15 by
15 now. So I do want to be employed, hopefully, by
16 HHS.
17   Q.   You said that you left Pennsylvania Life
18 in March. March of what year?
19   A.   2008. But I left only temporarily. I
20 left temporarily.
21   Q.   In -- I'm sorry. Go ahead.
22   A.   (Shaking head.)
23   Q.   Are you finished with your answer?
24   A.   (Nodding.)

Page 163

1   Q.   Okay. When did you start at Pennsylvania
2 Life?
3   A.   Probably about the 1st of March.
4   Q.   2008?
5   A.   Hm-hmm.
6   Q.   And why did you leave Pennsylvania Life?
7   A.   Because I'm running for U.S. Congress, and
8 I was going to work on obtaining the required
9 signatures. I need a hundred a day.
10      And I told my boss that I know the
11 country's in a recession, which we shouldn't be in.
12 People are losing money in their stocks, which they
13 shouldn't be doing. And I want to get involved in
14 making The Government work better.
15      So I told them, you know, I need to get
16 signatures. So he said, Okay.
17   Q.   So you're currently running for Congress?
18   A.   Yes.
19   Q.   By when do you need to collect all your
20 signatures?
21   A.   I needed to collect them by June 23rd,
22 2008.
23   Q.   Did you get all of the signatures that you
24 needed?

Page 164

1   A.   Well, I consider that to be private
2 information. I respect your question, but I don't
3 answer that question really to anybody.
4      I'm now a write-in candidate, and so now
5 I'm spreading the word that I'm a write-in
6 candidate, kind of talking to people the way I talk
7 today, less spending for foreign defense of other
8 countries. I don't mean humanitarian things, but
9 you need to get this country where it needs to be.
10   Q.   So you're still campaigning -- you're
11 still -- you're -- I'm sorry. Let me rephrase
12 that.
13      You're still running for Congress?
14   A.   I'm still running.
15      MS. MERIWEATHER: Barry, I want to take
16 about a five-minute break.
17      MR. GOMBERG: Sure.
18      MS. MERIWEATHER: Can we go off the
19 record, please.
20      (Recess taken.)
21 BY MS. MERIWEATHER:
22   Q.   Ms. Atanus, you stated that you've applied
23 for several other federal jobs since you left GSA
24 beyond HHS; is that correct?

Page 165

42 (Pages 162 to 165)
1828e225-cd91-449e-9825-ee8b50f8c6a6

1    A.   Yes.
2    Q.   Were any of the other positions that you
3    applied for writer/editor positions?
4    A.   No.
5    Q.   And do you recall which agencies you --
6    federal agencies you applied to?
7    A.   Yes.
8    Q.   Which agencies do you recall?
9    A.   Well, I applied to Department of Justice
10   and Securities Exchange Commission and to GSA
11   and -- and a couple of other ones.
12   Q.   And have you filed discrimination
13   complaints or EEO complaints against any agency
14   other than GSA and HHS?
15   A.   Oh.  Let me think about that.
16       I'll say no.
17   Q.   Do you believe that any agency other than
18   GSA and HHS has discriminated against you?
19   A.   Yes.
20   Q.   Which agency or agencies, if there's more
21   than one?
22   A.   Security Exchange Commission.
23   Q.   And have you --
24   A.   And --

Page 166

1    Q.   Oh, go ahead.
2    A.   And Department of Justice.
3       I believe all the agencies that I have
4    applied to when they see someone with three degrees
5    and worked for the Federal Government before, I
6    believe all the ones that I have applied to since
7    leaving GSA and probably even before I started
8    working at GSA -- I applied to many jobs before I
9    started working at GSA -- have discriminated
10   against me because of race and color.
11   Q.   And have you spoken to an EEO counselor
12   about discrimination at any agency other than HHS
13   and GSA?
14   A.   No.
15   Q.   Have you told any other agency that it
16   discriminated against you other than HHS and GSA?
17       Let me clarify when I say "tell the
18   agency," I mean tell an employee.
19   A.   I think I might have.  I think I might
20   have.
21   Q.   Which agency or which -- who might you
22   have told?
23   A.   I might have told an employee or employees
24   at SEC that I was discriminated against when they

Page 167

1    had a computer glitch, and I called and they didn't
2    really seem to care that there was a computer
3    glitch.
4       But if I was black and was -- you had to
5    call -- you had to work with them and you had to
6    call for them to set up your computer.  And I
7    didn't know that.  But I did call when I
8    experienced a glitch and it wasn't fixed in time.
9    Sometimes you can tell by the person's voice, or
10   not, what race they are.  Sometimes you can't.  But
11   most of the time, you can.
12       But the beginning of the application is
13   where they ask you your race.  So after you get
14   through that part, all of a sudden, there's a
15   computer glitch, you know.  And so you kind of
16   know, well, they've had a lot to do with it and
17   only the Government's affirmative action plans.  I
18   might have told them.
19   Q.   You might have told someone at the SEC?
20   A.   Hm-hmm.
21   Q.   Okay.  Do you believe that Melinda Bean
22   knew that you were Caucasian?
23   A.   Yes.
24   Q.   And how would Melinda Bean have known

Page 168

1    that?
2    A.   Because I checked that "Caucasian" box.
3    Q.   And do you believe that Melinda Bean knew
4    that you were Assyrian, second generation?
5    A.   Yes.
6    Q.   And how do you believe that Melinda Bean
7    would have known that?
8    A.   Because I told Eileen Gomsey that I was
9    Assyrian and it was on the record in the file, most
10   likely.  And Melinda Bean would know.  Also, she
11   knew because the counselor and the investigator all
12   asked me my national origin, and then they would
13   ask Melinda Bean questions.  And I'd have a record
14   of what she said, she'd have a record of what I
15   said.
16       So Melinda Bean knew I was Assyrian.  Can
17   you repeat your question, please.
18   Q.   Yes.  How do you believe that Melinda Bean
19   would have known that you were Assyrian?
20   A.   And you're not -- you're asking your
21   question at any time in the application process or
22   certain time?
23   Q.   Well, I was going to ask you a follow-up
24   question, but the question currently on the table

Page 169

1  is, how do you believe that she knew that?
2      A.  My name also is Assyrian. Atanus is
3  Assyrian. And Assyrian is modern day Aramaic.
4      And also, she -- Melinda Bean could know
5  by looking at my employment records. And in my
6  employment records, there's discrimination
7  complaint. She could talk to other HR people in
8  GSA, and she could look at the public records in
9  the court.
10     She could see them that were
11 electronically filed. She can request the Court
12 for a copy of my case. She could read it, see what
13 my case is about. But I checked that I was white
14 and I was not hired. And HHS acknowledges that I
15 checked that I was white. And if I checked that I
16 was black, I would have been hired because white
17 with three degrees is phenomenal, but nonwhite with
18 three degrees is really super phenomenal.
19     But I had enough on my resume just by me
20 graduating from Northwestern and being outstanding
21 scholar -- not too many people with an MBA have a
22 GPA of 3.84. And to be business-minded, very
23 gifted with math. And I have a high IQ. And I
24 took an IQ test. And I am a math wizard and a

1  spatial wizard.
2      And I'm a gifted writer, but I -- also,
3  you could tell how I talk, I very mature. I'm very
4  grown up. I'm very sincere. I'm very caring. I'm
5  helpful and compassionate. I don't treat people
6  like wolves and take advantage that they're little
7  sheep.
8      If someone's a wolf, I'll tell them to
9  their face they're a wolf. But do I act like them?
10 No. But I know that I was discriminated because of
11 my race. Judge John D. Bates agrees with that. I
12 was discriminated because of my national origin,
13 because my name is Assyrian. I was discriminated
14 because of my religion. Atanus is not Jewish.
15     I was discriminated because of
16 retaliation. I filed a lawsuit against GSA. I was
17 discriminated because of my age and sex, which is
18 on my resume. You see the years I went to college.
19 See, my name Susanne Atanus. Susanne is a female.
20 And I said it all. I was discriminated against
21 because I had noncompetitive status because I was
22 an 11.
23     And all Eileen Gomsey could have said is,
24 We'll put you on seven lists. Good luck to you.

1  And we'll give you a chance. Is there anything
2  wrong with giving somebody a chance? Your
3  education. You need a writer/editor. We can use
4  you. Good luck to you. You have noncompetitive
5  status. Your name is number one on all seven
6  lists. That's the way it should have worked.
7      So maybe, you know, it's reverse
8  discrimination. Not maybe. It is. It's reverse
9  discrimination. Because in the past, the Jews were
10 discriminated everywhere; at universities, on the
11 job. And now, they're hired and they're promoted
12 even without college education.
13     And when they're hired and given the job,
14 they're not told they have to get their college
15 degree. And everybody else is told, Well, if you
16 don't have a college degree, you can't get a job
17 past GS-12. And the system is not fair and so I
18 was reverse discriminated against.
19     Same for blacks. Now, the whites are
20 against affirmative action, and yet, there's
21 100,000 jobs on USA Jobs. I have nothing against
22 Jews and blacks getting jobs, but I have something
23 against what happened to me. That they wrote lies
24 and I -- there were a lot of lies written. And

1  someone with, you know, a few brain cells in their
2  head would say, you know, chances are some of this
3  is garbage discrimination. We should really give
4  her the benefit of the doubt that these people
5  acted like wolves, at least on some of the stuff
6  that they wrote about. And it was actually all of
7  it, but the system should be fair and it shouldn't
8  be, Oh, my goodness. This is what the courts do,
9  what happened in GSA case (sic)? But I have
10 confidence in this HHS case that I will get what
11 I'm asking for.
12     And I might as well put on the record what
13 I'm asking for. I'm asking reimbursement of lawyer
14 fees. I'm asking for backpay. I'm asking for
15 $300,000 compensory (sic) damages. Also three
16 million in pension. I plan to live close to a
17 hundred years old. People are living longer.
18 People need retirement money because they're living
19 a long life. Taxes don't go away. They seem to go
20 up every six months, until I get this country where
21 it needs to be. You need to take care of America.
22     People don't work just to pay bills and to
23 pay taxes. And we're not going to be hostage in
24 our own towns because of the gas prices. That's

1 another thing.
2     MS. MERIWEATHER: Could you please mark
3 this as Exhibit 2, I think.
4     THE WITNESS: So I'm asking for three
5 million in punitive damages. And, also, HHS made
6 me sick.
7     Here I am -- and it was at the stage where
8 HHS said, Well, we received your SS50, but we
9 didn't file it. They still didn't offer me a job.
10     Well, shortly after that, I woke up in the
11 morning. I was still in bed and my room is
12 spinning. They really upset my nervous system. My
13 room was spinning. And I get up. I'm very
14 nauseated and I was vomiting.
15     Finally, about 5:00 o'clock, my mom comes
16 by. And I didn't eat anything all day because I
17 was afraid I would be vomiting. And I was in touch
18 with her, and I even talked to my attorney that day
19 and he knows I told him the room's spinning. And I
20 had to go to the hospital. I was dehydrated. I
21 had bronchitis during this. I had a very bad cold.
22     And an Alexandra Meighan was doing a very
23 good job trying to have my case dismissed, but it's
24 because of my writing ability that she was not
Page 174

1 successful. And I was taking very strong medicine.
2 I had a very bad cold. Very bad -- I had
3 bronchitis and that medicine wiped me out. And the
4 cold -- the bronchitis wiped me out.
5     I was -- at the time, at the stage with
6 Alexandra Meighan -- and I had bronchitis. I was
7 fatigued. I could not work on the legal case. And
8 I went to the doctor and he put me on the strong
9 medicine, and the doctor even said this is not the
10 usual type of medicine. This is very strong
11 medicine. And the EEOC judge, because of what the
12 writing on the bottle said -- prescription said,
13 she allowed me to have more time.
14     But this -- HHS has been very
15 discriminatory and abusive to me. And then I had a
16 stiff neck because of nerves. I never had a stiff
17 neck for the length of time that I had this stiff
18 neck. I could not move my neck.
19     Once when I was in 2nd grade, I had a
20 stiff neck and I had to go to the doctor's office.
21 And I was in his office for about two and a half,
22 three hours. And he just said relax. He kept on
23 telling me to relax. And, finally, he moved it
24 after like the course of every (sic) 20, 30
Page 175

1 minutes. But I was in his office, like, for an
2 hour before he started moving it a little bit. I
3 was, Okay. But with this stiff neck, I could not
4 move my neck. And the doctor gave me medicine and,
5 slowly, I was able to move my neck.
6     After four weeks, I was pretty much healed
7 of the stiff neck, but it moved very slowly.
8 That's because of nerves. When you're under a lot
9 of stress -- and I really didn't want to get all
10 stressed up, but I was under stress because I
11 couldn't believe what was going on. I know when I
12 have three degrees and I know how to write -- well,
13 now, I have four degrees; paralegal certificate;
14 GPA 4.0; I'm very gifted writing legal documents,
15 and all the other things we had to write for our
16 paralegal certificate; client questions, questions
17 you ask a witness; and preparing orders, you know,
18 to force marital-related things; partnerships;
19 bankruptcies, corporations, small proprietorship.
20     So I know more than just employment law,
21 but I know a lot about employment law, a lot about
22 medical malpractice and a lot about contract law
23 and Medicare/Medicaid. And, HHS, you need to know
24 a lot about Medicare/Medicaid insurance, medical
Page 176

1 supplements. So...
2 BY MS. MERIWEATHER:
3     Q. I'd like to show you what's being marked
4 as Exhibit No. 2.
5     A. Did I answer your question? You can
6 repeat your last question one more time, just make
7 sure I answered it.
8     Did I answer it?
9     MS. MERIWEATHER: Could you read back the
10 question, please.
11     (Record read as requested.)
12     THE WITNESS: That I was Assyrian and my
13 name and like everything I said was applicable;
14 that she could talk to GSA HR people. She could go
15 to the court for records, like I said. She knew I
16 was an Assyrian because in the counselor's report,
17 the investigator's report, I said everything that
18 happened to me at GSA and I was Assyrian, second
19 generation.
20     So she knew. She was well aware of the
21 counselor, investigator's reports, but acted, you
22 know, very inappropriately, very discriminatory --
23 BY MS. MERIWEATHER:
24     Q. So she would have known --
Page 177

**Page 178**

1   A.  -- to not offer me the job, to not say,
2  I'm sorry, Susanne, you know, we're definitely, you
3  know, not doing the right thing so far, but we want
4  to make it right.  We'll offer you a job.  Would
5  that be so hard?
6       And -- and HHS did not follow the criteria
7  in the application.  It said you would look at the
8  resume; you look at your questions; you look at the
9  -- how you answered your essays.  And then that
10 means everything will be evaluated together.  But
11 then they said, Melinda Bean, Donna Thomas, you get
12 zero points for essays.  Are they stupid to say
13 that?  I mean, that is so stupid.  It's
14 unbelievable.
15      This whole case has been unbelievably
16 filled with stupid decisions, stupid actions.  Is
17 this what somebody making their salaries say on the
18 record in a lawsuit?  We'll give you zero points,
19 and then all of a sudden, you see these scores and
20 these four Jewish people have the top scores and
21 mine wasn't far behind.  I should have been on at
22 least one list.  My name's not on any list?
23      I would hate being in lawsuits like this
24 every day with such ignorance and such stupidity

**Page 179**

1  and such discrimination.  Is law school worth it to
2  deal with this?  It's worth it, because you'll pay
3  people damages who need to be made whole again.
4       I'll be the person to help these people
5  that are in this world with such discriminatory
6  evil, abusive, disgusting behavior; malicious,
7  vicious evil -- filled with evil spirits and they
8  act evil.  But I'm going to be the one to help
9  these people.  Then law school's worth it.
10      But to act like them?  Please.
11      MS. MERIWEATHER:  I'd like to show you
12 what's being marked as Exhibit No. 2.
13      (Whereupon, Atanus Deposition
14      Exhibit No. 2 was
15      marked for identification
16      as of this date.)
17 BY MS. MERIWEATHER:
18      Q.  You said that you checked the box is
19 white.  Is this form that's Exhibit No. 2 what you
20 were referring to?
21      A.  I did -- this form was not on-line.  It
22 wasn't even scanned on-line.  This is OMB number
23 0990-0208.  It's a form.  This -- this is a form.
24 This isn't something that you downloaded from the

**Page 180**

1  application that was on-line.
2       Q.  Did you answer the questions on this form?
3       A.  I answered just race.  I might have
4  answered sex.  Disability I don't remember
5  answering on-line.  Year of birth, I don't remember
6  answering that on-line.  C, for agency use.  You
7  can see that this is a paper form.  It says, C, for
8  agency use.
9       And so for you even to put this in front
10 of my face is an insult to my intelligence, which
11 has been happening all day today.  This form was
12 not in the application on-line.  This is a paper
13 form.  If there was a paper application, maybe I
14 would see this form.
15      And I never seen year of birth before.
16 It's not even on, you know, OF612, Official Form
17 612, where they ask for your year of birth.
18      Q.  So when you indicated your race on-line,
19 where did you indicate that?
20      You said you checked a box.  I'm -- where
21 was the box?
22      A.  On-line.
23      Q.  And were the boxes on-line -- what were
24 the other boxes besides "white"?

**Page 181**

1       A.  They asked -- they asked five other -- six
2  other categories.  This is not the form.
3       Q.  What were the other categories?
4       A.  They do ask if you're Latino, if you're
5  Hispanic, Alaskan, Native American.  They ask you
6  if you're Asian-Pacific.  They ask you if you're
7  white.  They ask you if you're multi-racial.  They
8  ask you if you don't know.
9       Q.  So Melinda Bean wouldn't have seen a form
10 like Exhibit 2 that you had filled out, correct?
11      A.  She saw what I downloaded in the QuickHire
12 system.
13      Q.  So she wouldn't have seen a form like
14 Exhibit 2, correct?
15      MR. GOMBERG:  I'm going to object to the
16 question being vague and ambiguous and also no
17 foundation and speculation.
18      Answer --
19      MS. MERIWEATHER:  You've testified --
20      MR. GOMBERG:  Wait a second.  I'm not
21 through yet.
22      Answer if you can.
23      MS. MERIWEATHER:  I'll rephrase the
24 question.  I'll break it down.

BY MS. MERIWEATHER:
Q.  You've stated --
A.  You don't have to --
Q.  -- complete form --
A.  You don't have to rephrase the question.
I'm speaking --
Q.  I've chosen to.  So I'm asking you -- I'm
retracting that question.
A.  Well, it's not that I didn't answer it.
Q.  I know.
A.  You didn't give me a chance to answer it.
Q.  I'm retracting it and asking you a new
question.
    The question is, you've stated that you
did not complete a form OMB Number 0990-0208; is
that correct?
    MR. GOMBERG:  Asked and answered.
    You can answer it again, if you want.
BY MS. MERIWEATHER:
Q.  Is it your testimony that you did not
complete this form?
A.  I did not complete this exact form.
Q.  There is no form that Melinda Bean would
have seen that you completed -- there's no form

Page 182

your tricky questions.
    Was I asked my religion?  No.  But my name
Atanus is not Jewish --
Q.  Were you asked --
A.  -- for the seventh time today.
    You can now go on and ask your other
question, which I've already answered another six
times today.
    Go ahead.
Q.  Did the on-line form that you're referring
to ask you for your national origin?
A.  Yes, because if I say I'm -- you're asking
if I'm Latino, that's national origin.  Are they
asking are you Hispanic?  That's national origin.
Are they asking are you Alaskan, Eastern -- or
Pacific Islander, Hawaiian, that's national origin.
Are they asking you, are you African?  That's
national origin.
    So, yes, I was asked my national origin
and I said I'm white.  That means I'm not Hispanic.
I'm not Latino.  I'm not Native American.  I'm not
Pacific Islander.  I'm not from the Samoan Islands,
which they ask, or other islands.  But I am a
minority because I'm Assyrian, which they knew

Page 184

0990-0208 that you completed that Melinda Bean
could have seen, correct?
A.  She saw the form that I completed on-line,
the questions.  The questions on-line asked my
race.  I answered "white."  They might have also
asked me for my sex, but they did ask me my race.
    Did they ask me my year of birth?  No.
Did they ask me if I had a disability?  Maybe.  But
I know they asked me my race.  Did they ask me
Question A, announcement numbers for the position
for which you are applying.  No, they didn't ask me
that, because you're in that announcement number
for that position and then the questions come.
    Did I see, C, for agency use, where
someone would write in something?  No.  Did I see
four boxes for B, year of birth?  No.  Was I asked
my year of birth?  No.
Q.  Were you asked your religion?
A.  No.
Q.  Were you asked your national origin?
A.  You know, Ms. Meriweather, I'm not going
to fall into your traps, okay?
    And I'm waiting for 5:00 o'clock to come
so I'll be out of here.  I don't have to fall into

Page 183

because I told the counselor and I told the
investigator and they have copies of those reports.
Q.  Did you tell anyone you were Assyrian
before you spoke to an EEO counselor?  Let me
rephrase the question.
    Did you tell anyone at HHS that you were
Assyrian before you spoke to the H- -- EEO
counselor?
A.  I told Eileen Gomsey that I was wrongfully
removed and on several counts of discrimination,
which includes national origin.
Q.  And you spoke to Eileen Gomsey after
you -- after you were not selected for the
writer/editor position, correct?
A.  Correct.
Q.  And you spoke to Eileen Gomsey.  What was
the time frame for that conversation with Eileen
Gomsey?
A.  August and September 2004.  And might have
gone after that, too.  Might have gone into
October 2004.
Q.  At the time you contacted the HHS -- an
EEO counselor regarding HHS, did you know anything
about the qualifications of Brian Moscul?

Page 185

1    A.  Can you repeat your question, please.
2    Q.  Yes.
3        At the time that you contacted an EEO
4   counselor at HHS, did you know anything about the
5   qualifications of Brian Moscul?
6    A.  Well, when you say "contact an EEO
7   counselor," the question, to me, is vague because
8   does that mean at the time I wrote to the EEO and
9   asked for a form?  That's contacting them.
10       So your question is very vague.
11   Q.  When did you first contact or communicate
12  with an EEO counselor at HHS?
13   A.  Oh, it was a couple of months after the
14  closing date of the application for -- or the
15  closing date of vacancy announcement for
16  writer/editor.  It was a couple months.  I'll give
17  you exact date.
18   Q.  Okay.
19   A.  I know it was a couple months, which I'm
20  sure is sufficient.
21   Q.  Okay.  So a couple of months after the
22  closing date for the writer/editor vacancy
23  announcement, at that time, did you know anything
24  about the qualifications of Brian Moscul?

Page 186

1    A.  Yes.
2    Q.  What did you know?
3    A.  Well, I knew that there are people who
4   applied who are considered writers.  Not that I'm
5   not considered a writer, but I knew that there are
6   people who are writers.
7        You know, I'm a very intelligent person.
8   So if this is a writer/editor job, you know that
9   there are people applying who are writers.  But
10  I've been writing ever since I've been six years
11  old.
12       I have a high IQ.  I'm a gifted writer.  I
13  have very good grammar, punctuation.  I've written
14  papers.  I've written reports.  I was sending out
15  e-mails to everybody.  I was synopsizing contracts,
16  writing contracts, awarding contracts, no protest,
17  no claims.  I wrote a book.  I wrote a play.  I've
18  written movies.  I've designed movies.  Very
19  creative.  I've helped people write their resumes.
20  I've saved it for them on discs, on CDs.  I've
21  helped them write their cover letters to their
22  resumes.
23       I've written letters, thousands of
24  letters.  I've written thousands of modifications.

Page 187

1   I've worked at HHS.  I'm familiar with Medicare and
2   Medicaid and Medicare supplements.  I've been
3   writing since I've been six.  I was writing reports
4   at Northwestern University, sometimes three
5   papers -- research papers a quarter.  And the first
6   quarter's ten weeks.  The second quarter is nine
7   weeks.  The third quarter is eight weeks.  And I
8   graduated.
9        Can you imagine being at Northwestern
10  University and carrying three or four courses in
11  eight weeks and having papers to write.  And as I'm
12  writing the papers, I'm saying I don't know how
13  these other students do this.  At the time, there
14  was no computers.  It was typing.  Computers came a
15  year or two after.
16       So here I am typing.  And then if you, you
17  know, typed on the wrong side of the paper, you're
18  so busy typing, you can't really, you know, stop to
19  actually look to see what you're typing.  You're
20  typing so fast.  But -- but I did do excellent
21  writing.  I'm just saying it was a tough school.
22  My quality was very good.
23       And are you saying, You were typing so
24  fast, you don't look to see what you're typing?

Page 188

1   Well, I know what I wrote.  What I'm writing is
2   very good.  It's just that the pressure at
3   Northwestern to complete everything on time was
4   really something.
5        And you hear people reading a whole book
6   overnight, and you would say why would someone do
7   that?  Well, the pressure was so great, they had to
8   stay up overnight to read their book.  That was 500
9   pages -- and all their books were 500 pages.
10  That's what you do at Northwestern.  You have to
11  really work.  And then to get As, you have to write
12  something unique.  It's not just writing.  You have
13  to write something unique to get an A.
14       And I'm an excellent writer and I can work
15  under pressure.  I did that all through my school
16  at Northwestern, completed all my assignments on
17  time, like I did at GSA.  And throughout my MBA and
18  my MPA program, degree programs.  And, like I said,
19  I'm very business minded.  I know how to do
20  samples.  I know what auditors do.
21       They look to see where regulations were
22  not followed or there was misappropriation of funds
23  or there were mistakes not following the backup
24  system that's supposed to audit your own program.

Page 189

1 You need to have auditors auditing your own program
2 to make sure that you're on track.
3     So you need your own internal control
4 system that has to be in place. And there has to
5 be someone who's going to check to see if errors
6 were made and to correct those errors. And on
7 certain days of the month when those reports for
8 Medicare and Medicaid have to be written, there has
9 to be someone really to check, make sure those
10 reports are right. If they're not, to correct them
11 before the auditor gets there.
12     And I'm familiar, very familiar with the
13 system. The reports are not hard to write. Once
14 the reports are written, they're in the computer.
15 You just have to tweak it a little bit to make it
16 fit that case. You don't have to write the whole
17 report over. So that's what we have computers for.
18 You don't have to type the whole report. Just fix
19 and input information that's applicable to --
20 applicable for that audit report.
21     So I knew more than Moscul, Liverhott,
22 Alinder Mestry and Grizzell knew.
23     Q. How do you know that you knew more than
24 they did?

1 works. I know more than they knew.
2     Q. How do you know what they actually knew?
3 Have you met any of the selectees?
4     A. Well, I saw their resumes which were
5 furnished to us. They never worked in a medical or
6 insurance field before. You know, they didn't have
7 an MBA. They're not familiar with random sampling,
8 with how to do an audit, how to write a report,
9 whereas this is second nature to me. I did this
10 for 18 and three-quarters years at GSA.
11     I'm familiar with different insurances,
12 healthcare plans, health insurance plans, Medicare
13 supplements, Medicaid, how long you can be in a
14 nursing home, when -- when Medicaid/Medicare stops
15 paying, when you have to pay on your own.
16     And I have a public administration degree
17 and I have a paralegal certificate, and I'm
18 familiar with the law and medical malpractice, and
19 I'm familiar with fraud in the legal field and
20 how -- how fraud is -- how fraud happens with
21 Medicare and Medicaid.
22     Q. When did you --
23     A. So -- so to answer your question, Did you
24 know about Moscul, Well, I know that there are

1     A. Well, because I know how the audit system
2 works. I've taken auditing class. I was at GSA
3 where they had audits all the time. Not directors
4 were told to have their production available for
5 inspection. Quality assurance specialists would do
6 a random sample. They wouldn't pick their sample
7 the same way every time. It would all be
8 different.
9     Contractors didn't know what box would be
10 picked from or how many from each box. And this is
11 what the auditors do. They do it randomly. They
12 look at forms to make sure that they are correct,
13 if not, the agencies or the companies or the
14 organizations will be told how many errors they've
15 made, how much they owe The Government; to look
16 over the report and furnish comments, but they have
17 a date when they have to furnish reimbursement.
18     And I read over the reports and I would
19 know how to do them. I'm familiar with them. That
20 there's some services you have to charge. There are
21 some services you have to charge the correct amount
22 and the correct category. And working at HHS and
23 with my insurance licenses, I know how Medicare
24 works, how Medicare supplements work, how Medicaid

1 people applying who are writers, but I'm a writer,
2 too. So it doesn't come as a surprise to me that
3 they hired people who are writers, but I'm a
4 writer, too.
5     I've edited articles. I've edited other
6 people's writing. I've written reports. I've done
7 research papers. I've extracted information from
8 other sources. I've researched other sources to
9 obtain information. I'm a critical analyzer. I
10 read and I know when something isn't clear. I know
11 when something is fraudulent. I know when
12 something is possibly not true.
13     And I've edited my work. I've edited
14 other people's works. I know how to spell. I have
15 very good spelling, grammar, cadence, good form;
16 get to the point; make good articles; clear
17 concise, accurate. And I've done more than the
18 other four applicants, Alinder, Moscul, Liverhott,
19 Grizzell.
20     In this lawsuit, I've done a lot of legal
21 writing. I've done more as a writer than I would
22 ever be expected to do on this job.
23     Q. You --
24     A. And so I, you know, answered your

1  question. I know about Moscul's writing.
2     Q.  You said that you've written a play; is
3  that correct?
4     A.  Yes.
5     Q.  When did you write the play?
6     A.  I wrote the play in 2004.
7     Q.  Early 2004 or late 2004?
8     A.  Well, when I answered your question
9  earlier that I had completed my play and book, I --
10  in July '04, I -- technically, I want to scratch
11  that answer. I finished it -- is that what you
12  want to know, when I finished it?
13     Q.  Yes.
14     A.  So I finished it like maybe four or five
15  months after that. I had my thought pattern -- I
16  had my thought patterns down. I had started to do
17  it. I knew what I was going to do and it was a
18  matter of just finishing it up.
19     Q.  So you finished the play around
20  November of 2004?
21     A.  Hm-hmm. I would say maybe around that
22  time, yes.
23     Q.  What was the name of the play, title?
24     A.  Jesus.

Page 194

1     Q.  Was that play ever shown on stage?
2     A.  My Jesus play?
3     Q.  Yes.
4     A.  No.
5     Q.  Do you expect that it will be shown on
6  stage, your Jesus play?
7     A.  It may be. It may be.
8     Q.  Do you have a director or any actors for
9  your play?
10     A.  Well, I'm the director. I haven't -- no,
11  not characters -- not actors yet. I could get them
12  if I have the money to pay them.
13     Q.  Oh, I thought you were saying something.
14        And you also wrote a movie; is that
15  correct?
16     A.  I've written/designed a movie.
17     Q.  And what does it mean to "write/design a
18  movie"?
19        What do you mean by that?
20     A.  The movie's -- as far as the exact script,
21  the exact jobs that all the crew would do is not
22  completely written out, but I've designed --
23  written, designed three movies that I would like to
24  do and I know how I would go about doing it, what

Page 195

1  scenes I would have in them.
2     Q.  And would you be the director of the
3  movies if -- as well?
4     A.  Yes.
5     Q.  And what are -- do you have titles for any
6  of the movies?
7     A.  Yes, but I don't divulge it to anybody
8  because why should I? It's a public record and I
9  don't want people to have my ideas.
10     Q.  So you haven't copyrighted a screenplay
11  yet for the movies?
12     A.  No.
13     Q.  Prior to working for Pennsylvania Life
14  doing insurance work, what was the most recent job
15  that you held before that?
16     A.  Substitute teaching.
17     Q.  And when did you do substitute teaching?
18     A.  I did substitute teaching a year and a
19  half before Pennsylvania Life.
20     Q.  So you started substitute teaching --
21     A.  Yeah. And then also I -- at the same
22  time, I was working at Oakton Community College as
23  a help desk, student help desk.
24     Q.  And when did you work at the Oakton

Page 196

1  Community College help desk?
2     A.  Let's see. I'll say January to March '07.
3     Q.  And did you hold any job or jobs between
4  August of 2004 and January of 2007?
5     A.  That's a long -- you're talking about
6  almost three years.
7     Q.  Yes.
8        Were you employed at any point during that
9  time frame?
10     A.  Yes.
11     Q.  Where were you employed immediately prior
12  to Oakton Community College?
13     A.  I was substitute teaching.
14     Q.  Okay. And then before substitute
15  teaching, what was your most -- your last -- let me
16  rephrase that.
17        What was your most recent employment prior
18  to substitute teaching?
19     A.  We've gone over that from this morning.
20  Asking the same questions again. We talked about
21  my employment history this morning.
22     Q.  I talked about your -- we talked about
23  your GSA employment.
24        I'm -- you've said that you've held

Page 197

1  several jobs between August of 2004 and January of
2  2007. So I'm asking you what those are.
3      My understanding is your GSA employment
4  was 2003. So that would have been earlier.
5      A. Let's see. I worked for Energy Marketing
6  Services from 10/04 to 10/05. And then from 10/05
7  to 1/06, I worked at Marshall Field and Company.
8  And then I started substitute teaching.
9      Q. And just to clarify, exactly when did you
10 start substitute teaching?
11     A. February '06.
12     Q. And what grade level were you teaching?
13     A. Grammar school.
14     Q. Apart from the GSA issues that we
15 discussed earlier, have you had any disciplinary
16 actions taken against you at any of your prior
17 jobs?
18     A. There's been some complaints, but not
19 valid complaints. There's been -- you know,
20 substitute teaching, there was some complaints.
21     Q. And why did you stop substitute teaching?
22     A. I wanted to make more money.
23     Q. How much did you -- what was your -- did
24 you have a salary as a substitute teacher?

Page 198

1      A. Yes.
2      Q. What was that salary?
3      A. Started out $95 a day and then it ended at
4  $100 a day. And most of the time, I worked three
5  or four days a week. There were a lot of people
6  looking for jobs as a substitute teacher.
7      Q. Are you currently looking for employment
8  apart from the Congressional campaign?
9      A. Yes.
10     Q. What types of employment have you been
11 seeking more recently?
12     A. HHS employment. I'm in this lawsuit and
13 I'd like the settlement.
14     Please.
15     Q. And apart from seeking HHS employment,
16 have you -- are you seeking any other employment at
17 this time?
18     A. Well, this last couple of weeks, I've been
19 tied up with this lawsuit. So, you know, when you
20 say "are you seeking," well, right now, it's hard
21 when you have to come to depositions, prepare for
22 depositions.
23     You know, are you seeking employment? I
24 hear, you know, that Walgreens -- someone we know

Page 199

1  got an interview, and my cousin who's a lawyer
2  there said Walgreens is hiring, but I've already
3  applied for, like, eight paralegal jobs there,
4  other jobs. They don't seem to be interested in
5  me.
6      So I know I have to keep on doing what I
7  need to do. I'm thinking about selling annuities
8  and senior services, and I want to do that.
9      I'm approaching people, though, now. I'm
10 telling them that I'm a write-in candidate. I --
11 you know, it's kind of hard to be talking about I'm
12 a write-in candidate, telling them about my agenda
13 and also saying, I also sell annuities. I guess I
14 should be doing both. But when I was getting
15 petitions, I was just focusing ten weeks -- I had
16 ten weeks to get petitions. That's what my focus
17 was on and also working on this lawsuit. And --
18 but I want to go back to doing something, but I
19 feel my calling is politics. And I believe I will
20 win the election.
21     And, yes, I could be a writer/editor.
22 Yes, I would be happy doing that. But when I hear
23 about all the problems our country's going through
24 and no one is fixing them, I just can't ignore it.

Page 200

1      So I'm cut out to be a politician and I
2  know that's my calling is to get this country where
3  it needs to be on many issues. And I know I can do
4  it and I want to do it.
5      But to answer your question, am I seeking
6  employment, yes. Right now, my e-mail is down. I
7  need to get that up and running. I need to be
8  sending out more of my resumes. I can do
9  caregiving work. I know that's available to me. I
10 need to be working.
11     And I will be doing, you know, something
12 soon, but I am preparing for the 4th of July parade
13 and -- two parades on the 4th of July, and I need
14 to be knocking on more doors and telling them I
15 need their write-in. I need to be telling them
16 from now to November, tell everyone that -- you
17 know, that I'm a write-in candidate.
18     And I want to do something where I can
19 still knock on doors on the weekends and evenings,
20 tell people I'm a write-in candidate. So I'm
21 working on it. I can -- I know where I have to go
22 to seek employment. I can do caregiving. But
23 between now and November 4th, I'm planning on
24 working and winning the election.

Page 201

51 (Pages 198 to 201)
1828e225-cd91-449e-9825-ee8b50f8c6a6

1    Q.  You stated that you've seen the resumes of
2  the people who were selected for the writer/editor
3  position.  When did you first see those resumes?
4    A.  When the report of investigation was being
5  put together.  I know the investigator was going to
6  ask for them.  And she might have showed them to me
7  when she received them and/or they were put in the
8  report of investigation that I saw when I received
9  a copy of the report of the investigation.
10   Q.  And this is the investigation into your
11 EEO complaint against HHS?
12   A.  Yes.
13     MS. MERIWEATHER:  Let me take just a
14 five-minute break and we'll wrap it up here.
15       (Recess taken.)
16 BY MS. MERIWEATHER:
17   Q.  Ms. Atanus, when we were off the record,
18 did you say that you wanted to amend your answer to
19 a question I asked you?
20   A.  Yes.
21   Q.  What is that?
22   A.  You had asked me a question -- you could
23 ask it again.  You had asked did I know about
24 Mr. Moscul before applying.  I think that was your

Page 202

1  selectees other than Mr. Moscul?
2    A.  No.
3      MS. MERIWEATHER:  Okay.  We have no
4  further direct questions.
5      Did you have any redirect?
6      MR. GOMBERG:  No.
7      We won't waive signature.
8        FURTHER DEPONENT SAYETH NOT. . .
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 204

1  question.
2      Was that correct?  Did I know about
3  Mr. Moscul before applying?
4    Q.  No.  The question was at the time that you
5  first contacted an EEO counselor at HHS, what, if
6  anything, did you know about Mr. Moscul?
7    A.  I didn't know anything about him.  Well,
8  actually, I want to change that answer.
9      I had talked to Mr. Slammer (phonetic) and
10 he did say that for Chicago, a vet was hired, but I
11 didn't know it was Mr. Moscul then.
12     So at the time that I filed an EEO
13 complaint, did I understand about Mr. Moscul?  I
14 knew a vet was hired.  I didn't know the name of
15 the person.  Mr. Slammer didn't give me the name.
16     So I would say, no, I didn't know about
17 Mr. Moscul, but I did know for Chicago, a vet was
18 hired.
19   Q.  And at the time you filed your EEO
20 complaint, did you know anything about any other
21 selectee besides Mr. Moscul?
22     Let me clarify that.
23     At the time you filed your EEO complaint,
24 did you know anything about any of the other

Page 203

1      IN THE UNITED STATES DISTRICT COURT
            DISTRICT OF COLUMBIA
2
   SUSANNE ATANUS,          )
3                           )
        Plaintiff,          )
4                           )
        vs.                 )  No. 06-1078 (JDB)
5                           )
   MICHAEL O. LEAVITT,      )
6  Secretary, U.S. DEPARTMENT )
   OF HEALTH AND HUMAN      )
7  SERVICES,                )
                            )
8      Defendant.           )
9      This is to certify that I have read the
10 transcript of my deposition taken on the 24th day
11 of June 2008 in the foregoing cause, and that the
12 foregoing transcript accurately states the
   questions asked and answers given by me, with the
13 changes or corrections, if any, made on the Errata
14 Sheet(s) attached hereto.
15
16
17
18
           SUSANNE ATANUS
19
      Subscribed and sworn to
20    before me this     day
      of          2008.
21
22    Notary Public
23
24

Page 205

1  STATE OF ILLINOIS )
   ) SS:
2  COUNTY OF DU PAGE )
3     We, Caryl Hardy and Steven Stefanik, a
4  notary public in and for the County of Cook and
5  State of Illinois, do hereby certify that SUSANNE
6  ATANUS was first duly sworn to testify the whole
7  truth, and that the above deposition was recorded
8  stenographically by us and was reduced to
9  computerized transcript under our personal
10 direction.
11    We further certify that the said
12 deposition was examined and read over by said
13 deponent and was signed by her and that the said
14 deposition constitutes a true record of the
15 testimony given by the said witness.
16    We further certify that the said
17 deposition was taken at the time and place
18 specified and that the taking of said deposition
19 commenced on the 24th day of June 2008 and was
20 completed the same day.
21    I further certify that BARRY A. GOMBERG of
22 the firm of BARRY A. GOMBERG & ASSOCIATES, LTD., 53
23 West Jackson Boulevard, Suite 1350, Chicago,
24 Illinois 60604, appeared as attorney for the

Page 206

---

July 9, 2008

BARRY A. GOMBERG & ASSOCIATES, LTD.,
53 West Jackson Boulevard, Suite 1350
Chicago, Illinois 60604
Re: Atanus v. Leavitt, et al.
Dear Mr. Gomberg:
    The transcript of the discovery deposition of
SUSANNE ATANUS, taken on June 24, 2008, in the
above-entitled cause is ready for review.
    Since signature was reserved, please ask
Ms. Atanus to call our office to make an
appointment to come and review said transcript at
her convenience.  After 28 days from receipt of
this letter, signature will be waived.
    Your cooperation in this matter is greatly
appreciated.  Thank you.

        Sincerely,

        Steven Stefanik, CSR
        SULLIVAN REPORTING COMPANY

CC: Ms. Meriweather

Page 208

---

1  plaintiff; that MS. ROBIN M. MERIWEATHER, UNITED
2  STATES DEPARTMENT OF JUSTICE, 555 4th Street N.W.,
3  Washington, D.C., 20530, appeared as attorney for
4  the defendant.
5     I further certify that I am not a relative
6  or employee or attorney or counsel of any of the
7  parties, or a relative or employee of such attorney
8  or counsel, or financially interested directly or
9  indirectly in this action.
10    In witness whereof, I have hereunto set my
11 hand and affixed my seal of office, at Chicago,
12 Illinois, this 9th day of July 2008.
13
14
15
          Caryl Hardy, CSR
16
17
          Steven T. Stefanik, CSR
18            No. 084-003298
19
20
21
22
23
24

Page 207