# EXHIBIT 20

Cert #: SA-HHS-0001

Vacancy: **HHS-OIG-2004-0160 Writer**
**Editor**

Grade: **12**

Locations: **Kansas City, MO**

Applicant: **MESTRE, SARA ALLINDER**

# Personal Data

| First Name: | SARA ALLINDER |
|---|---|
| MI: | |
| Last Name: | MESTRE |
| Address1: | ~~XXX SOUTH INDEL LANE~~ |
| Address2: | |
| City: | OLATHE |
| State: | KS |
| Zip Code: | 66061 |
| Plus 4: | |
| Phone: | ~~XXXXXXXXXX~~ |
| Email: | ~~SaraAllinderMestre@hotmail.com~~ |
| US Citizen: | Y |
| Veteran Preference: | Not a veteran |
| Start of Service: | |
| End of Service: | |

# Core Questions

| 1 | Are you a veteran who was separated from the armed forces under honorable conditions after completing an initial continuous tour of duty of 3 years (may have been released just a few days short of three (3) years)? |
|---|---|
| | No |
| 2 | Individuals who have retired from active military service with a disability rating of thirty (30) percent or more OR who have been rated by the Department of Veteran Affairs (VA) within the proceeding twelve (12) months as having a compensable service-connected disability of thirty (30) percent or more are eligible for a noncompetitive temporary appointment for more than sixty (60) days or a term appointment. Are you eligible for such appointments? |
| | No |

| | |
|---|---|
| 3 | If you are a current Federal civilian employee, are you serving under a VRA Appointment as defined by the categories below? |
| | No |
| 4 | If you are currently a Federal civilian employee (or Commissioned Corps Officer/Applicant), by what agency and organization are you employed? |
| | I am not a current Federal employee |
| 5 | If you indicated that you work for another agency within the Federal Government, please specify the agency and organization. |
| 6 | If your position is covered by an HHS bargaining unit, please indicate to which bargaining unit it belongs. |
| | Not Applicable |
| 7 | If you are a current Federal employee, what is your current duty station [City,State]? |
| 8 | If you are currently a Federal employee (or Commissioned Corps Officer/Applicant), under what type of appointment are you serving? |
| | Not Applicable |
| 10 | Are you a student appointee under the Student Career Experience Program (SCEP) who has completed all requirements for graduation and conversion under the SCEP appointing authority and is in the 120 day period for conversion to term, career or career-conditional appointment? |
| | No |
| 11 | If you are NOT currently serving in the competitive service as a permanent career or career conditional Federal employee, are you eligible for reinstatement? |
| | Yes |
| 12 | If you are, or ever were, a Federal civilian employee, please indicate pay plan and series of the highest graded position you held (as an example GS-0341): |
| | GS-0130 |
| 13 | If you are, or ever were, a Federal civilian employee, please indicate the grade level of the position referenced in the above question: |
| | 13 |
| 14 | If you are, or ever were, a Federal civilian employee, please indicate the dates of the highest graded position or appointment you held (MM-YYYY to MM-YYYY, MM-YYYY to Present, or NA if Not Applicable): |
| | 09-2003 to 04-2004 |
| 15 | If you are, or were, a Federal employee who held a permanent position in the competitive service, what is the highest GS equivalent full performance level/promotion potential of that position? |
| | 13 |
| 16 | If you are a male at least 18 years of age, born after December 31, 1959, have you registered with the Selective Service System? |
| | Not Applicable |
| 17 | Are you a retiree receiving a Federal annuity, either military or civilian? |
| | No |
| 18 | Have you accepted a buyout from a Federal agency within the past five (5) years? |
| | No |

| 19 | Are you eligible for noncompetitive appointment under a Special Appointing Authority (e.g. Outstanding Scholar, present or former Peace Corps personnel, current Postal Service personnel, etc)? |
| | No |
| 21 | Are you eligible for the Federal Employment Program for Persons with Disabilities? (For information on Schedule A appointments, see the OPM website.) |
| | No |
| 22 | Are you eligible for Indian preference as defined by the Department of the Interior (DOI) and as evidenced by appropriate Bureau of Indian Affairs (BIA) authorized certification? |
| | No |
| 23 | Are you eligible for preference based on being a Public Law 94-437 Indian Health Service Scholarship recipient? For more information, please click here. |
| | No |
| 24 | Displaced employee information: |
| | I am not a displaced employee from a Federal Agency. |

# Vacancy Data

## HHS-OIG-2004-0160 Writer Editor

| 12 | 1 | GS-12 Choose one answer that best describes your experience as related to the basic qualification requirements for this position: |
| | | **Answer(0 points):** I have at least one year of specialized experience that has equipped me with the particular knowledge, skills, and abilities to successfully perform the duties of the position. This experience is related to the work of the position and equivalent to at least the GS-11 level in the Federal service as described in the vacancy announcement. |
| All Grades | 1 | Select the answer that describes your education/experience in researching, analyzing, and evaluating complex information. |
| | | **Answer(9 points):** In addition to independently performing this task as a regular part of my job, I have supervised performance of this task and/or I have trained others in performance and/or am normally consulted by others as expert for assistance in performing task. |
| All Grades | 2 | From the answer choices below, please select the one that best reflects your ability to communicate technical and non-technical information in writing. |
| | | **Answer(18 points):** I have been acknowledged for my ability to write technical and non-technical information for a variety of inside and outside readers. My writing skills are considered to be of superior quality. |
| | | Please describe below your ability to communicate clearly in writing a variety of legal and/or analytical and technical documents or articles that require a research and analytical approach: |

| | |
|---|---|
| All Grades | 3 |

**Answer(0 points):** For much of the last decade, I have worked for the U.S. Government or in government-related positions. From February 2000 to April 2004, I worked at the U.S. Department of State on international health, global HIV/AIDS, human rights, and consular affairs policy. In each office I served, I was required to analyze technical and non-technical information and communicate clearly in writing on the policy issue in question. I prepared policy documents, briefing memoranda, talking points, and Congressional testimony on these issues for senior Department principals and the President. Most recently, I served as Policy Advisor on health issues such as HIV/AIDS, Severe Acute Respiratory Syndrome (SARS), and Avian Influenza in the Office of International Health Affairs. In that capacity, I worked closely with and was required to communicate technical and non-technical policy information to colleagues within the Department and at other Federal agencies, such as the U.S. Department of Health and Human Services (HHS), international organizations, non-governmental organizations, and private sector firms. This was especially true during my involvement in the development and management of the President`s two international HIV/AIDS initiatives and coordination of the U.S. Government response to the recent outbreaks of SARS and Avian Influenza in Asia. During the SARS and Avian Influenza outbreaks, I drafted numerous briefing memoranda and talking points for senior Department and government principals to provide updates on the developing situation and alert them to key policy questions. The briefing memoranda and issue papers in particular often included an abundance of technical information on the early medical lessons as they were learned. It was necessary for me to digest and present this information in a clear manner to the senior officials receiving my memos. I also organized numerous interagency meetings to discuss key policy and response issues. These meetings regularly included briefings by HHS senior medical personnel. I was required to analyze their briefings and provide concise summaries with accurate technical information to the policy makers. In addition, I was the Department`s point of contact in the response to the Government Accounting Office (GAO) regarding its draft report on the initial 2003 SARS outbreak. I was responsible for analyzing the report, collecting comments from relevant offices and bureaus within the Department, coordinating with HHS and other agencies, and drafting the informal and formal comments back to GAO. The formal letter that I drafted is included as an addendum to the final April 2004 GAO report. In April 2004, I was recognized for my work on SARS and Avian Influenza with the Department of State`s Extra Mile Award. Prior to joining the Office of International Health Affairs, I served as Regional Advisor for Central and East Africa in the Bureau of Democracy, Human Rights, and Labor. After one year, I was recognized for my writing and editing ability and was promoted to Senior Editor for Africa. As Regional Advisor, I was responsible for editing and producing 13 Central and East African reports, which were compiled in the annual 6000-page Country Reports on Human Rights Practices (human rights reports) and the International Religious Freedom report. The Country Reports on Human Rights Practices is the largest and most comprehensive report the Department publishes. Both reports are Congressionally mandated and require great coordination to meet strict deadlines. As Regional Advisor, I collected and analyzed human rights information from numerous sources, including Embassy reporting, print media, and nongovernmental organization materials. Such information includes legal systems, abuse of lawyers and judges, civil liberties, freedom of speech, political rights, women`s rights, child labor, and refugees. I also coordinated with the Embassies and regional desk officers and edited each report according to strict guidelines. I created a "cheat sheet" for the Embassies and regional desk officers to use that explained some of the arcane style and order guidelines used to edit the reports. The cheat sheet helped minimize confusion during the editing process for those not familiar with the guidelines and decreased the frequency of disagreements over requisite changes, which focused the content negotiations on core issues instead of style. As Senior Editor, I used the cheat sheet during the training sessions that I held for new members of the office to familiarize them with the report process. As Senior Editor, I coordinated the production of all 48 sub-Saharan Africa human rights and religious freedom reports by a team of

| | | |
|---|---|---|
| | | 5 regional editors. During the human rights report "cycle," I was required to edit and proofread all 48 reports at least once, and sometimes up to four times, to ensure consistency and quality. This required that I continuously track the reports on my desk and work with multiple reports on any given day. I also was required to track the work of my team to ensure that each editor met requisite deadlines. In order to do so, I created a number of different systems to help me track our work, which resulted in my team being the first to complete their reports on time. Examples of my work as a regional editor can be found at http://www.state.gov/g/drl/rls/hrrpt/2000/af/ and as Senior Editor at http://www.state.gov/g/drl/rls/hrrpt/2001/af/. In addition, as both Regional Advisor and Senior Editor, I drafted dozens of letters to the Immigration and Naturalization Service and Immigration Judges on asylum cases, prepared briefing materials on human rights in Africa for Department principals, and briefed the Assistant Secretary in preparation for Congressional testimony. While working at the Department of State, I was temporarily detailed to the U.S. Embassy in Kampala, Uganda. During my 7-week service as Political Officer, it was my duty to collect information and report to Washington and other Embassies throughout the region through cables and e-mails on political and human rights occurrences. Most of my reporting centered around the 2001 parliamentary election and recount in one district that I observed while there, as well as the formation of a new government. Some of the information regarding the election recount in Mbarara Municipality was of a legal and technical nature and required great analysis. There was evidence of electoral fraud and other political fraud during the parliamentary election and recount. I was required to analyze information collected from newspaper articles, personal meetings, and other sources for accuracy and relevance and present it in a clear, concise manner through 12 cables I wrote to the Department and 10 additional cables written by colleagues that I edited. |
| All Grades | 4 | I have reviewed and edited documents produced by others to ensure proper quality, content, and grammatical usage prior to dissemination or publication. |
| | | **Answer(12 points):** True |
| All Grades | 5 | I have written and edited: |
| | | **Answer(16 points):** Press Releases<br>Technical Manuals<br>Brochures<br>Pamphlets<br>Speeches<br>Scripts<br>Reports of audit findings<br>Periodicals |
| All Grades | 6 | Have you worked in a high level office with complex assignments of a widely varying nature, short deadlines, and competing demands for attention? |
| | | **Answer(12 points):** Yes |
| All Grades | 7 | Indicate which of the following personal computer and word processor software you are proficient in using (proficient means you understand and utilize a major part of the system`s functionality/capabilities). |
| | | **Answer(4 points):** Microsoft Word<br>Microsoft Access<br>Microsoft Excel<br>Microsoft Powerpoint<br>Windows 98<br>Windows 2000 |

| All Grades | 8 | Have you searched for and extracted information from files, documents, reports, publications, or other materials to compose written materials? |
| | | **Answer(15 points):** In addition to independently performing this task as a regular part of my job, I have supervised performance of this task and/or I have trained others in performance and/or am normally consulted by others as expert for assistance in performing task. |
| All Grades | 9 | Which of the following best reflects your ability to communicate technical and non-technical information orally? |
| | | **Answer(9 points):** I have been acknowledged by management for my ability to orally communicate technical and non-technical information to a variety of inside and outside persons. |
| All Grades | 10 | Choose a method of consideration - Please select one choice from the following: |
| | | **Answer(0 points):** (NC-only) I am an active USPHS Commissioned Corps Officer OR a current or former Federal employee in the career competitive service with permanent or conditional tenure, I am eligible for noncompetitive consideration because I am currently holding or have held a permanent grade that is equal to or above the full performance level/promotion potential of the position being advertised. |

---

# RESUME for SARA ALLINDER MESTRE

## RESUME

Sara Allinder Mestre
~~███████████████████~~
~~███████~~ (HOME); ~~███████~~ (CELL);
~~███████████████~~

PROFESSIONAL EXPERIENCE

Policy Advisor (GS-13)
October 2002-April 2004
Office of International Health Affairs
Bureau of Oceans and International Environmental and
Scientific Affairs
U.S. Department of State
2201 C Street, NW, Washington, DC 20520
Supervisor Name:  Judith Kaufmann
Supervisor Title::  Office Director, Office of
International Health Affairs
Supervisor Phone: 202-647-1318

- Advised the Secretary of State and other principals on
international health issues in Africa, the Americas, Asia,
and on health issues related to human rights, including
gender and trafficking in persons
- Briefed Department officers, nongovernmental
organizations, students, and others on health as a foreign
policy issue, global health issues, and role of the U.S.
Government in responding
- Coordinated the interagency response during the
outbreaks of Severe Acute Respiratory Syndrome (SARS) and

Avian Influenza in Asia
- Served on the interagency steering committee for the
President's International Mother and Child HIV Prevention
Initiative and as the Department lead on the committee's
Communications work group
- Authored an article on the Office of International
Health Affairs, which was published in State Magazine

Policy Advisor (GS-13)
October 2003-December 2003
Office of the Global AIDS Coordinator Planning Taskforce
U.S. Department of State
2201 C Street, NW, Washington, DC 20520
Supervisor Name: Ambassador John Lange
Supervisor Title:: Deputy Global AIDS Coordinator
Supervisor Phone: 202-663-2581

- Advised and briefed the U.S. Global AIDS Coordinator and
Deputy Coordinators on bilateral policy issues
- Prepared remarks and briefing materials for the
Coordinator and Deputy Coordinator, including for the
Africa, Europe/Eurasia, East Asia and the Pacific, and
South Asia Chiefs of Mission conferences and the
U.S.-United Kingdom AIDS Roundtable
- Served on the planning committee for the 2003 Africa
Growth and Opportunity Act Forum's HIV/AIDS plenary;
drafted remarks and briefing memo for the Global AIDS
Coordinator, who served as chair

Senior Editor for Africa (GS-11)
August 2001-October 2002
Office of Country Reports and Asylum Affairs
Bureau of Democracy, Human Rights, and Labor
U.S. Department of State
2201 C Street, NW, Washington, DC 20520
Supervisor Name: Cynthia Bunton
Supervisor Title:: Director
Supervisor Phone: 202-261-8107

- Managed the production by 5 regional editors of the 48
sub-Saharan Africa Country Reports on Human Rights
Practices and International Religious Freedom reports,
which are submitted to Congress and published
- Edited each Africa report to ensure quality and
consistency according to report guidelines and principles
- Prepared Assistant Secretary and other principals for
Congressional testimony on human rights issues in Africa
- Briefed students at the Foreign Service Institute on
human rights issues in Africa

Political Officer (GS-9)
June-August 2001
U.S. Embassy Kampala, Uganda
Supervisor Name: Don Teitelbaum
Supervisor Title:: Charge d'Affairs (Deputy Chief of
Mission)
Supervisor Phone: 202-647-1000

- Supervised the Embassy's Political Section for 2 weeks;
oversaw work of Political Assistant local employee
- Reported to Washington on political and human rights
issues in Uganda via 12 cables to Department; edited more
than 10 additional cables written by colleagues

- Served as an International Observer during the
parliamentary elections in Mbarara Municipality and
Kashari County; observed the recount of the Mbarara ballots

Regional Advisor for Central and East African Affairs
(GS-9)
August 2000-August 2001
Office of Country Reports and Asylum Affairs
Bureau of Democracy, Human Rights, and Labor
U.S. Department of State
2201 C Street, NW, Washington, DC 20520
Supervisor Name: William Dilday
Supervisor Title:: Director
Supervisor Phone: 202-663-2571

- Edited and produced the 2000 Country Reports on Human
Rights Practices and 2001 International Religious Freedom
reports for countries in Central and East Africa:
Burundi, Cameroon, Central African Republic, Democratic
Republic of the Congo, Djibouti, Kenya, Republic of the
Congo, Rwanda, and Uganda
- Exercised the Department's discretionary option to
comment to Immigration and Naturalization Service offices
and U.S. Immigration Courts regarding foreign country
conditions relevant to the adjudication of asylum
applications by nationals of Chad, Equatorial Guinea,
Gabon, and the countries listed above

ADDITIONAL EXPERIENCE

Co-op/Student Career Experience Program (GS-5)
February-August 2000
Office of Policy Review & Interagency Liaison
Office of Overseas Citizens Services, Bureau of Consular
Affairs
U.S. Department of State
2201 C Street, NW, Washington, DC 20520
Supervisor Name: Ed Betancourt
Supervisor Title:: Director
Supervisor Phone: 202-736-9104

Project Assistant/Receptionist/Intern Coordinator
June 1999-January 2000
International Forum for Democratic Studies
National Endowment for Democracy
1101 15th Street, NW, Suite 802, Washington, DC 20005
Supervisor Name: Art Kaufmann
Supervisor Title:: Director, World Movement for Democracy
Supervisor Phone: 202-293-9072

Intern and Account Assistant
February 1998-June 1999
Hager Sharp, Inc.
1090 Vermont Ave, NW, Washington, DC 20005
Supervisor Name: Garry Curtis
Supervisor Title:: Senior Vice President
Supervisor Phone: 202-842-3600
- Educated Federal benefit recipients about their payment
choices for the EFT 99 (Electronic Funds Transfer) public
education campaign for the U.S. Department of the Treasury
- Managed a national network of staff and community,
consumer and financial partners
- Administered EFT 99 National Database of more than 1000

organizational contacts

Intern and Staff Assistant
January-November 1996
Office of Congresswoman Karen McCarthy (Missouri-5th
District)
Washington, D.C. and Kansas City, MO

EDUCATION

Master of Public Policy (MPP), concentration in
International Development, May 2000
The American University, Washington, D.C.

Bachelor of Arts (BA) in Political Science and Sociology,
magna cum laude, May 1998
Austin van der Slice Award for Excellence in Sociology
(Department award)
The American University, Washington, D.C.

AWARDS/HONORS

- U.S. Department of State Extra Mile Award, 2004
- U.S. Department of State Meritorious Honor Group Award,
2003
- U.S. Department of State Cash Performance Award, 2001
- Presidential Management Internship (PMI) Class of 2000

LANGUAGES

- Limited Working Knowledge of French (Foreign Service
Institute level 2/2; tested 5/23/02)
- Limited Knowledge of Spanish

COMPUTER SKILLS

Proficient: Microsoft Office Suite
Possess Limited Knowledge: SPSS, Adobe Illustrator, and
Adobe PhotoShop

# EXHIBIT 21

Cert #: SA-HHS-0001
Vacancy: **HHS-OIG-2004-0160 Writer Editor**
Grade: 11/12
Locations: Chicago, IL

Applicant: **MOSKAL, BRIAN**

# Personal Data

| First Name: | BRIAN |
|---|---|
| MI: | S |
| Last Name: | MOSKAL |
| Address1: | ~~████████████~~ |
| Address2: | |
| City: | CHICAGO |
| State: | IL |
| Zip Code: | 60630 |
| Plus 4: | |
| Phone: | ~~████████~~ |
| Email: | ~~████████~~ |
| US Citizen: | Y |
| Veteran Preference: | Other 10-point veteran. |
| Start of Service: | 09/10/1968 |
| End of Service: | 09/09/1974 |

# Core Questions

| 1 | Are you a veteran who was separated from the armed forces under honorable conditions after completing an initial continuous tour of duty of 3 years (may have been released just a few days short of three (3) years)? |
|---|---|
| | Yes |
| 2 | Individuals who have retired from active military service with a disability rating of thirty (30) percent or more OR who have been rated by the Department of Veteran Affairs (VA) within the proceeding twelve (12) months as having a compensable service-connected disability of thirty (30) percent or more are eligible for a noncompetitive temporary appointment for more than sixty (60) days or a term appointment. Are you eligible for such appointments? |
| | No |

| 3 | If you are a current Federal civilian employee, are you serving under a VRA Appointment as defined by the categories below? |
| | No |
| 4 | If you are currently a Federal civilian employee (or Commissioned Corps Officer/Applicant), by what agency and organization are you employed? |
| | I am not a current Federal employee |
| 6 | If your position is covered by an HHS bargaining unit, please indicate to which bargaining unit it belongs. |
| | Not Applicable |
| 8 | If you are currently a Federal employee (or Commissioned Corps Officer/Applicant), under what type of appointment are you serving? |
| | Not Applicable |
| 10 | Are you a student appointee under the Student Career Experience Program (SCEP) who has completed all requirements for graduation and conversion under the SCEP appointing authority and is in the 120 day period for conversion to term, career or career-conditional appointment? |
| | No |
| 11 | If you are NOT currently serving in the competitive service as a permanent career or career conditional Federal employee, are you eligible for reinstatement? |
| | Not Applicable |
| 13 | If you are, or ever were, a Federal civilian employee, please indicate the grade level of the position referenced in the above question: |
| | Not Applicable |
| 15 | If you are, or were, a Federal employee who held a permanent position in the competitive service, what is the highest GS equivalent full performance level/promotion potential of that position? |
| | NA (this includes excepted service employees such as AD pay plan) |
| 16 | If you are a male at least 18 years of age, born after December 31, 1959, have you registered with the Selective Service System? |
| | Not Applicable |
| 17 | Are you a retiree receiving a Federal annuity, either military or civilian? |
| | No |
| 18 | Have you accepted a buyout from a Federal agency within the past five (5) years? |
| | No |
| 19 | Are you eligible for noncompetitive appointment under a Special Appointing Authority (e.g. Outstanding Scholar, present or former Peace Corps personnel, current Postal Service personnel, etc)? |
| | No |
| 21 | Are you eligible for the Federal Employment Program for Persons with Disabilities? (For information on Schedule A appointments, see the OPM website.) |
| | No |
| 22 | Are you eligible for Indian preference as defined by the Department of the Interior (DOI) and as evidenced by appropriate Bureau of Indian Affairs (BIA) authorized certification? |
| | No |

| 23 | Are you eligible for preference based on being a Public Law 94-437 Indian Health Service Scholarship recipient? For more information, please click here. |
| | No |
| 24 | Displaced employee information: |
| | I am not a displaced employee from a Federal Agency. |

# Vacancy Data

## HHS-OIG-2004-0160 Writer Editor

| 11 | 1 | GS-11 Choose one answer that best describes your experience, education, or combination of education and experience as related to the basic qualification requirements for this position: |
| | | **Answer(0 points):** I have at least one year of specialized experience that has equipped me with the particular knowledge, skills, and abilities to successfully perform the duties of the position. This experience is related to the work of the position and equivalent to at least the GS-09 level in the Federal service as described in the vacancy announcement. |
| 12 | 1 | GS-12 Choose one answer that best describes your experience as related to the basic qualification requirements for this position: |
| | | **Answer(0 points):** I have at least one year of specialized experience that has equipped me with the particular knowledge, skills, and abilities to successfully perform the duties of the position. This experience is related to the work of the position and equivalent to at least the GS-11 level in the Federal service as described in the vacancy announcement. |
| All Grades | 1 | Select the answer that describes your education/experience in researching, analyzing, and evaluating complex information. |
| | | **Answer(5 points):** I have performed this task as a regular part of the job, independently and usually without review by supervisor or senior employee. |
| All Grades | 2 | From the answer choices below, please select the one that best reflects your ability to communicate technical and non-technical information in writing. |
| | | **Answer(18 points):** I have been acknowledged for my ability to write technical and non-technical information for a variety of inside and outside readers. My writing skills are considered to be of superior quality. |
| | | Please describe below your ability to communicate clearly in writing a variety of legal and/or analytical and technical documents or articles that require a research and analytical approach: |
| | | **Answer(0 points):** For: Vacancy Announcement: HHS-OIG-2004-0160 Please allow me to introduce myself. My name is Brian S. Moskal. I am an award-winning professional writer/editor with superior written and oral communication skills. In college, I was awarded the Eugene C. Pulliam Journalism Scholarship. More recently, I was fortunate to be named a finalist for the Jesse H. Neal Editorial Achievement Award. My ability to produce a variety of communications materials for diverse inside and outside audiences is well documented here and in my resume. During my |

career I have worked as a reporter, writer and editor for a newspaper, a specialized business magazine, personal finance publications, and trade journals. As a freelance writer, I have created public relations materials for executives, for major corporations, and for national trade organizations. Many of the various written materials have presented, promoted or explained programs and activities. I have produced these materials for Ernst & Young, IndustryWeek, YourMoney, Insurance Networking News and Public Works magazine to name a few. I have created reports based on the results of information-gathering business surveys. For example from 1994 to 1997, I produced IW's annual CEO cover story. The information came from mail-in surveys that had been completed by CEOs from major corporations and returned to me. From those results, I created in-depth magazine articles. As managing editor of YourMoney magazine, I edited cover stories, features and department news briefs to conform to the style and tone of the publication. There was a hidden voice contained in each story that urged readers to take action in their personal investing lives. It was a subliminal type of motivational writing. I also took complicated mutual-fund data, analyzed it and presented conclusions in a column I wrote about fund investing. The consumer magazine was read by 550,000. I have also published technical articles on subjects such as the future of the electric car for IndustryWeek's 350,000 public and private sector readers. I gathered information from scientists and executives inside and outside the automobile industry, assimilated it, analyzed it, and then came to conclusions. The result was one of the first articles written about the true advantages and the real drawbacks of the electric car. Predictions I made in the story about limited vehicle range have plagued electric cars and made them difficult to sell. Also while at IndustryWeek, I researched and wrote an award-winning magazine cover story about the lessons Vietnam combat veterans learned in Southeast Asia and were applying to their professional lives as business executives in the United States. It was my original idea. I found the combat veterans, asked if they would agree to be interviewed for the story, and produced the article. It has won a national writing award. Since my IW days, I have written speeches for the former Chief Technology Officer of Amoco Corp. (now BP Amoco) and for the former General Manager of the Cadillac Division of General Motors Corp. The GM speech was delivered before 275 New York automotive financial analysts. I also wrote and delivered a speech to an international gathering of 250 Accenture management consultants in St. Charles, IL. (At one point, my remarks actually made them laugh, as intended.) For at least 10 years, I made oral presentations before my journalist peer group and publishing company bosses about manufacturing and business trends during annual IW meetings. Furthermore, my college education included active participation in a rigorous and comprehensive speech-writing class. Last year, I was hired to edit a 215-page technical manuscript about logistics, disasters, terrorism and the role played by the Federal Emergency Management Agency (F.E.M.A.) in the aftermath of the World Trade Center attack. The challenge was to transform a technical paper written in an "engineering language" and make it understandable to non-technical people. The audience was the membership of the Council on Logistics Management, a trade organization. Earlier this year, PBS&J Engineering hired me to create a marketing brochure for a new division of the 3,400-employee company. I interviewed and gathered information from two company executives and two external consultants in order to create the 800-word document. Audit, tax and accounting firm Ernst & Young retains me annually to interview, research, and write feature articles about executives such as CEO Herb Kohler of Kohler Co., CEO Sergio Magestri, of defense contractor InVision Technologies, and CEO David Neeleman and President Dave Barger of JetBlue Airways. I use background materials provided by the company, speeches, and the Internet (for example: www.finance.yahoo.com) to supplement the interviews. Since 2001, I have produced 15 articles for Ernst & Young's annual "Entrepreneur of the Year" publications. For the past three years, Thomson Media's Insurance Networking News has hired me on a regular basis to write information technology case studies. To do so means comprehending technical information about software, computers and tying it together with the business needs of insurance companies. The challenge is to

make the technical case studies understandable to a non-technical audience without boring the technically-inclined. The articles discuss cost/benefit analysis, return on investment, and the positive benefits of the technology on the company's bottom line. I recently wrote a story explaining a Blue Cross of California program to give away desktop computer systems or personal digital assistants without charge to thousands of doctors in the state. My professional journalism background includes interviewing and writing stories about the best and the brightest. In the past, I have learned about the strategies of various companies from the leaders at the very top of the respective organizations. The companies include: Charles Schwab, Harley-Davidson, Mercedes-Benz, Chrysler Corp., Rolls-Royce, Kohler Co., JetBlue Airways, Big Bang Products LLC, and Pfizer Drug. Toss in a rare non-sports interview granted by Phil Jackson, former coach of the Chicago Bulls and the Los Angeles Lakers, and you get the picture of some of the background that I can draw on that makes me a versatile writer/editor. Such overall experiences have helped me also to develop first-rate analytical and technical writing skills. My background includes writing in a newsletter format and producing content for an Internet site at YourMoney. At IW, I participated on a special team to establish IndustryWeek.com on the Internet in 1994. At IW, I also co-led a six-person team to develop and implement staff editorial and quality performance standards. In summation: I am an award-winning versatile business writer and editor. My professional strengths are based on my ability to research a variety of complex subjects and present the information in a clear, simple and distinct manner. In my opinion, I can add significant value to the U.S. Dept. of Health and Human Services, Region V. Please review my resume. I would welcome the opportunity to discuss the writer/editor position during a personal interview. Sincerely, Brian S. Moskal 4856 N. McVicker Avenue Chicago, IL 60630 773.775.3220 bmoskal@speedsite.com

| All Grades | 4 | I have reviewed and edited documents produced by others to ensure proper quality, content, and grammatical usage prior to dissemination or publication. |
| | | **Answer(12 points):** True |

| All Grades | 5 | I have written and edited: |
| | | **Answer(12 points):** Technical Articles<br>Press Releases<br>Technical Manuals<br>Brochures<br>Speeches<br>Periodicals |

| All Grades | 6 | Have you worked in a high level office with complex assignments of a widely varying nature, short deadlines, and competing demands for attention? |
| | | **Answer(12 points):** Yes |

| All Grades | 7 | Indicate which of the following personal computer and word processor software you are proficient in using (proficient means you understand and utilize a major part of the system`s functionality/capabilities). |
| | | **Answer(4 points):** Microsoft Word<br>Microsoft Access<br>Microsoft Excel<br>Microsoft Powerpoint<br>Windows 2000 |

| All Grades | 8 | Have you searched for and extracted information from files, documents, reports, publications, or other materials to compose written materials? |
| | | **Answer(10 points):** I have performed this task as a regular part of the job, independently and usually without review by supervisor or senior employee. |
| All Grades | 9 | Which of the following best reflects your ability to communicate technical and non-technical information orally? |
| | | **Answer(5 points):** I have orally presented non-technical and technical information on the job to superiors, co-workers and others. |
| All Grades | 10 | Choose a method of consideration - Please select one choice from the following: |
| | | **Answer(0 points):** (DE) I am not a Federal employee in the career competitive service with permanent or conditional tenure OR I am a current or former Federal employee in the career competitive service with permanent or conditional tenure, as indicated on my Standard Form 50 (Notice of Personnel Action), please consider me only through the Delegated Examining process. |

# RESUME for BRIAN MOSKAL

# RESUME

Brian S. Moskal
~~\[redacted\]~~
Chicago, IL 60630
~~\[redacted\]~~
~~\[redacted\]~~

Summary

Award-winning journalist seeks writer/editor position

Highlights of Qualifications:

*Versatile writer and editor with outstanding written and
  oral communications skills
*Proven ability to create communications materials for
diverse
  internal and external audiences
*Excellent reporting, information gathering, researching,
  interviewing and organizing skills
*College graduate with journalism degree; computer and
Internet
  literate
*U.S. Army military veteran; Awarded Purple Heart; Jesse
H. Neal
  Editorial Achievement Award finalist

Professional Experience:

Contract Work          4856 N. McVicker Ave. Chicago IL. 60630
8-2001 to Now          Supervisor: Self
             Salary: $30 K; 45 hours per week

*National Assn. of Manufacturers Magazine: wrote a cover
story about
  Harley-Davidson CEO Jeff Bleustein
*Plastic Surgery News: produced stories about vintage car
  collecting and retirement planning
*Thomson Media's Insurance Networking News: wrote
technical case
  studies about the use of information technology in
insurance
*Ernst & Young LLP: wrote articles about executives for
  the "Entrepreneur of the Year" publications
*Kiplinger's Personal Finance magazine: wrote a stock
analysis story
*PBS&J Engineering Firm: created a marketing brochure to
promote a
  new division
*Council on Logistics Management: edited a 215-page
technical
  manual about FEMA and disasters
*Public Works Magazine: wrote a cover story about
technology usage
  in city public works departments

YourMoney Magazine    8001 N. Lincoln Avenue, Skokie, Il.
60077
6-2000 to 8-2001    Supervisor: Dennis Fertig; Tele:
847-543-9965
Managing Editor    Salary: $65K; 50 hours per week

Produced a mutual-fund column and a mutual-fund manager
profile for the Consumers Digest Inc. personal finance
publication. Noteworthy interviews included Charles R.
Schwab and portfolio managers at Dodge & Cox, Fidelity,
Janus, Oakmark, Turner and Vanguard. Generated calendar
story ideas, hired and managed freelance writers, rewrote
and copy-edited features including magazine cover stories,
guided the magazine production process, interfaced with
the art department, and increased productivity of the
editorial staff. YourMoney magazine ceased publication in
2001.

Saturn of Chicago    5515 W. Irving Park Rd, Chicago, IL
60641
11-1998 to 6-2000    Supervisor: Scott Duncan; Tele:
773.282.9000
                     Salary: $31K; 52 hours per week

Hired as an automotive sales consultant. Promoted to
Internet sales manager in charge of all e-commerce for new
and used cars. Managed Internet site traffic and developed
marketing skills.

Moskal Communications    2020 W. Waveland Ave., Chicago, Il
60618
10-1997 to 11-1998    Supervisor: Self;
                      Salary: $25K; 45 hours per week

Created an independent freelance writing, business
research and media consulting company. Major clients
included BP Amoco Corp. and General Motors Corp. Created
various public relations materials, speeches and a
national leadership award nomination document.

```
IndustryWeek Magazine    Two Prudential Plaza
2-1974 to 10-1997        180 N. Stetson, Suite 2555
Regional Editor;         Chicago, IL. 60601
Associate Editor;        Supervisor: Perry Pascarella
Senior Editor                   Tel. 440.871.0276
                         Salary: $55K; 45 hours per week
```

Researched and wrote major news and feature articles for
the flagship publication of Penton Media Inc., a
$440-million, Cleveland-based publishing company. Led the
coverage of the global auto industry and produced an
annual automotive buying guide with a unique rating
system. Interviewed a wide range of senior business
leaders on timely topics of interest to decision makers.
Provided a distinctive analysis of business, management
and manufacturing trends for an executive audience of
350,000.

Key Achievements:
*Interviewed and wrote major articles about leadership roles
 models such as Phil Jackson coach of the Chicago Bulls,
Katherine
 Hudson of Brady Co., Richard Teerlink of Harley-Davidson,
Dennis
 Pawley of Chrysler Corp., Michael Donovan and Peter Ward
of Rolls-
 Royce, Andreas Renschler of Mercedes-Benz U.S. and
football coach
 Gary Barnett of Northwestern University.
*Led a six-person, cross-functional team from 1994 to 1997
to
  produce Industry Week's annual CEO Survey special issue
and wrote
  the cover story.
*As team leader, worked with Northwestern University's
Kellogg
  Graduate School of Business to launch an annual listing
of IW's
  250 most competitive companies in the United States.
*Spoke before 250 senior management consultants of Andersen
  (Accenture) Consulting LLP.
*Reprinted in the Chicago Tribune; named "Seer of the
Year" among
  Chicago media by Borg-Warner Corp.
*Participated on a special team to establish
IndustryWeek.com on
  the Internet in 1994.

Major Awards:
*1st Place, Editorial Excellence, 1997 American Society of
Business
  Press Editors 19th Annual National Awards Competition,
Case
  History, "Mercedes Bends."
*Finalist, 1996 Jesse H. Neal Editorial Achievement Award,
Best
  Single Magazine Article, "Warriors in Our Midst," an IW
cover
  story about Vietnam combat veterans who held senior
executive
  positions.
*1st Place, 1994 Excellence in Journalism Award, the Press

Club of
  Cleveland, Human Interest Reporting; Third Place, 1994
American
  Society of Business Press Editors & Writers, Cleveland
Chapter,
  Feature Article, "The Plight of the Seasoned Worker."
*Honorable Mention, 1993 American Society of Business
Press Editors
  & Writers, Cleveland Chapter, In-Depth Article, "Managing
  Survivors."
*1st Place, 1989 Excellence in Journalism Award, the Press
Club of
  Cleveland and the Cleveland Chapter of the Society of
Professional
  Journalists, Human Interest, "The Sun Also Rises at GM."

The Chicago Daily Calumet    91st and Baltimore, Chicago,
IL. 60617
3-1971 to 2-1974            Supervisor: Robert Seltzer
(Tel. Unk.)
Sports Editor;              Salary: $7K; 50 hours a week
Columnist;
News Reporter

Hired to manage the sports section of the daily newspaper.
Directed staff photographers and freelance writers.
Promoted to news department. Reported on city hall,
elections, education, police, fire etc.

Education

B.S. in journalism, minor in philosophy, Northern Arizona
University, Flagstaff 1971. Pledge class president, Alpha
Epsilon Pi. Awarded the Eugene C. Pulliam Journalism
Scholarship. Selected editor-in-chief of college
newspaper, The Lumberjack; as managing editor, directed
17-person staff for one year. Graduated with honors.

Continuing education: QuarkXPress classes at Mac
University; Web-page authoring classes at Chicago City
College; Morningstar Inc. mutual-fund data training.

Mendel College Prep High School
250 East 111th Street
Chicago, IL
1960-1964

Took college prepatory curriculum including languages,
math and science. Graduated in 1964.

U.S. Military

U.S. Army (1968-1970). Vietnam combat veteran. Awarded the
Purple Heart while serving with the First Air Cavalry
Division. Developed exceptional crisis management skills.
Public information specialist at Fort Knox, KY. Honorable
discharge; DD 214.

# EXHIBIT 22

New User | About the Agency | What's New | Quick Index | Operating Status [          ] |

## Office of Personnel Management
### The Federal Government's Human Resources Agency

Strategic Management of Human Capital | Employment and Benefits | Career Opp

*Working for*

You are here: Home > employ

# Outstanding Scholar and Bilingual/Bicultural Programs (Luevano Consent Decree)

*The following information is provided as background information. Except for the actual language from it does not represent formal guidance from the Department of Justice or from the court.*

Background | Outstanding Scholar Program | Bilingual/Bicultural Program

## Background Information for both Programs

The Outstanding Scholar and Bilingual / Bicultural programs were established by a consent decree appr United States District Court for the District of Columbia on November 19, 1981. The decree resolved a action suit that was filed in 1979 and is now known as Angel G. Luevano, et al., v. Janice R. Lachance, Office of Personnel Management, et al. The plaintiffs alleged that the Professional and Administrative ( Exam (PACE), which the Government had been using to hire into about 120 occupations at the GS-5 ar levels, had adverse impact on the employment of African Americans and Hispanics for reasons that wer related.

Although the Outstanding Scholar and Bilingual/ Bicultural programs are aimed at addressing underrep of African Americans and Hispanics, the programs have never been restricted to those designated mino The history of the programs' use is consistent with that openness.

The merit principle, that "Recruitment should be from qualified individuals from appropriate sources in endeavor to achieve a work force from all segments of society, and selection and advancement should b determined solely on the basis of relative ability, knowledge, and skills...," still applies. [5 U.S.C. 2301

To achieve its intent, the Luevano consent decree depends on agencies to focus their recruiting on sourc would increase the pool of African American and Hispanic candidates for employment. Actual hiring d must not be made on the basis of race or national origin except in situations that meet all of the requiren established by the Supreme Court in its 1995 ruling in Adarand Constructors v. Pena.

- o **Occupations Covered**. The Outstanding Scholar and Bilingual / Bicultural programs may be use into only certain positions at grades GS-5 and GS-7. Only those positions which were subject to t exam are covered by the consent decree. Appendix A lists the covered occupations, updated to re changes in occupational classification that were made after the consent decree was issued. Person

be selected into covered positions with the intent of moving them later to non-covered positions. 330.501 and 330.503.)

- **Relationship to Competitive Examining.** The Outstanding Scholar and Bilingual / Bicultural pr must only be used as supplements to competitive examining. They should not be used unless an a an established pattern of competitive selection into the covered jobs or is currently making comp selections into those jobs. The Outstanding Scholar and Bilingual / Bicultural programs should b lesser degree, as a supplement to reduce adverse impact on African Americans and Hispanics. Th neither a requirement nor an authority to use either program to hire only persons from the designa minority groups. To reduce adverse impact, agencies should focus their **recruiting** in a way that : the pool of African American and Hispanic candidates for employment in these occupations.

- **Record-keeping.** Under Section 25 of the consent decree, agencies are to collect race and nationa (RNO) data on all applicants for *Luevano*-covered occupations; similar data is collected through Government's Central Personnel Data File (CPDF) on those actually appointed. For Outstanding applicants, agencies collect data on form OPM-1386B. Completing the form is optional for appli is mandatory that agencies provide copies of the form to applicants. In January of each year, agen required to report to OPM the prior calendar year's cumulative RNO data on applicants, using for 1592. In March of each year, agencies must also submit narrative reports on their prior year's effe special programs to eliminate adverse impact on African Americans and Hispanics when hiring ir Professional and Administrative Career Exam (PACE) occupations.

- **Agencies covered.** Although OPM was the defendant named in the caption, approximately 45 otl departments and agencies were listed as representatives of the defendant class, which included al that had ever used the Professional and Administrative Career Exam (PACE). Since most agencie defendants in the *Luevano* case, whether specifically named or not, each should consult its own l counsel to ensure compliance with the terms of the decree and with other provisions of law.

## The Outstanding Scholar Program

- **Eligibility.** The Outstanding Scholar Program may be used to appoint those college graduates fro accredited schools who obtained a grade point average of 3.5 or higher on a 4.0 scale for all unde courses completed toward a baccalaureate degree. It can also be used to appoint those who stand upper 10% of a baccalaureate graduating class, or of a major university subdivision such as a Col Arts and Sciences. These appointments may be made without going through an examination proc jobs at grades GS-5 and GS-7 in covered occupations.

- **Announcing Vacancies.** Prior to making appointments under the program, an agency must adver positions, including posting them through OPM's job information system. There are three basic r the positions must be announced:

  1. By law, the principle of merit principle requires fair and open competition, which in turn re public notice of vacancies so all who are eligible may apply [5 U.S.C. 2301];

  2. Another law requires agencies to report to OPM and to the United States Employment Ser Department of Labor, each vacant position in the agency which is in the competitive servic Senior Executive Service and for which the agency seeks applications from persons outside Federal service [5 U.S.C. 3327]; and

  3. The regulation establishing the Interagency Career Transition Assistance Plan (ICTAP) for Employees requires agencies to report all vacancies to OPM when accepting applications f

the agency (including applications for temporary positions lasting 120 or more days)[5 CFI
Applicants who meet the ICTAP requirements must be selected before Outstanding Schola
also, Relationship to Competitive Examining, above.]

○ **Timing of Appointments.** Outstanding Scholars cannot be appointed until they have actually be
"college graduates." They may, however, be given conditional offers pending graduation. Althou
Outstanding Scholar candidates do not have to appear on a certificate, their consideration must be
concurrent with the priority consideration of displaced employees eligible for ICTAP selection (s
The Outstanding Scholar selection and offer need to be made within 90 days from the time a cert
returned to the agency personnel office, based on an announcement open to ICTAP candidates. If
has not been made within those 90 days, the agency is required to readvertise the vacancy.

After the selection, the candidate should be appointed to the position within a reasonable amount
accommodate special situations, however, such as the completion of education, a geographical m
obligations to current employers, temporary agency hiring restrictions, and the processing of secu
clearances, an agency may delay appointment up to six months from the date of selection. If an a
exceeds six months, it is required to readvertise the vacancy. Requests for extensions beyond six
will be entertained by OPM on a case by case basis. The decree sets no time limit after graduatio
Outstanding Scholar eligibility, nor does it set a limit on the number of times an individual can re
Outstanding Scholar appointments.

○ **Grade point average.** The decree prevents the use of graduate grades in calculating grade point a
(GPAs). It also requires using grades received in all undergraduate courses leading to the degree.
include courses from all undergraduate schools attended, not just courses taken at the school prov
degree. That requirement also means that the candidate must have the 3.5 GPA at the time of grac
any conditional offers made prior to graduation must be rescinded if the GPA is not maintained. S
grade point average must be calculated on a 4.0 scale, agencies also need to adjust GPAs that wei
a scale that allows a 4.5 (A+) grade.

○ **Class Standing.** The decree is specific in limiting to the upper 10% of a graduating class, or of a
university subdivision, eligibility based on class standing. A major university subdivision is a col
school and is not merely a department or program of study. For class standing to be used, it must
determined formally by the college, school, or university.

○ **Relationship to Qualification Standards.** To be selected through this program, a candidate mus
the eligibility requirements for the Outstanding Scholar program and the qualification standards f
position. Basic qualifications are described in OPM's Operating Manual, Qualifications Standard:
General Schedule Positions. Agencies may add their own job-related requirements. The manual d
such things as the requirement that education be from accredited colleges and universities and the
established procedure of rounding GPAs to the nearest tenth of a percent (i.e., 3.45 rounded to 3.:
manual also describes the requirements for the Superior Academic Achievement (S.A.A.) provisi
S.A.A. designation is solely grade-determining. It establishes eligibility to appoint at the GS-7 le
of at GS-5, but does not in itself provide an appointment opportunity.

○ **Direct hire.** Although the term "direct hire" is used, the decree essentially provides for a noncom
appointment to the competitive service. "Direct hire" means the ability to hire without having to r
candidates, but only when there are less than four candidates and there are no candidates eligible
veterans' preference. The Outstanding Scholar program does not have that restriction. Rating and
are not required, so neither the "rule of three" nor veterans' preference are applied. There are requ
however, that the positions be announced, that displaced employees be given preference, and that
program only be used as a supplement to competitive examining. (See "Announcing Vacancies" a

Case 1:06-cv-01078-JDB    Document 29-6    Filed 09/12/2008    Page 25 of 45

Context," above.)

## The Bilingual/Bicultural Program

- **Eligibility.** An agency may appoint applicants who obtain a passing score in an examination, with regard to rank, provided that:

    1. the job is one in which interaction with the public or job performance would be enhanced t having bilingual and/or bicultural skills and is at grade GS-5 or GS-7 in a covered occupati and

    2. the agency has determined through use of a reasonable questionnaire or interview that the applicant to whom appointment is to be offered has the required level of oral Spanish langu proficiency and/or the requisite knowledge of Hispanic culture. Agencies must maintain documentation that these requirements have been met.

- **Rating Candidates.** Unlike the Outstanding Scholar program, the Bilingual / Bicultural program that applicants receive a passing score through the alternative examining procedure. The examini procedure in current use is OPM's rating schedule used in case examining. A candidate who meet minimum qualifications for the position will be rated as having "passed" the examination.

 Downloadable Version (28 kb)
 Downloadable Version (13 kb)
 Downloadable Version (19 kb)

---

Office of Personnel Management                                                                 Site
1900 E Street NW, Washington, DC 20415-1000 | (202) 606-1800 | TTY (202) 606-2532

Contact Us | Forms | FAQ's | Products & Services

# EXHIBIT 23

HHS-OIG-2004-0160

Delegated Examining Unit Certificate of Eligibles
DHHS Rockville, MD

Certificate Number: HHS/PSC-1-04-1138 AMENDMENT
Certificate Issued on: 8/28/04
Certificate Expires on: 11/29/04
Type of Appointment: Career/Career-Conditional
Occupation: Writer Editor
Pay Plan-Series-Grade: GS-1082-12
Location: Dallas, TX
Random Number: 3
**INSTRUCTIONS FOR SELECTING OFFICIALS**
-Use the following symbols to indicate action: A=selected; NS=not selected; D=declined
-This certificate is void if selection is not made by the deadline date for return,
unless an extension is requested and approved.

GRADE: 12



AFHA4   - Set

| | | |
|---|---|---|
| A | 98.80 NV | GREISSEL, MICHAEL |
| N S | 98.20 NV | |
| N S | 97.60 NV | |
| N S | 97.30 NV | |
| N S | 96.40 NV | |
| N S | 96.10 NV | |

Signature: _Gordon L Sato_        Date: _9/15/04_
                Selecting Official

Page 1

HHS-OIG-2004-0160

Delegated Examining Unit Certificate of Eligibles
DHHS Rockville, MD

Certificate Number: HHS/PSC-1-04-1136
Certificate Issued on: 8/26/04
Certificate Expires on: 11/26/04
Type of Appointment: Career/Career-Conditional
Occupation: Writer Editor
Pay Plan-Series-Grade: GS-1082-12
Location: Chicago, IL
Random Number: 3
**INSTRUCTIONS FOR SELECTING OFFICIALS**
-Use the following symbols to indicate action: A=selected; NS=not selected; D=declined
-This certificate is void if selection is not made by the deadline date for return,
unless an extension is requested and approved.

GRADE: 12

A    103.40   XP    MOSKAL, BRIAN ████████████████

D    99.40    NV    ████████████████

NS   99.40    NV    ████████████████

NS   99.10    NV    ████████████████

NS   98.80    NV    ████████████████

NS   98.70    TP    ████████████████

Signature: _Stephen Slomar_          Date: _9/10/2004_
                Selecting Official
        _for PAUL SWANSON_

Page 1

HHS-OIG-2004-0160

Delegated Examining Unit Certificate of Eligibles
DHHS Rockville, MD

Certificate Number: HHS/PSC-1-04-1141-A
Certificate Issued on: 9/1/04
Certificate Expires on: 11/30/04
Type of Appointment: Career/Career-Conditional
Occupation: Writer/Editor
Pay Plan-Series-Grade: GS-1082-11
Location: New York, NY
Random Number: 6
**INSTRUCTIONS FOR SELECTING OFFICIALS**
-Use the following symbols to indicate action: A=selected; NS=not selected; D=declined
-This certificate is void if selection is not made by the deadline date for return,
unless an extension is requested and approved.

GRADE: 11



| 98.80 | NV | ▓▓▓▓▓▓▓ | N S |
| 98.20 | NV | LIVERHANT, CHARLES | A = Selected |
| 97.90 | NV | * ▓▓▓▓▓▓▓ | N S |
| 97.30 | NV | ▓▓▓▓▓▓▓ | N S |
| 96.40 | NV | ▓▓▓▓▓▓▓ | N S |
| 96.40 | NV | ▓▓▓▓▓▓▓ | N S |

Signature: _____        Date: 9/13/04
              Selecting Official

Page 1

Office of the Secretary                HHS-OIG-2004-0160
NON-COMPETITIVE MERIT PROMOTION CERTIFICATE OF ELIGIBLES
STATUS APPLICANTS

CERTIFICATE NUMBER: HHS-OIG-2004-0160-GS-12NC-MO
POSITION: Writer Editor GS-1082-12
PROMOTION POTENTIAL: NONE
NUMBER OF VACANCIES: MANY
TENURE: Career-Career/Conditional
ISSUE DATE: 8/25/04
RETURN DATE: 11/26/04
LOCATION: Kansas City, MO
**INSTRUCTIONS FOR SELECTING OFFICIALS**
-Use the following symbols to indicate action: A=selected; NS=not selected; D=declined
-This certificate is void if selection is not made by the deadline date for return,
unless an extension is requested and approved.

GRADE: 12

A   MESTRE, SARA ALLINDER

NS

Signature of Selecting Official            RIGA         Title            9/10/04  Date

Concurrence of Office/Center Dir (Optional)          Title            Date

Signature of EEO Officer                             Title            Date

Contact for this Certificate: Melinda Bing, 301-443-3201
Issuing Office: DHHS Rockville HR Center
Page 1

# EXHIBIT 24

⧠ORIGINAL

1

1                 UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

2

3 - - - - - - - - - - - - - -x
                       :

4 SUSANNE ATANUS,           :
                       :

5           Plaintiff,    :
                       :

6 VS.                :   Civil Action No. 06-1078(JDB)
                       :

7 MICHAEL O. LEAVITT,       :
   SECRETARY, U.S. DEPARTMENT    :

8 OF HEALTH AND HUMAN SERVICES :
   (HHS),                  :

9                      :
          Defendant.    :

10                      :
   - - - - - - - - - - - - - -x

11

12                     Washington, D.C.

13                     April 9, 2008

14

15 Deposition of:

                    MELINDA BING

16

17 the Deponent, called for examination by counsel for Plaintiff,

Susanne Atanus, pursuant to notice and agreement as to time

18 and place, at the United States Attorney's Office, 501 3rd

19 Street, N.W., Washington, D.C., before Victor Lindsay, a

20 Notary Public in and for the District of Columbia.

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

17

1    Q.    And you've been doing that since 11 months ago, is

2    that correct?

3    A.    I have been assiging, assiging work for the past

4    11 months.

5    Q.    How long have you been determining the

6    qualifications of applicants for positions?  Are you thinking,

7    Ms. Bing, because I'm just not hearing you.

8    A.    Oh, yes, I'm sorry.  I should have -- I'm sorry.

9    I'm thinking.

10    Q.    That's the problem with the telephone dep.  I

11    apologize.  I can't -- I don't know if you're thinking or not.

12    A.    Okay.  I'll say approximately -- let me think.  Let

13    me think of exactly what year.

14    Q.    Absolutely.  You can take your time, but maybe it

15    would help if you're -- if you need time to think, just tell

16    me you're thinking, so I don't think the phone is, is not

17    working.

18    A.    I'll say approximately 2001.

19    Q.    Okay, and since that time --

20    A.    Maybe 2002.  Maybe the beginning of 2002.

21    Q.    Okay.  Since that time, what's the process by which

22    you determine the qualifications of job applicants?

23    A.    Well, the applicants apply in the automated system.

24    It was called QuickHire, QuickHire system.  There are self-

25    assessment questions that the applicants must respond to along

1  with submitting their resume, a copy of their resume.  So I

2  review the application -- the applicant responses, self-

3  assessment questions and the resume in comparison to the job

4  analysis, the job announcement, position description to

5  determine if the applicant meets the qualifications.  The

6  automated system generates a score also based on the applicant

7  assessment questions.

8      Q.  Anything else?

9      A.  No.

10      Q.  In that process that you just described, Ms. Bing,

11  do you have some discretion to determine the score that you

12  generate?

13      A.  Can you repeat that question, please?

14      Q.  In the process that you just described, Ms. Bing, do

15  you have some discretion to determine the score that you

16  generate?

17      A.  Okay.  I don't generate the score.  The QuickHire

18  automated system generates the score, and it's based upon the

19  applicant, the self-assessment questions, the way that the

20  applicant responds to the questions.

21      Q.  Well, in, in my notes about what you said about

22  1 minute ago, you said you generate a score.

23      A.  No, I didn't.  I said I don't generate a score.  The

24  automated system generates a score.  It's an automated hiring

25  system.

24

1    Q.   Okay, we may have that here which if we do I'll show
2  that to you later.
3    A.   Okay.
4    Q.   Anything else you recall that were qualification
5  standards that based -- when you were considering and
6  evaluating Ms. Atanus' job application?
7    A.   Nothing else that I can recall.
8    Q.   Okay, and, and in looking at Ms. Atanus' application
9  documents, what conclusion did you come up with regarding her
10 qualifications for this position?
11   A.   She was not qualified for the position.
12   Q.   On what did you base that opinion?
13   A.   I based that opinion on the responses to her self-
14 assessment questions and a review of her resume.
15   Q.   Do you recall exactly what you're referring to here
16 that she put on her resume or her application that she filed
17 that led you to the conclusion she was not qualified?
18   A.   I don't recall everything on her resume or her
19 applicant responses.  She works as a --
20   Q.   Well, tell me what you do recall.
21   A.   Okay.  I recall that she worked for 18½ years as a
22 contracting officer at GSA and then for approximately 3 months
23 maybe in 2003 as a procurement analyst.  She did fundraising,
24 worked at Kohl's, couple of other jobs, and basically the --
25 her -- the responses to the applicant assessment questions

1  pertaining to her technical writing ability were not

2  demonstrated in her resume.  The duties and responsibilities

3  in her resume, they basically pertained to her contracting --

4  administering contracts, but I didn't see 1 year of

5  specialized experience which demonstrated the caliber of

6  experience that was required for the writer-editor position.

7  I didn't see that experience on anything in her resume.

8       Q.   And --

9       A.   And I also had my superiors, more than one,

10 reevaluate her resume.  We gave her every consideration

11 possible.

12      Q.   And what superiors are you referencing?

13      A.   Okay.  One is -- one was Eileen Gomsi.  She was my

14 team leader.

15      Q.   I'm sorry, Eileen who?

16      A.   Oh, I could spell her last name.  Gomsi, G-O-M, like

17 Mary, S-I.

18      Q.   Okay, anyone else?

19      A.   Yes, Casandra Cuffee, C-U-F-F-E-E.  She was our

20 manager.

21      Q.   Okay.

22      A.   Okay, and then another manager came in, and she

23 reviewed it.  Her name was Kimberly Lewis.

24      Q.   Anyone else?

25      A.   Yes, Donna Thomas reviewed it.

1    A.    I'm thinking.  I think that if she had a higher

2  degree of writing or more experience writing, it was not

3  indicated in her resume, and I know that doesn't answer your

4  question, does it?

5    Q.    Not exactly.  We'll come back.

6    A.    Okay, thanks.

7    Q.    Obviously I'm -- maybe I'm not making it clear.  I

8  thought I did, but what exactly did Ms. Atanus have to

9  demonstrate to you at the time you reviewed her documents that

10  would have led you to the conclusion she was qualified for

11  this position?

12    A.    Her resume would have to have indicated 52 weeks of

13  specialized experience in writing and editing or duties

14  directly related to the position being advertised at the next

15  lower -- which is equivalent to the next lower grade level in

16  the federal government.

17    Q.    Explain what you --

18    A.    Her resume --

19    Q.    -- what you mean --

20    A.    I'm sorry --

21    Q.    -- by that answer?

22    A.    I'm sorry, I missed the question.  I was talking

23  too.

24    Q.    We're talking?

25    A.    I was talking while you were asking the beginning of

1 | your question.

2      Q.   What do you mean by that answer?

3      A.   I meant that her resume did not indicate that she

4 | had 1 year, 52 weeks of specialized experience to -- 52 weeks

5 | of specialized experience at the next -- which is equivalent

6 | to the next lower grade level in the federal government.  The

7 | duties would have to be directly related to the position.

8 | That's specialized experience.  In her resume -- the bulk of

9 | her resume contained duties and responsibilities pertaining to

10 | her position as a contract, contract officer and then the

11 | 3 months as a procurement analyst.  But the bulk of her

12 | resume, the 18½ years that she spent at GSA, pertained to

13 | basically the duties that she performed as a contracting

14 | officer.

15      Q.   What is your understanding of what the definition is

16 | of specialized experience?

17      A.   That's experience which is directly related to the

18 | duties of a position.

19      Q.   Well, in, in this question, in this --

20      A.   And the position is a writer-editor.

21      Q.   -- this context, what's -- what is your

22 | understanding of what specialized experience Ms. Atanus needed

23 | to qualify for this position?

24      A.   She would have needed substantial experience in

25 | writing and editing brochures, speeches, congressional

1  testimony, all of the items that are listed on the vacancy

2  announcement under duties and responsibilities.

3      Q.    And are you aware whether or not the individuals

4  that received the position for which, which Ms. Atanus applied

5  had that experience that you just described?

6      A.    I'm aware that yes, they did.  Some were writer-

7  editors.  One was an award-winning journalist.  One had

8  written an article for a periodical or a magazine.  They were

9  writer-editors.  They had strong, concrete experience which

10 was displayed on their resume.

11     Q.    Do you recall their names?

12     A.    The names of the chosen ones?

13     Q.    The ones that you just referenced.

14     A.    I remember the names of -- well, I can think of the

15 names of a couple of them, the last names.

16     Q.    What are their names?

17     A.    We had a Moskal, M-O-S-K-A-L.  I can't think of his

18 first name.

19     Q.    Okay.

20     A.    Mestre.  I think her name was Susanne, Susan?

21     Q.    What's the last name?

22     A.    M-E-S-T-R-E.

23     Q.    What's the last name?

24     A.    Oh, can you hear me?

25     Q.    I'm sorry.  Could you spell her last name?

58

```
 1              WITNESS:  Race.
 2              BY MR. GOMBERG:
 3        Q.    R-A-C-E.
 4        A.    Oh, I'm sorry.  It wasn't clear.  Her race?
 5        Q.    Ms. Bing.
 6        A.    Yes.
 7        Q.    Answer my question, please.
 8        A.    Oh, okay.  I just wasn't sure if I was allowed to
 9   give out her race, that's all.  Okay, she's Caucasian.
10        Q.    What is your race?
11        A.    Black, African-American.
12        Q.    Ms. Thomas' race?
13        A.    Now I did not know her race when I received her
14   application, but when I read the deposition, that's when I was
15   aware of her race.
16        Q.    What deposition?
17        A.    Not the deposition, the affidavit.  I'm not an
18   attorney, so I'm trying to speak in your language, but the,
19   the -- her complaint, her case.
20        Q.    Oh, I'm just simply asking do you know what
21   Ms. Thomas' race is?
22        A.    Oh, I'm sorry, I thought you said Ms. Atanus.  I am
23   so sorry.  Ms. --
24        Q.    Thomas.
25        A.    Thomas, I'm sorry.  Yes, she's black, African-
```

99

1  listed in alphabetical order, no scores.  So the selecting

2  official would only see a listing of applicants in A through Z

3  order.  Noncompetitive certificates of eligibles are issued

4  the same way, alphabetical order, no score.  Delegated

5  examining certificates are issued in score order and veteran's

6  preference and a hiring official can -- a selecting official

7  cannot select a nonvet over a veteran.

8          Does that answer your question?

9          BY MR. GOMBERG:

10    Q.   Well, what happened in Ms. Atanus' case?

11    A.   Okay, in Ms. Atanus' case under -- first let me say

12  that in order for an applicant to be referred on a

13  certificate, they have to be found qualified for the position.

14  So in Ms. Atanus' case, although her application was reviewed

15  under merit promotion procedures when she did submit her --

16  when we did receive her SF-50, she was not qualified to be

17  referred on the merit promotion certificate of eligibles.  If

18  her score were high enough on the DEU roster in order for us

19  to review her application, she would not have been qualified

20  for the position also.  Her score was not high enough on the

21  delegated examining roster in order for our -- in order for me

22  to review her application, because we only reviewed the top

23  six highest scoring applicants under delegated examining, DE,

24  nonstatus.

25          Is that clear?

1    Q.    Where did Ms. Atanus fall on the DE list?

2    A.    Now I don't have a copy of the list, the roster.

3  Okay, we're not going to use the word "list," okay.  The list

4  refers to the certificates of eligibles, so we'll call that a

5  list.  The roster would be where she falls among all of the

6  other applicants who were -- who applied under delegated

7  examining procedures.  Her score I, I don't recall, but it was

8  not one of the top highest scores to be considered for the --

9  to have her application reviewed.  I'm, I'm thinking 96.20?

10    Q.    Is there something you could look at that you have

11  in front of you to refresh your memory about that?

12    A.    Yes, I'm searching right now.  Thank you.

13        MS. MEIGHAN:  Her affidavit.  Page 3.

14        MS. MERIWEATHER:  Which one?  F-4?

15        MS. MEIGHAN:  F-4, page 3.

16        MS. MERIWEATHER:  Barry, this is Robin Meriweather

17  speaking.  In the packet of exhibits you sent, there is an

18  affidavit of Melinda Bing, and the Bates numbers are

19  Atanus-0065 through Atanus 0069.  I think that reviewing that

20  might refresh Ms. Bing's recollection.

21        MR. GOMBERG:  Victor, could we mark that as Bing

22  Exhibit 2, please?

23        COURT REPORTER:  Getting it out now, sir.

24                          (Whereupon, Bing Exhibit

25                          No. 2 was marked for

101

```
 1                              identification.)

 2            BY MR. GOMBERG:

 3       Q.   Ms. Bing, are you looking at Bing Exhibit 2 which

 4  Ms. Meriweather indicated are Bates stamped pages 65 through

 5  69?

 6       A.   Yes.  Thank you.

 7       Q.   Does that help you with -- go ahead and look at it.

 8  Let me know if that helps you.

 9       A.   Okay, thank you.

10            WITNESS:  Okay, I -- sir, thank you.  Her score is

11  92.20 out of 100.

12            MR. GOMBERG:  Okay.  Can you tell either by looking

13  at Exhibit 2 or anything else how far away Ms. Atanus was from

14  the lowest qualified person on the list?

15            MS. MERIWEATHER:  Objection.  Vague as to which list

16  we're referring to.

17            MR. GOMBERG:  I think I -- maybe I misspoke.  Maybe

18  it's called a roster.

19            MS. MERIWEATHER:  Okay, I would also object.  Vague

20  as to which, which roster.

21            BY MR. GOMBERG:

22       Q.   Can you answer the question, please, Ms. Bing?

23       A.   Okay, which roster, delegated examining or merit

24  promotion?

25       Q.   Both.
```

1     A.   Okay, and you'd like to know the lowest score?

2     Q.   No.  I said how far away was Ms. Atanus from the

3  lowest qualified score?

4          WITNESS:  How far away was she from the lowest?  Oh,

5  I would need to see the roster.

6          Okay, according to this exhibit, I see the lowest

7  score to be referred for the merit promotion certificates, but

8  her score would not matter, because she was not qualified for

9  the position.  Do you understand that part?  Unfortunately,

10 she wasn't qualified.  Therefore, her score would not matter.

11 She didn't -- she wasn't qualified.

12         BY MR. GOMBERG:

13    Q.   Are you saying, Ms. Bing, that even if Ms. Atanus'

14 score --

15    A.   Even if her score were -- I'm sorry.

16    Q.   -- I'm in the middle of my question.

17    A.   I'm sorry.

18    Q.   Are you saying that even if Ms. Atanus' score was as

19 high or higher than the people who got the job, she still

20 wouldn't have been qualified for the job?

21    A.   Yes, based on a review of her application and

22 responses to the applicant assessment questions, that is

23 correct, sir.

24    Q.   Explain how that could happen.

25    A.   Because sometimes applicants -- the, the questions

1  are self-assessments, so the applicants rate themselves before

2  the application is really reviewed by a specialist, and that's

3  how that can happen, happen.

4      Q.   Did that happen in Ms. Atanus' case?

5      A.   No.   In her case, under delegated examining, her

6  score was not high enough for us to even look at her

7  application for her application to be reviewed.   We only --

8  we, we probably looked at the top highest scores under -- the

9  top six highest scores under delegated examining, okay, on the

10 whole roster.   That's everyone that applied under delegated

11 examining, the roster.   We would have looked at the top six

12 highest scoring applicants, and her score of 92.20 did not

13 place her in the top six.   Had it placed her in the top six

14 we -- she would have had an opportunity to have her

15 application reviewed, but it would have been determined in the

16 end that she was not qualified for the position regardless of

17 her score.

18     Q.   Did you or someone else have any input into why

19 Ms. Atanus scored a 92.2?

20     A.   No, that was totally based on her own self-

21 assessment, her responses to the self-assessment questions.

22     Q.   -- that was scored by a computer?

23     A.   Yes, computer generated score.

24     Q.   Now that's the QuickHire program, correct?

25     A.   Yes.